**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

_____

**SECURITIES AND EXCHANGE**              18-05459-JS-GRB
**COMMISSION,**

                  **Plaintiff,**

**vs.**

**NUTRA PHARMA CORPORATION,**
**ERIK DEITSCH A/K/A RIK DEITSCH,**
**AND SEAN PETER MCMANUS,**

                  **Defendants.**
_____/

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT ERIK DEITSCH'S MOTION TO DISMISS THE COMPLAINT

# TABLE OF CONTENTS

Page

Table of Authorities.......................................................... iv

Table of Claims ............................................................. viii

Table of Exhibits ........................................................... xi

I.    INTRODUCTION.......................................................... 1

II.   STANDARD OF REVIEW.................................................... 3

III.  LEGAL ARGUMENT........................................................ 5

      A.    Counts 1 and 2 Fail to State a Claim Because the Nutra Pharma Press
            Releases Did Not Contain Material Misstatements in Violation of Section
            17(a)(2) of the Securities Act or Section 10(b) of the Exchange Act and Rule
            10b-5(b) .......................................................... 5

            1.    August 15, 2013 Press Release: "Nutra Pharma is
                  announcing a recent interview with Chris Castaldo and
                  Wall Street Buy Sell Hold." .................................. 6

            2.    August 29, 2013 Press Release: "Nutra Pharma
                  Announces Delivery of Nyloxin™ to New Vitality.".............. 9

            3.    October 22, 2013 Press Release: "Nutra Pharma
                  Announces Updated Interviews with Wall Street Buy Sell
                  Hold.". ..................................................... 10

            4.    May 14, 2015 Press Release: "Nutra Pharma Announces
                  Nyloxin Distribution Plans for Canada.". ..................... 11

            5.    June 23, 2015 Press Release: "Nutra Pharma Announces
                  Expansion and Upgrades for Nyloxin Production.".............. 15

            6.    July 10, 2015 Press Release: "SeeThruEquity Initiates
                  Coverage on Nutra Pharma Corporation with a Price
                  Target of $0.53." ........................................... 16

**B.**     **Count 1 Also Fails to State a Claim for Violation of Section 17(a)(2) of the Securities Act Because There Is No Allegation that Deitsch Personally Obtained Money or Property as a Result of Any Untrue Statement of Material Fact.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

**C.**     **Counts 2 and 3 Also Fail to Plead the Scienter Necessary to State a Claim for Violation of Section 10(b) of the Exchange Act.** . . . . . . . . . . . . . . . . . . . . 18

**D.**     **Deitsch Did Not Engage in Manipulative Trading Activity in the Securities of Nutra Pharma in Violation of Sections 9(a)(2) and 10(b) of the Exchange Act and Rules 10b-5(a) and (c) Thereunder.** . . . . . . . . . . . . . 19

**E.**     **The Complaint Fails to Plead that Deitsch Aided and Abetted Nutra Pharma's Alleged Violations of the Securities Laws and Counts 12, 13, and 14 Should Be Dismissed.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

**F.**     **The SEC's Complaint Is a "Shotgun" and "Puzzle" Pleading That Fails to Comply with the Particularity Requirement of Fed. R. Civ. P. 9(b) and the General Pleading Requirements of Fed. R. Civ. P. 8(a)(2) and 10(b).** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

**CONCLUSION.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

# TABLE OF AUTHORITIES

**Cases**                                                                                         Page

*Acito v. IMCERA Grp., Inc.*,
 47 F.3d 47 (2d Cir. 1995).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*Armstrong v. McAlpin*,
 699 F.2d 79 (2d Cir.1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ix, 20

*Ashcroft v. Iqbal*,
 556 U.S. 662 (2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 4

*Bell Atlantic Corp. v. Twombly*,
 550 U.S. 544 (2007).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 4

*Corrado v. New York State Unified Court Sys.*,
 No. CV 2012-1748 DLI MDG, 2014 WL 4626234 (E.D.N.Y. Sept. 15, 2014). . . . . . . . 23

*Cortina v. Anavex Life Scis. Corp.*,
 No. 15-CV-10162(JMF), 2016WL 7480415 (S.D.N.Y. Dec. 29, 2016). . . . . . . . . . . . . . 8

*Croons v. New York State Office of Mental Health*,
 18 F. Supp. 3d 193 (N.D.N.Y. 2014) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22, 24

*In re Ford Fusion & C-Max Fuel Econ. Litig.*,
 No. 13-MD-2450 KMK, 2015 WL 7018369 (S.D.N.Y. Nov. 12, 2015) . . . . . . . . . . . . 23

*In re Galectin Therapeutics, Inc. Sec. Litig.*,
 843 F.3d 1257 (11th Cir. 2016). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7-8

*Garvey v. Arkoosh*,
 354 F.Supp.2d 73 (D. Mass. 2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 8

*Halperin v. eBanker USA.com, Inc.*,
 295 F.3d 352 (2d Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Harris v. TD Ameritrade Inc.*,
 338 F. Supp. 3d 170 (S.D.N.Y. 2018) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Hulett v. City of Syracuse*,
 253 F. Supp. 3d 462 (N.D.N.Y. 2017). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Janus Capital Group, Inc. v. First Derivative Traders*,
　　564 U.S. 135 (2011)........................................................ 16

*Kalnit v. Eichler*,
　　264 F.3d 131 (2d Cir.2001) ............................................. 18

*Novak v. Kasaks*,
　　216 F.3d 300 (2d Cir.2000)............................................. 17

*Paylor v. Hartford Fire Ins. Co.*,
　　748 F.3d 1117 (11th Cir. 2014)........................................ 22

*Rombach v. Chang*,
　　355 F.3d 164 (2d Cir. 2004)............................................ 14

*Roth v. Jennings*,
　　489 F.3d 499 (2d Cir. 2007)............................................. 4

*Rothstein v. UBS AG*,
　　708 F.3d 82 (2d Cir. 2013)............................................... 4

*SEC v. DiMaria*,
　　207 F. Supp. 3d 343 (S.D.N.Y. 2016) ............................... 17

*SEC v. Egan*,
　　994 F. Supp. 2d 558 (S.D.N.Y. 2014)............................... 18

*SEC v. Espuelas*,
　　908 F.Supp.2d 402 (S.D.N.Y. 2012) ................................. 20

*SEC v. Fraser*,
　　No. CV-09-00443-PHX-GMSC, 2009 WL 2450508 (D. Ariz. Aug. 11, 2009). ....... 21

*SEC v. Husain*,
　　No. 2:16-CV-03250-ODW(E), 2016 WL 11269462 (C.D. Cal. Oct. 24, 2016) ....... 21

*SEC v. Kelly*,
　　817 F. Supp. 2d 340 (S.D.N.Y. 2011)................................ 20

*SEC v. Patel*,
　　No. CIV. 07-CV-39-SM, 2009 WL 3151143 (D.N.H. Sept. 30, 2009)............... 21

*SEC v. Rorech*,
    673 F. Supp. 2d 217 (S.D.N.Y. 2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*SEC v. Saltsman*,
    No. 07CV4370NGGRML, 2016 WL 4136829 (E.D.N.Y. Aug. 2, 2016) . . . . . . . . . . . ix

*SEC v. Sayid*,
    No. 17 CIV. 2630 (JFK), 2018 WL 357320 (S.D.N.Y. Jan. 10, 2018). . . . . . . . . . . . . . 4

*SEC v. Smith*,
    No. 14-CV-192-PB, 2015 WL 4067095 (D.N.H. July 2, 2015) . . . . . . . . . . . . . . . . . . 21

*SEC v. Syron*,
    934 F. Supp. 2d 609 (S.D.N.Y. 2013) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . viii, 17

*SEC v. Thompson*,
    238 F. Supp. 3d 575 (S.D.N.Y. 2017) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . viii, 14

*SEC v. Wey*,
    246 F. Supp. 3d 894 (S.D.N.Y. 2017) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . viii, 17

*Sharette v. Credit Suisse Int'l*,
    127 F. Supp. 3d 60 (S.D.N.Y. 2015) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . viii, 19

*Sidik v. Royal Sovereign Int'l Inc.*,
    348 F. Supp. 3d 206 (E.D.N.Y. 2018) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*T.D.S. Inc. v. Shelby Mut. Ins. Co.*,
    760 F.2d 1520 (11th Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Toler v. State Farm Mut. Auto. Ins. Co.*,
    64 F. App'x 388 (4th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Volpe v. Nassau County*,
    915 F. Supp. 2d 284 (E.D.N.Y. 2013) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

**Statutes, Rules and Regulations**

Fed. R. Civ. P. 8(a)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 20, 23

Fed. R. Civ. R. 9(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 4, 20, 21

Fed. R. Civ. P. 10(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 20, 23

Fed. R. Civ. P. 12(b)(6) .. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 3

Fed. R. Evid. 201 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

SEC Rule 10b-5,
      codified at 17 C.F.R. 240.10b-5.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

Section 9(a)(2) of the Securities Exchange Act of 1934,
      15 U.S.C.§ 78i. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Section 17(a)(2) of the Securities Act of 1933,
      15 U.S.C. § 77q(a)(2).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

Section 17(b) of the Securities Act of 1933,
      15 U.S.C. § 77q(b). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6-7

Section 10(b) of the Securities Exchange Act of 1934,
      15 U.S.C. § 78j(b). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

## Other Authorities

Black's Law Dictionary 528 (6th ed.1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

# **TABLE OF CLAIMS**

The Complaint is a lengthy 43-page, 295-paragraph document asserting fifteen claims. This Motion challenges only the fraud-based Counts 1, 2, 3, 4, 6, 12, 13, and 14, each of which is marked with an asterisk, along with the elements of each of the challenged claims.

| Count | Claim | Elements |
|---|---|---|
| 1* | Securities Act § 17(a)(2) - All Defendants | A Section 17(a)(2) claim requires (1) the offer or sale of securities; (2) the existence of a material misrepresentation or omission; and (3) that the defendant personally obtained money or property from the alleged fraud. *See, e.g., SEC v. Syron*, 934 F. Supp. 2d 609, 640 (S.D.N.Y. 2013) (dismissing Section 17(a)(2) claim when no allegation that defendants personally benefitted). |
| 2* | Exchange Act § 10(b) and Rule 10b-5(b) - All Defendants | To establish a Rule 10b–5(b) disclosure violation, "the SEC must prove that the defendant (1) made one or more misstatements of material fact, or omitted to state one or more material facts that the defendants had a duty to disclose; (2) with scienter; (3) in connection with the purchase or sale of securities." *SEC v. Thompson*, 238 F. Supp. 3d 575, 591 (S.D.N.Y. 2017) (citation omitted). |
| 3* | Exchange Act § 10(b) and Rule 10b-5(a) & (c) - Deitsch | To violate Section 10(b) and Rule 10b–5(a) & (c), the defendant must have (1) engaged in deceptive conduct distinct from any alleged misrepresentations; (2) with scienter; (3) in connection with the purchase or sale of securities. *SEC v. Wey*, 246 F. Supp. 3d 894, 925 (S.D.N.Y. 2017) |
| 4* | Exchange Act § 9(a)(2) - Deitsch | To assert a claim under Section 9(a)(2), a plaintiff must show " '(1) a series of transactions in a security creating actual or apparent trading in that security or raising or depressing the price of that security, (2) carried out with scienter, and (3) for the purpose of inducing the security's sale or purchase by others ...' " *Sharette v. Credit Suisse Int'l*, 127 F. Supp. 3d 60, 78 (S.D.N.Y. 2015) |

| | | |
|---|---|---|
| 5 | Exchange Act § 13(a) and Rule 13a-13 - Nutra Pharma Quarterly Report Filing Requirement | |
| 6* | Exchange Act § 13(a) and Rule 13a-14 - Deitsch Certification of Quarterly Report | Exchange Act Rule 13a-14 requires principal financial officers to execute a certification for certain public filings and is violated when that certification contains false information. *See, e.g., SEC v. Saltsman*, No. 07CV4370NGGRML, 2016 WL 4136829, at *22 (E.D.N.Y. Aug. 2, 2016). |
| 7 | Exchange Act § 15(a) - McManus Registration as Broker-Dealer | |
| 8 | Securities Act §§ 5(a) and (c) - Nutra Pharma and Deitsch Registration of Securities | |
| 9 | Exchange Act § 13(d) and Rule 13d-2 - Deitsch | |
| 10 | Exchange Act § 16(a) and Rule 16a-3 - Deitsch | |
| 11 | Exchange Act § 13(a) and Rule 13a-11 - (Form 8-K) Nutra Pharma | |
| 12* | Aiding & Abetting Securities Act § 17(a)(2) - Deitsch | To state a claim of aiding and abetting securities fraud, the SEC must allege that (1) there was a securities violation by a primary wrongdoer; (2) the defendant had actual knowledge of the primary violation; and (3) the defendant rendered substantial assistance to the primary violation. *See Armstrong v. McAlpin*, 699 F.2d 79, 91 (2d Cir.1983). |
| 13* | Aiding & Abetting Exchange Act § 10(b) and Rule 10b-5(b) - Deitsch | Same as for 12. |

| 14* | Aiding & Abetting Exchange Act § 13(a) and Rule 13a-13 - Deitsch | Same as for 12. |
|---|---|---|
| 15 | Aiding & Abetting Exchange Act § 13(a) and Rule 13a-11 - Deitsch | |

# TABLE OF EXHIBITS

| NO. | DESCRIPTION OF EXHIBIT |
|---|---|
| **1.** | August 15, 2013 Nutra Pharma Press Release "Nutra Pharma Announces Interview with Wall Street Buy Sell Hold" |
| **2.1** | WSBSH Compensation Disclosure Screen Shots of interview with Mr. Deitsch |
| **2.2** | WSBSH Compensation Disclosure Screen Shots of interview of Mr. Flicker |
| **3.** | July 10, 2013 Consulting Agreement between Nutra Pharma Corporation and Wall Street Buy Sell Hold, Inc. |
| **4.** | October 10, 2013 Consulting Agreement between Nutra Pharma Corporation and Wall Street Buy Sell Hold, Inc. |
| **5.** | August 29, 2013 Nutra Pharma Press Release "Nutra Pharma Announces Delivery of Nyloxin™ to New Vitality" |
| **6.** | March 28, 2013 Consulting Agreement between NAC Marketing Company, LLC and MGRD, Inc. |
| **7.** | October 22, 2013 Nutra Pharma Press Release "Nutra Pharma Announces Updated Interviews with Wall Street Buy Sell Hold" |
| **8.** | WSBSH Compensation Disclosure Screen Shot of Interview with Mr. Deitsch |
| **9.** | WSBSH Compensation Disclosure Screen Shot of Interview with Mr. Flicker |
| **10.** | May 14, 2015 Nutra Pharma Press Release entitled "Nutra Pharma Announces Nyloxin Distribution Plans for Canada |
| **11.** | June 23, 2015 Nutra Pharma Press Release entitled "Nutra Pharma Announces Expansion and Upgrades for Nyloxin Production" |
| **12.** | July 10, 2015 See Thru Equity Press Release entitled "SeeThruEquity Initiates Coverage on Nutra Pharma Corporation with a Price Target of $0.53" |
| **13.** | Excerpt from Nutra Pharm Form 10-Q, Aug. 18, 2015 |
| **14.** | Excerpt from Nutra Pharma Form 10-K for 2014 |
| **15.** | Excerpt from Nutra Pharma Form 10-K for 2015 |
| **16.** | Excerpt from Nutra Pharma Form 10-K for 2016 |
| **17.** | Excerpt from Nutra Pharma Form 10-K for 2017 |

Pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure and the Court's scheduling directive entered at the pre-motion hearing held on February 27, 2019, Docket Entry ("DE") 18, Defendant Erik Deitsch a/k/a Rik Deitsch ("Deitsch"), by and through his undersigned counsel, respectfully moves this Court for an Order dismissing Counts 1, 2, 3, 4, 6, 12, 13, and 14 of the Complaint and, in support hereof, states as follows:

## I.    <u>INTRODUCTION</u>

While the Complaint alleges a number of technical violations such as failing to file a required form with the SEC or selling an unregistered security to two non-accredited investors,[1] it primarily sounds in fraud, charging that Deitsch was responsible for various material misrepresentations and omissions in six press releases about Nutra Pharma and that he made small purchases of Nutra Pharma stock intending to "manipulate" the stock price. Severely undercutting all allegations of fraud, however, the Complaint fails to plead that Deitsch had the requisite scienter. Nowhere is there any allegation that Deitsch had an impermissible motive to commit fraud or that he gained anything personally as a result of the alleged fraud or that he even acted recklessly. Unlike a number of SEC enforcement actions involving start ups and penny stocks, there are no allegations of a "pump and dump" scheme — nor could there be since there is no allegation that Deitsch ever sold any of his Nutra Pharma shares.

This appears to be a case in which the SEC discovered certain technical violations and then scrambled to find fraud claims. The SEC dissected the wording of six press releases about Nutra Pharma and contend that they contained material misrepresentations. Three of the press releases are

---

[1]Deitsch quarrels with some of the alleged facts underlying the technical violation claims but does not challenge those claims in this Motion which challenges only the fraud-based counts — Counts 1, 2, 3, 4, 6, 12, 13, and 14 — as failing to state a claim.

alleged to be misleading because they failed to disclose that two stock promoters were paid by Nutra Pharma but Nutra Pharma had no duty to disclose such payments since the applicable statute as well as interpretive case law places the duty of disclosure squarely on the promoter.

The remaining three press releases at issue announced Nutra Pharma's plans to distribute its products in Canada, India, and China and are alleged to be misleading because Nutra Pharma, although it had taken preliminary steps toward international distribution to those three countries, did not have signed distribution contracts. There was nothing misleading about those press releases which made clear that Nutra Pharma was announcing plans for the future, not events that had occurred. In addition, all of Nutra Pharma's press releases contained specific "bespeaks caution" language warning investors that its forward-looking statements were just that and that actual results could differ materially from Nutra Pharma's business plan.

The manipulation claims against Deitsch are founded on allegations that he made a number of *de minimus* purchases of Nutra Pharma stock with the intent of trying to stabilize Nutra Pharma's stock price against short sellers. Aside from the fact that a 100 share purchase of a twenty cent stock could not have the effect of "manipulating" a stock price, there are no allegations that Deitsch ever sold any of his shares or had any "purpose of inducing the purchase or sale of such security by others" as required for liability under the anti-manipulation statute and, indeed, the Complaint alleges precisely the opposite, stating that his purpose was to stop the short selling.

Notably, if Counts 1 and 2 — asserting claims for primary violations of Section 17(a)(2) of the Securities Act and Section 10(b) of the Exchange Act against all defendants — are dismissed as failing to state a claim, then Counts 6, 12, 13, and 14 must also be dismissed since they are based on the same conduct underlying Counts 1 and 2.

Finally, the 294-paragraph Complaint is a "shotgun" pleading in which each count of the Complaint incorporates by reference the first 245 paragraphs of the Complaint — containing all the factual allegations — and then simply recites statutory language with no reference to the particular factual allegations alleged to state that specific claim. This leaves the defense (and the Court) struggling to figure out exactly what the SEC is attempting to allege was the wrongful conduct underlying each claim. In addition, the SEC often does not state forthrightly *why* a particular statement is alleged to be a material misrepresentation or omission and instead offers only clues, turning the Complaint into a puzzle to be solved. Combined with the SEC's propensity to base multiple legal claims on the same underlying conduct, the SEC's pleading style is intentionally designed to obscure the flaws in its Complaint and has been soundly criticized by a number of courts. Furthermore, numerous courts have found that "shotgun" and "puzzle" pleadings are not acceptable and fail to satisfy the pleading requirements for fraud claims imposed by Fed. R. Civ. P. 9(b), as well as the general pleading requirements of Fed. R. Civ. P. 8(a) and 10(b).

## II.    STANDARD OF REVIEW

To survive a motion to dismiss under Rule 12(b)(6), a complaint must plead "enough facts to state a claim to relief that is plausible on its face," *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007), and allow the Court "to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). To be facially plausible, a claim must "plead[ ] factual content that allows the court to draw the reasonable inference that the defendant is liable" and must demonstrate "more than a sheer possibility that a defendant has acted unlawfully." *Id.* Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.' " *Id.*

(quoting *Twombly*, 550 U.S. at 555) (internal citations omitted).

Determining whether a complaint states a plausible claim for relief is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal, supra*, at 679 (citation omitted). "In addressing the sufficiency of a complaint, [the Court] accept[s] as true all factual allegations and draw[s] from them all reasonable inferences; but [the Court is] not required to credit conclusory allegations or legal conclusions couched as factual allegations." *Rothstein v. UBS AG*, 708 F.3d 82, 94 (2d Cir. 2013).

While these standards govern the consideration of a Rule 12(b)(6) motion generally, claims of securities fraud are also subject to the strict pleading standards of Rule 9(b) of the Federal Rules of Civil Procedure requiring particularized allegations of the "circumstances constituting fraud." Fed. R. Civ. P. 9(b); *SEC v. Sayid*, No. 17 CIV. 2630 (JFK), 2018 WL 357320, at *3 (S.D.N.Y. Jan. 10, 2018). Rule 9(b) requires that the SEC "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Sayid, supra*, citing *Rombach v. Chang*, 355 F.3d 164, 170 (2d Cir. 2004). To plead scienter under Rule 9(b), the complaint must contain "facts that give rise to a strong inference of fraudulent intent." *Sayid, supra*, citing *Acito v. IMCERA Grp., Inc.*, 47 F.3d 47, 52 (2d Cir. 1995). "A strong inference of fraudulent intent may be established by alleging facts sufficient to show (1) motive and opportunity to commit fraud, or (2) strong circumstantial evidence of conscious misbehavior or recklessness." *Sayid, supra*, citing *Acito, supra*.

Generally, the Court is "'required to look only to the allegations on the face of the complaint.'" *Volpe v. Nassau County*, 915 F. Supp. 2d 284, 291 (E.D.N.Y. 2013) (quoting *Roth v. Jennings*, 489 F.3d 499, 509 (2d Cir. 2007)). But when resolving a motion to dismiss for failure to

state a claim, the Court is permitted to consider:

> (1) facts alleged in the complaint and documents attached to it or incorporated in it by reference, (2) documents "integral" to the complaint and relied upon in it, even if not attached or incorporated by reference, (3) documents or information contained in [the] defendant's motion papers if plaintiff has knowledge or possession of the material and relied on it in framing the complaint, (4) public disclosure documents required by law to be, and that have been, filed with the Securities and Exchange Commission, and (5) facts of which judicial notice may properly be taken under Rule 201 of the Federal Rules of Evidence.

*Sidik v. Royal Sovereign Int'l Inc.*, 348 F. Supp. 3d 206, 212 (E.D.N.Y. 2018) (citations omitted).

*See also Tellabs, Inc. v. Makor Issues & Rights, Ltd.,* 551 U.S. 308, 322 (2007) ("courts must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice"); *SEC v. Rorech*, 673 F. Supp. 2d 217, 221 (S.D.N.Y. 2009) ("When presented with a motion to dismiss pursuant to Rule 12(b)(6), the Court may consider documents that are referenced in the complaint, documents that the plaintiff relied on in bringing suit and that are either in the plaintiff's possession or that the plaintiff knew of when bringing suit, or matters of which judicial notice may be taken.") (citations omitted).[2]

### III.    LEGAL ARGUMENT

A.    **Counts 1 and 2 Fail to State a Claim Because the Nutra Pharma Press Releases Did Not Contain Material Misstatements in Violation of Section 17(a)(2) of the Securities Act or Section 10(b) of the Exchange Act and Rule 10b-5(b)**

The Complaint alleges that six press releases about Nutra Pharma issued during the time

---

[2]Deitsch requests that the Court take judicial notice pursuant to Fed. R. Evid. 201 of the excerpts from Nutra Pharma's SEC filings included in the exhibits attached hereto. *See, e.g., Harris v. TD Ameritrade Inc.*, 338 F. Supp. 3d 170, 187 (S.D.N.Y. 2018) ("the Court may take judicial notice of certain matters of public record without converting the motion [to dismiss] into one for summary judgment," including "documents publicly filed with the SEC . . . .").

frame between August 15, 2013 and July 10, 2015 contain material misstatements and omissions of material fact in violation of Section 17(a)(2) of the Securities Act and Section 10(b) of the Exchange Act and Rule 10b-5(b). When given a fair reading, however, the press releases do not contain material misstatements or omissions as a matter of law and each will be addressed below:

1. **August 15, 2013 Press Release: "Nutra Pharma is announcing a recent interview with Chris Castaldo and Wall Street Buy Sell Hold."**

In the August 15, 2013 press release, attached as **Exhibit 1**, Nutra Pharma announced that Deitsch had been interviewed by Chris Castaldo of Wall Street Buy Sell Hold ("WSBSH") and also announced that Castaldo had interviewed Jonathan Flicker of New Vitality which, at the time, was radio test marketing Nyloxin®, Nutra Pharma's homeopathic treatment for chronic pain. The Complaint alleges that the press release was misleading because it was "[s]uggesting" that WSBSH had "independently identified" Nutra Pharma as a stock with "enormous opportunity" without disclosing that WSBSH was a paid promotion consultant. Complaint, ¶¶ 63, 65.

The press release contains a link to the videotaped WSBSH interviews of Deitsch and Flicker where WSBSH itself disclosed the fact and amount of compensation at the end of each interview (*see* WSBSH compensation disclosure screen shots from interviews, attached as **Composite Exhibit 2**). The press release also contains a disclosure regarding forward-looking statements and expressly directed that "[t]he WSBSH interviews should not be construed as an indication in any way whatsoever of the future value of the Company's common stock or its present or future financial condition." *Id*. The press release does not contain a disclosure that Nutra Pharma had compensated WSBSH for the interviews since, as a matter of law, Nutra Pharma had no duty to make such a disclosure.

Pursuant to 15 U.S.C. § 77q(b), it is the stock promoter which has the duty to disclose any

6

compensation paid to promote a security, not the issuer of the security:

> (b) Use of interstate commerce for purpose of offering for sale
> It shall be unlawful for any person, by the use of any means or instruments of transportation or communication in interstate commerce or by the use of the mails, to publish, give publicity to, or circulate any notice, circular, advertisement, newspaper, article, letter, investment service, or communication which, though not purporting to offer a security for sale, describes such security for a consideration received or to be received, directly or indirectly, from an issuer, underwriter, or dealer, without fully disclosing the receipt, whether past or prospective, of such consideration and the amount thereof.

In accord with the statutory language, numerous courts have concluded that the issuer of a stock is under no duty to disclose compensation paid to a stock promoter and its failure to do so does not render other statements made materially misleading. "There is no [SEC rule] requiring a company . . . to disclose that it pays a stock promoter for promotional material." *In re Galectin Therapeutics, Inc. Sec. Litig.*, 843 F.3d 1257, 1263 (11th Cir. 2016). In *Galectin*, the Court dismissed claims against an issuer that were premised on a failure to disclose compensation paid to a promoter:

> We start with the premise that nothing in the securities laws prohibits Galectin as a company (issuing a regulated security) from hiring analysts to promote Galectin, circulating positive articles about its drug development, or recommending the purchase of Galectin's stock. Under § 17(b) . . ., the duty to disclose promotional payments lies with the parties that receive the payments for promotional activities. 15 U.S.C. § 77q(b). There is no statutory duty to disclose imposed on the issuer—here defendant Galectin—which paid for the promotional articles or activities. *Garvey v. Arkoosh*, 354 F.Supp.2d 73, 83 (D. Mass. 2005).

> "It may seem odd to the uninitiated, but nothing in the securities laws bars the issuer of a regulated security from paying an analyst for a stock recommendation." *Id.* "[T]he approach taken by the securities laws — in practical recognition of the fact that most market research is performed by analysts who are paid by brokerage firms, investment banks, and other marketers of securities — is to require disclosure of the fact that the analyst has been paid" by the analyst or the stock promoter in the article itself. *Id.* This way, the disclosure is visible to the reader in the article. *Id.* Galectin's engagement of third parties to promote awareness of its stock and to encourage investment in its business was legal and did not constitute stock-price manipulation.

Because the securities laws otherwise place the duty to disclose payments only on the stock promoters here, the defendants had no additional duty to disclose their payments to the stock promoters.

843 F.3d at 1272–73. *See also Cortina v. Anavex Life Scis. Corp.*, No. 15-CV-10162 (JMF), 2016 WL 7480415, at *5 (S.D.N.Y. Dec. 29, 2016) (omission is actionable only when there is a duty to disclose and issuer had no duty to disclose payment to stock promoter since 15 U.S.C. § 77q(b) places duty to disclose on recipient of payment); *Garvey v. Arkoosh*, 354 F. Supp. 2d 73, 83 (D. Mass. 2005) ("[T]he burden to disclose rests on the person who publishes the analyst's report; by contrast, there is no duty imposed by the statute on the issuer who has paid for the puffery.").

Notably, the Consulting Agreement[3] between Nutra Pharma and WSBSH contained specific language requiring WSBSH to disclose "with particularity" any compensation from Nutra Pharma *See* Consulting Agreement, dated July 10, 2013, at page 4, ¶ 11, attached as **Exhibit 3** hereto.

At the end of each video of the interviews of Deitsch and Flicker, WSBSH displayed a specific disclosure that it had received payment from Nutra Pharma that reads:

**Compensation from Featured Companies, Generally**

**The Company is compensated for profiling the featured companies on the Program. The Company may receive cash, stock, warrants or other consideration.**

**The Company was compensated by Nutra Pharma Corp., in the amount of ten thousand dollars, the Company also received a six month note for ten thousand dollars and five million restricted shares for development of corporate videos and a marketing / awareness campaign.**

*See* Screen Shots of Disclosure for WSBSH interviews of Deitsch and Flicker, attached as

---

[3] The Court may properly consider the Consulting Agreement with WSBSH because the SEC relied on it in the Complaint. *See* Complaint, ¶¶ 57-60.

**Composite Exhibit 2** hereto.[4]

WSBSH fully disclosed the fact that it was being compensated, as well as the amount of compensation and the source, along with numerous risk disclosures. Nutra Pharma had no duty to disclose that it was compensating WSBSH and anyone viewing the interviews conducted by Castaldo could read the specific disclosures and cautionary language provided at the end of each of the videotaped interviews. Any claims premised on Nutra Pharma's failure to announce that WSBSH was a paid stock promoter fail to state a claim and must be dismissed as a matter of law since Nutra Pharma had no duty to make such disclosure.

**2.     August 29, 2013 Press Release: "Nutra Pharma Announces Delivery of Nyloxin™ to New Vitality."**

In the August 29, 2013 press release, attached as **Exhibit 5**, Nutra Pharma announced delivery of Nyloxin™ to New Vitality, described New Vitality's business, and again referenced the WSBSH interviews of Deitsch and Flicker. The Complaint, ¶¶ 72-81, indicates that the press release is materially misleading because it failed to disclose that, *five months earlier*, on March 28, 2013, Deitsch, acting through his company, MGRD, Inc., entered into a Consulting Agreement (attached as **Exhibit 6**) with NAC Marketing Company, LLC, a company related to New Vitality, whereby Deitsch agreed to act as NAC's "Chief Science Officer and Formulator" for compensation of $7,000 per month plus $2,500 a month as a credit against future royalty payments.

---

[4] As of the date of this filing, the interview of Deitsch is still available at the link to YouTube provided in the press release: http://tinyurl.com/nutra-interview. At time stamp 14:58, there are numerous disclosures by WSBSH including not only the disclosure of payment by Nutra Pharma but also numerous risk disclosures relating to the high degree of risk when investing in micro-cap and emerging-growth companies. The interview of Flicker also remains available at the link to YouTube provided in the press release: http://tinyurl.com/JF-interview. The disclosures appear at time stamp 8:19.

The Complaint fails to particularize how the Consulting Agreement between MGRD and NAC renders the August 29, 2013 press release materially misleading when the two have nothing to do with each other.[5]

While a good example of a "puzzle" pleading requiring the defendant and the Court to try to figure out why a statement is alleged to be a misrepresentation, the Complaint seems to allege that the August 29, 2013 press release was misleading when it stated that New Vitality had placed and received its first order for Nyloxin because it did not mention the consulting agreement between Deitsch and New Vitality and because three days earlier, on August 26, 2013, Nutra Pharma sent New Vitality an invoice for shipping Nyloxin to New Vitality which the SEC contends New Vitality never paid. Complaint, ¶¶ 79-81. The allegation does not make sense and does not undercut the truthfulness of the statement that New Vitality had placed and received its first order of Nyloxin.

### 3. October 22, 2013 Press Release: "Nutra Pharma Announces Updated Interviews with Wall Street Buy Sell Hold."

In the October 22, 2013 Press Release, attached as **Exhibit 7**, Nutra Pharma announced updated interviews with WSBSH. Again, the pertinent Consulting Agreement between Nutra Pharma and WSBSH contained specific language requiring WSBSH to disclose "with particularity" any compensation from Nutra Pharma. *See* Consulting Agreement, dated Oct. 10, 2013, at page 4, ¶ 11, attached as **Exhibit 4** hereto. Again, WSBSH did disclose the fact that it was being compensated at the end of the updated interview videos. *See* **Exhibits 8 and 9** attached hereto.[6]

---

[5]In the Consulting Agreement, Deitsch agreed to act as NAC's "Chief Science Officer and Formulator" and to "be responsible for the formulation of Health/Wellness/Anti-Aging Formulations to be sold exclusively through [NAC] . . ." Consulting Agreement, at 7, §1.2.

[6]As of the date of this filing, the interview of Deitsch is still available at the link to YouTube provided in the press release: http://tinyurl.com/nutra-interview2 and, at time stamp 14:25, there are

As previously discussed, *infra* at page 9-10, Nutra Pharma had no duty to disclose that it was compensating WSBSH and any claims premised on Nutra Pharma's failure to announce that WSBSH was a paid stock promoter fail to state a claim and must be dismissed as a matter of law.

4.  **May 14, 2015 Press Release: "Nutra Pharma Announces Nyloxin Distribution Plans for Canada**."

In the May 14, 2015 Press Release, attached as **Exhibit 10**, Nutra Pharma announced that it had "begun working with Canadian distributors to register Nyloxin® for sale throughout Canada." Deitsch is quoted as saying "We already have dedicated product users in Canada that have been purchasing Nyloxin for personal consumption. Regulatory approval will allow us to warehouse, market and distribute Nyloxin throughout the country and permit for the eventual retail sales of our brands in Canadian stores." The Press Release also states that "Nutra Pharma Has Announced That They Have Engaged the Nature's Clinic to Begin the Process of Distributing Nyloxin® in Canada." Although the Complaint acknowledges that Deitsch and the CEO of Nature's Clinic had reached a tentative distribution agreement, apparently the SEC interprets the word "engaged" as meaning that they had a signed contract. Complaint, ¶¶ 112, 113, 121. Interpreting "engaged" to mean "having a signed contract" and then using the word "engaged" to attempt to render the press release misleading is wrong.

Black's Law Dictionary defines "engage" as "To employ or involve one's self; to take part in; to embark on." Black's Law Dictionary 528 (6th ed.1990). Obviously, in reaching a tentative

---

numerous disclosures by WSBSH including not only the disclosure of payment by Nutra Pharma but also numerous risk disclosures relating to the high degree of risk when investing in micro-cap and emerging-growth companies. The interview of Flicker also remains available at the link to YouTube provided in the press release: http://tinyurl.com/JF-interview2 and the disclosures appear at time stamp 15:47.

agreement for Nature's Clinic to distribute Nyloxin® in Canada, the two CEOs were "involved" and ready to "embark on" that distribution. *See Toler v. State Farm Mut. Auto. Ins. Co.*, 64 F. App'x 388, 389 (4th Cir. 2003) (construing insurance contract provision specifying no coverage for person "engaged" in the car business).

The SEC cannot place an arbitrary meaning on a word and then contend that a statement using that word is a "material misrepresentation" because the facts do not accord with its arbitrary definition. Again, this is not a question of asking the Court to prematurely rule on a factual dispute, this is a request that the Court review the allegations in the Complaint to ascertain whether those allegations — charging Deitsch with securities fraud — are sufficient to state such a claim.

The May 15, 2015 Press Release also quoted the CEO of Nature's Clinic as stating that "we've already begun setting up our Chatham, Ontario warehouse facility for distribution and fulfillment." Complaint, ¶ 117. The Complaint alleges that in July 2015, Deitsch was advised by a regulatory consultant for Nature's Clinic that Health Canada had erected hurdles to the resale of the types of products that Nutra Pharma sold and that he needed more information to develop a costing analysis in order to work out the fee that Nature's Clinic would be paid. Complaint, ¶¶ 119-122. On August 18, 2015, Nutra Pharma repeated the statements in the May 14, 2015 Press Release in its Form 10-Q filed with the SEC. Complaint, ¶¶ 123-25.

While not expressly saying so, the SEC hints that the 10-Q was misleading not only because it repeated the May 14, 2015 press release but because, in the interim, the regulatory consultant for Nature's Clinic had indicated he needed more information to develop a costing analysis . . ." *Id.* at ¶ 120. The Complaint does not quote the regulatory consultant or the CEO as stating that Nature's Clinic *had not* "begun setting up our Chatham, Ontario warehouse facility," but the SEC appears to

construe the consultant's request for information necessary to develop a costing analysis as implying that Nature's Clinic was not "setting up" the warehouse which in turn rendered the May 14, 2015 press release false as repeated in the August 18, 2015 Form 10-Q.[7]

The Press Release is clear that Nutra Pharma had "engaged the Nature's Clinic to *begin* the process of regulatory approval of the Company's Over-the-Counter pain drug, Nyloxin® for marketing and distribution in Canada." (Italics added.) Thus, it was clear to any reader that Nutra Pharma was not poised to immediately begin sales in Canada but had merely *begun* the process to obtain regulatory approval for Nyloxin in Canada. Notably, both the May 15, 2015 Press Release and the August 18, 2015 Form 10-Q contains language and extensive disclaimers that "bespeak caution," including a specific warning that "[t]he engagement of the Nature's Clinic should not be construed as an indication in any way whatsoever of the future value of the Company's common stock or its financial value. . . ." *See* **Exhibits 10 and 14.** The disclaimer also contains specific language advising that "we do not undertake and we specifically disclaim any obligation to update any forward-looking statements to reflect occurrences, developments, unanticipated events or circumstances after the date of such statement." *Id.* Forward-looking statements — such as Nutra Pharma's plans for international distribution in the future — are protected by the judicial "bespeaks caution" doctrine and the statements in the May 14, 2015 press release (and to the extent repeated in the Form 10-Q) are deemed immaterial as a matter of law because no reasonable investor could

---

[7] The 10-Q does not repeat the entire press release and merely states: "On May 14, 2015 we announced that we had engaged the Nature's Clinic to begin the process of regulatory approval of our Company's Over-the-Counter pain drug, Nyloxin® for marketing and distribution in Canada. The Nature's Clinic has already begun setting up their Chatham, Ontario warehouse and expect to complete the approval process to begin distributing Nyloxin® by the end of the year." *See* excerpt of August 18, 2015 Form 10-Q, attached as **Exhibit 13.**

consider them important in light of the extensive cautionary language accompanying them warning that "[t]he engagement of the Nature's Clinic should not be construed as an indication in any way whatsoever of the future value of the Company's common stock or its financial value. . . . Statements made herein are as of the date of this press release and should not be relied upon as of any subsequent date. The Company cautions readers not to place reliance on such statements. . ."[8] *See, e.g.,Halperin v. eBanker USA.com, Inc.*, 295 F.3d 352, 357 (2d Cir. 2002) ("Certain alleged misrepresentations in a stock offering are immaterial as a matter of law because it cannot be said that any reasonable investor could consider them important in light of adequate cautionary language set out in the same offering.").

It is not unlawful for Deitsch and Nutra Pharma to take an optimistic view of Nutra Pharma's future and they need not issue press releases painting the bleakest picture and the "worst case" scenario. *See, e.g., Rombach v. Chang*, 355 F.3d 164, 174 (2d Cir. 2004) ("expressions of puffery and corporate optimism do not give rise to securities violations. . . . Up to a point, companies must be permitted to operate with a hopeful outlook: 'People in charge of an enterprise are not required to take a gloomy, fearful or defeatist view of the future; subject to what current data indicates, they can be expected to be confident about their stewardship and the prospects of the business that they manage.'") (citations omitted).

---

[8] Deitsch is not invoking the PLSRA statutory safe harbor and is relying on the common law safe harbor for forward looking statements accompanied by language that "bespeaks caution." The common law "bespeaks caution" doctrine applies to SEC enforcement actions. *See, e.g., SEC v. Thompson*, 238 F. Supp. 3d 575, 602 (S.D.N.Y. 2017) ("There is no doubt that the common law bespeaks caution doctrine invoked by Thompson applies in enforcement actions and actions involving penny stocks.").

**5.      June 23, 2015 Press Release: "Nutra Pharma Announces Expansion and Upgrades for Nyloxin Production."**

In the June 23, 2015 Press Release, attached as **Exhibit 11**, Nutra Pharma announced that it had "completed upgrades and an expansion to the reptile farm that houses the Asian cobras utilized in the production of the Company's OTC pain drug, Nyloxin®." Deitsch is quoted as saying "We need to make sure that we have an adequate supply of validated material [cobra venom] to meet our future production needs. With the recently announced expansion into India and China, we realize that we will need to grow exponentially to meet these expected product orders in the coming months. . . ." The Complaint alleges that the Press Release was materially misleading since it referred to "expected product orders" from India and China when Nutra Pharma had made efforts to reach distribution deals but had not yet had any sales in either India or China and because "neither Nutra Pharma nor Deitsch has ever owned cobras . . ." Complaint, ¶¶ 128-139.

Included in the June 23, 2015 Press Release, Nutra Pharma included a forward-looking "bespeaks caution" disclosure, including a specific disclosure stating that the upgrades and future orders "should not be construed as an indication in any way whatsoever of the future value of the Company's common stock or its financial value. . ." Such disclosures were sufficient to advise any reader of the Press Release that expected product sales were just that — *expected* — and might not materialize.

Furthermore, neither Nutra Pharma nor Deitsch has ever claimed to own a cobra farm or cobras and in fact, Nutra Pharma has repeatedly disclosed in its 10-Ks that it obtains the cobra venom necessary for its products from third party suppliers. *See, e.g.*, Nutra Pharma Form 10-Ks for 2014, 2015, 2016, 2017 (pertinent excerpts attached as **Exhibits 14, 15, 16, and 17**) ("We currently have two US suppliers of cobra venom that we use according to product demand. . . .").

15

Nutra Pharma has never claimed to have solid contracts for the sale of its products in Canada, India, or China, instead making clear that it was announcing *plans* for its future after it had taken preliminary steps toward the accomplishment of its goals. A "plan" by definition speaks to the future achievement of a goal, not to having already accomplished that goal.

6.      **July 10, 2015 Press Release: "SeeThruEquity Initiates Coverage on Nutra Pharma Corporation with a Price Target of $0.53."**

In the July 10, 2015 Press Release, attached as **Exhibit 12**, SeeThruEquity announced that "SeeThruEquity, a leading independent equity research and corporate access firm focused on smallcap and microcap public companies, today announced it has initiated coverage of Nutra Pharma Corporation (NPHC) with a Price Target of $0.53."   As alleged in the Complaint, SeeThruEquity was the "source" of the release, not Nutra Pharma.   Complaint, ¶ 150.[9] The Complaint alleges that the Press Release was materially misleading since SeeThruEquity is not an "independent equity research and corporate access firm" but is instead a paid promoter.   SeeThruEquity describes itself as "a leading independent equity research and corporate access firm focused on smallcap and microcap public companies."   *See, e.g.*, **Exhibit 12**.   There is no allegation that Nutra Pharma created that description of SeeThruEquity.

As discussed above with regard to promoter WSBSH, *infra* at page 9-10, the duty to disclose payment for promoting a stock lies with the promoter, not the issuer of the stock.   Since Nutra Pharma had no duty to disclose payment to a promoter, its failure to do so will not suffice to state

---

[9] Since neither Nutra Pharma nor Deitsch had the ultimate authority on behalf of SeeThruEquity for the statements contained in the July 10, 2015 Press Release, they can have no primary liability for same. *See, e.g., Janus Capital Group, Inc. v. First Derivative Traders*, 564 U.S. 135, 142-43 (2011) (confining primary securities fraud liability under Section 10(b) of the Exchange Act to the "maker" of a fraudulent statement and defining a "maker" as the person or entity with ultimate authority over the statement).

a claim under either Section 17(a)(2) of the Securities Act or Section 10(b) of the Exchange Act.

**B.     Count 1 Also Fails to State a Claim for Violation of Section 17(a)(2) of the Securities Act Because There Is No Allegation that Deitsch Personally Obtained Money or Property as a Result of Any Untrue Statement of Material Fact**

Section 17(a)(2) of the Securities Act provides:

> It shall be unlawful for any person in the offer or sale of any securities ... directly or indirectly ... *to obtain money or property* by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading . . . .

15 U.S.C. § 77q (italics added).

The Complaint does not contain any factual allegation that Deitsch "obtained money or property" by means of any untrue statement.  Accordingly, Count 1 asserting a Section 17(a)(2) claim must be dismissed.  *SEC v. Syron*, 934 F. Supp. 2d 609, 640 (S.D.N.Y. 2013)  (dismissing Section 17(a)(2) claim when SEC failed to allege that defendants personally gained money or property from stock offerings).  *See also SEC v. DiMaria*, 207 F. Supp. 3d 343, 358 (S.D.N.Y. 2016) (following *Syron* and dismissing Section 17(a)(2) claim "because the amended complaint does not allege that Gamsey obtained money or property by means of the alleged misstatements . . ."); *SEC v. Wey*, 246 F. Supp. 3d 894, 915 (S.D.N.Y. 2017) (following *Syron* and *DiMaria* and dismissing Section 17(a)(2) claim because "the complaint fails to allege that Uchimoto obtained money or property by means of his alleged misrepresentation to NASDAQ").

**C.     Counts 2 and 3 Also Fail to Plead the Scienter Necessary to State a Claim for Violation of Section 10(b) of the Exchange Act**

A complaint alleging securities fraud must satisfy the heightened pleading requirements of Rule 9(b) by alleging "facts that give rise to a strong inference of fraudulent intent." *SEC v. Syron*, 934 F. Supp. 2d 609, 631 (S.D.N.Y. 2013), citing *Novak v. Kasaks*, 216 F.3d 300, 307 (2d Cir.2000).

The SEC may establish a strong inference of fraudulent intent by alleging either (1) "facts that show 'the defendants had both motive and opportunity to commit fraud,'" or (2) "facts that 'constitute strong circumstantial evidence of conscious misbehavior or recklessness.'" *Syron, supra* (citations omitted).

In addition to the absence of any material misrepresentation or omission in the six press releases at issue, the Complaint is devoid of any allegations that would support a finding that Deitsch acted with the scienter required to state a claim for securities fraud. There is no allegation that he had any motive or obtained anything of value as a result of the alleged misrepresentations and omissions. Deitsch's desire, as CEO, to promote Nutra Pharma is not an improper motive and is not sufficient to plead the requisite scienter. *See, e.g., SEC v. Egan*, 994 F. Supp. 2d 558, 565 (S.D.N.Y. 2014) (SEC "may not assert a motive possessed by nearly all corporate insiders, but must 'allege that defendants benefited in some concrete and personal way from the purported fraud . . . As the SEC attributed no motive to Egan's conduct in the Complaint other than implying a general 'desire for the corporation to appear profitable,' the SEC fails to allege an improper motive.") (citation omitted).

"Absent allegations of improper motive, the SEC may still plead sufficient circumstantial evidence of conscious misbehavior or recklessness to raise the requisite inference of scienter, but 'the strength of the circumstantial allegations must be correspondingly greater.'" *Egan, supra*, at *4. The Complaint contains no factual allegation indicating that Deitsch engaged in any conduct that was "highly unreasonable and which represents an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *Id.*, citing *Kalnit v. Eichler*, 264 F.3d 131, 138 (2d Cir.2001).

**D.** **Deitsch Did Not Engage in Manipulative Trading Activity in the Securities of Nutra Pharma in Violation of Sections 9(a)(2) and 10(b) of the Exchange Act and Rules 10b-5(a) and (c) Thereunder**

To assert a claim under Section 9(a)(2), a plaintiff must show " '(1) a series of transactions in a security creating actual or apparent trading in that security or raising or depressing the price of that security, (2) carried out with scienter, and (3) for the purpose of inducing the security's sale or purchase by others ...' " *Sharette v. Credit Suisse Int'l*, 127 F. Supp. 3d 60, 78 (S.D.N.Y. 2015). The Complaint alleges that Deitsch made "manipulative trades" by placing five 100 share buy orders for Nutra Pharma stock on June 17, 2015 and "eleven small buy orders" between September 1 and 8, 2015. Complaint, ¶¶ 163-207. But missing from the Complaint is any allegation that Deitsch placed those orders with any scienter or, more significantly, that he placed them "for the purpose of inducing the security's sale or purchase by others." The Complaint actually pleads just the opposite: that Deitsch was attempting *to protect* Nutra Pharma's stock from "professional shorters" who would stop shorting the stock after he placed a small trade. *Id.* at ¶¶ 183, 205. He was not placing trades for "the purpose of inducing the security's sale or purchase by others," he was placing trades *to stop* the short sellers from destroying Nutra Pharma's stock price and impairing its ability to continue functioning.

Furthermore, the fact that he was candid with both Broker A and Broker B cuts against any assertion that he acted with scienter since if Deitsch was bent on "manipulating" Nutra Pharma's stock to induce its purchase or sale, it is unlikely he would have been so forthright when questioned. *Id.* As discussed above, one of the ways the SEC can establish a strong inference of fraudulent intent is by alleging "facts that 'constitute strong circumstantial evidence of conscious misbehavior or recklessness" and in the present Complaint, the SEC has alleged facts demonstrating the contrary,

that Deitsch showed no "conscious misbehavior or recklessness."

Scheme liability under subsections (a) and (c) of Rule 10b–5 "hinges on the performance of an inherently deceptive act that is distinct from an alleged misstatement." *SEC v. Kelly*, 817 F. Supp. 2d 340, 344 (S.D.N.Y. 2011). Deitsch's handful of small trades were not "inherently deceptive" and combined with the absence of any allegation demonstrating scienter, Count 4 should be dismissed.

### E. The Complaint Fails to Plead that Deitsch Aided and Abetted Nutra Pharma's Alleged Violations of the Securities Laws and Counts 12, 13, and 14 Should Be Dismissed

To state a claim that Deitsch aided and abetted Nutra Pharma's alleged securities law violations, the SEC must demonstrate: (1) a primary violation by Nutra Pharma; (2) knowledge of the violation by Deitsch; and (3) that Deitsch substantially assisted the primary violation. *See, e.g., Armstrong v. McAlpin*, 699 F.2d 79, 91 (2d Cir.1983); *SEC v. Espuelas*, 908 F.Supp.2d 402, 409 (S.D.N.Y. 2012). The aiding and abetting claims against Deitsch fail as to the first element, a primary violation by Nutra Pharma, since all of the claims are premised on the six press releases alleged to be materially misleading. As discussed above, at pages 8-19, *infra*, the press releases, if given a fair reading, are not materially misleading.

### F. The SEC's Complaint Is a "Shotgun" and "Puzzle" Pleading That Fails to Comply with the Particularity Requirement of Fed. R. Civ. P. 9(b) and the General Pleading Requirements of Fed. R. Civ. P. 8(a)(2) and 10(b).

In its letter to the Court responding to Deitsch's request for a pre-motion conference, the SEC accused the defendants of "misconstruing" the Complaint. DE13, at 2. But the SEC has deliberately constructed its Complaint in a manner intended to make it difficult to understand and analyze. The Complaint contains fifteen counts and 294 paragraphs in total, with the first 245 paragraphs of the Complaint incorporated wholesale by reference into each of the fifteen counts and each count

containing only the relevant statutory language.  The result is that it is difficult to know exactly which facts are meant to support which counts and many of the alleged facts are entirely irrelevant to many of the counts.

Numerous courts have concluded that a complaint sounding in fraud fails to plead with the particularity required by Rule 9(b) when, like the present Complaint, it is a "shotgun" or "puzzle" pleading. "Shotgun pleadings" are pleadings that incorporate every factual allegation into each claim for relief so as to require the opposing party and the court to attempt to figure out which allegations support each claim for relief. *See, e.g.*, *SEC v. Fraser*, No. CV-09-00443-PHX-GMSC, 2009 WL 2450508, at *14 (D. Ariz. Aug. 11, 2009) (dismissing SEC Complaint with leave to replead when it was a "shotgun" and "puzzle" pleading) (citations omitted). "Puzzle pleadings" are pleadings that "require the defendant and the court to match the statements up with the reasons they are false or misleading." *Fraser, supra.*   "A complaint which relies on shotgun or puzzle pleading *does not meet Rule 9(b)'s particularity requirement*." *Id.* (italics in original) (citations omitted). *See also SEC v. Husain*, No. 2:16-CV-03250-ODW(E), 2016 WL 11269462, at *3 (C.D. Cal. Oct. 24, 2016) (dismissing SEC Complaint with leave to replead and noting that "[t]his Court is not alone in its condemnation of the SEC's use of 'shotgun pleading.'"); *SEC v. Patel*, No. CIV. 07-CV-39-SM, 2009 WL 3151143, at *3 (D.N.H. Sept. 30, 2009) (dismissing parts of SEC Complaint with prejudice since SEC had already been given leave to replead and still  offered a "shotgun" and "puzzle" pleading, blurred legal theories, based multiple legal claims on the same conduct, and had "a view of aider-and-abettor liability that calls to mind the apocryphal butterfly accused of causing a tornado in Texas by fluttering its wings in Brazil."). *Cf. SEC v. Smith*, No. 14-CV-192-PB, 2015 WL 4067095, at *6 n.5 (D.N.H. July 2, 2015) (advising the SEC that it would "have been better

served to organize and analyze its case violation by violation, and element by element for each violation" rather than in a "shotgun" or "puzzle" pleading).

The Eleventh Circuit Court of Appeals has been vocal in condemning the use of "shotgun pleadings" for nearly thirty years and has issued numerous opinions discussing why such pleadings waste the time of both the parties and the courts, result in extra expense and unnecessary discovery, and prejudice the opponents' case. In *Paylor v. Hartford Fire Ins. Co.*, 748 F.3d 1117, 1126 (11th Cir. 2014), confronted with the results of what it described as a "goat rodeo" of unfocused discovery, the Court explained that "when the plaintiff kicks things off with a shotgun pleading, where 'allegations of fact that may be material to a determination of count one, but not count four, are nonetheless made a part of count four.... [I]t is virtually impossible to know which allegations of fact are intended to support which claim(s) for relief,'" the defendant should move to dismiss pursuant to Rule 12(b)(6) or for a more definite statement pursuant to Rule 12(e). *Id.* The defendant should not respond in kind by filing a "shotgun" answer and leave the scope of discovery unbounded: "Civil pleadings are supposed to mark the boundaries for discovery; discovery is not supposed to substitute for definite pleading." *Id.* at 1127. The time to delineate the specific claims set out in the Complaint is at the start of the litigation. *Id. See also Croons v. New York State Office of Mental Health*, 18 F. Supp. 3d 193, 199 (N.D.N.Y. 2014) (finding that confusion caused by "shotgun pleading" complaint, "exacerbated by defendants' decision not to move against either plaintiff's initial or amended complaint seeking clarification of the issues," led to "the inevitable morass of discovery materials" and resulted in a "massive waste of judicial and private resources.") (citations omitted).

Not only do "shotgun" pleadings fail to meet Rule 9(b)'s particularity standard in fraud cases, they also fail to meet even the general pleading standards of Rules 8(a)(2) and 10(b) of the Federal Rules of Civil Procedure.[10]  *See, e.g., In re Ford Fusion & C-Max Fuel Econ. Litig.*, No. 13-MD-2450 KMK, 2015 WL 7018369, at *35 (S.D.N.Y. Nov. 12, 2015) (shotgun pleading "renders it difficult to identify the precise nature of Plaintiff's claims" and shows "utter disrespect for Rule 8 of the Federal Rules of Civil Procedure") (citation omitted).  In *Corrado v. New York State Unified Court Sys.*, No. CV 2012-1748 DLI MDG, 2014 WL 4626234, at *5 (E.D.N.Y. Sept. 15, 2014), the Court found a "shotgun" complaint defective:

> To confuse things further, plaintiff does not correlate specific factual allegations to each of the various "causes of action" or violations of a particular statute. Instead, she perfunctorily "repeats and realleges each allegation in each numbered paragraph above." As such, the reader cannot distinguish which factual allegations correspond to the violation of which statute, particularly since there is a considerable overlap between the various factual allegations and the statutory violations to which they could relate. Thus, it is not clear how the many overlapping claims vary and what facts each overlapping claim is dependent on.

The Court ordered the plaintiff to replead to, among other things, specify "which factual allegations correspond to each claim . . ."  *Id.* at *13.

Deitsch has made a good faith effort to parse the Complaint and figure out which of the alleged facts are intended to support which of the asserted claims and decipher why the SEC contends that the six press releases at issue are misleading.  Rather than accusing the defendants of "misconstruing" the Complaint, the SEC should cease the litigation strategy of filing "shotgun" and

---

[10] Fed. R. Civ. P. 8 (a) states: "A pleading that states a claim for relief must contain: . . . (2) a short and plain statement of the claim showing that the pleader is entitled to relief . . ."  Rule 10(b) states: "(b) Paragraphs; Separate Statements. A party must state its claims or defenses in numbered paragraphs, each limited as far as practicable to a single set of circumstances. . . . If doing so would promote clarity, each claim founded on a separate transaction or occurrence--and each defense other than a denial--must be stated in a separate count or defense."

"puzzle" complaints that are "calculated to confuse the 'enemy,' and the court, so that theories for relief not provided by law and which can prejudice an opponent's case, especially before the jury, can be masked . . ." *T.D.S. Inc. v. Shelby Mut. Ins. Co.*, 760 F.2d 1520, 1544 n.14 (11th Cir. 1985) (Tjoflat, J., dissenting). *See also Hulett v. City of Syracuse*, 253 F. Supp. 3d 462, 480 (N.D.N.Y. 2017) (noting that confusion in the briefing "is attributable to the fact that Hulett's operative complaint is a 'shotgun pleading,' a document which 'incorporates all of the factual allegations preceding [each count]'" and "observing that 'this type of litigation strategy ultimately acts to thwart meaningful legal analysis'") (citing *Croons, supra*).

**CONCLUSION**

There was no securities fraud by either Nutra Pharma or Deitsch as evidenced by the fact that the SEC has been unable to plead any improper motive or any personal gain by Deitsch. Without some allegations of fact that could reasonably give rise to a finding of scienter, the fraud-based claims in the Complaint fail to state a claim and should be dismissed.

**WHEREFORE**, Defendant Erik Deitsch aka Rik Deitsch, by and through his undersigned counsel, hereby requests that the Court enter an Order dismissing Counts 1, 2, 3, 4, 6, 12, 13, and 14 of the Complaint and granting such other and further relief as this Court deems just and proper.

Dated: March 20, 2019
Boca Raton, Florida

Respectfully submitted,

**By: s/ Carl F. Schoeppl, Esq. (CS7917)**
Carl F. Schoeppl, Esq.
*Counsel for Defendant Erik Deitsch*
**SCHOEPPL LAW, P.A.**
4651 North Federal Highway
Boca Raton, Florida 33431-5133
Telephone: (561) 394-8301
Facsimile: (561) 394-3121
E-Mail: carl@schoeppllaw.com

## CERTIFICATE OF SERVICE

I hereby certify that on March 20, 2019, the foregoing **MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT ERIK DEITSCH'S MOTION TO DISMISS THE COMPLAINT**, along with supporting exhibits, was filed with the Clerk of the Court and served in accordance with the Federal Rules of Civil Procedure, the Eastern District's Local Rules, and/or the Eastern District's Rules on Electronic Service, upon the following parties:

| Party | Method of Service | Name, Address, Telephone, and E-mail Address of Party |
|---|---|---|
| *Securities and Exchange Commission, Plaintiff* | ECF | Lara Shalov Mehraban<br>Lindsay Senechal Moilanen<br>Preethi Krishnamurthy<br>Sheldon Leo Pollock, III<br>Marc P. Berger<br>U.S. Securities and Exchange Commission<br>New York Regional Office<br>200 Vesey Street<br>Suite 400<br>New York, NY 10281-1022<br>Telephone: 212-336-0591<br>Email: MehrabanL@sec.gov<br>Email: moilanenl@sec.gov<br>Email: krishnamurthyp@sec.gov<br>Email: pollocks@sec.gov<br>Email: bergerm@sec.gov |
| *Nutra Pharma Corporation, Defendant* | ECF | Daniel Desouza<br>DeSouza Law, PA<br>101 NE Third Avenue<br>Suite 1500<br>Fort Lauderdale, FL 33301<br>Telephone: 954-603-1340<br>Fax: 954-356-0406<br>Email: ddesouza@desouzalaw.com |

| Party | Method of Service | Name, Address, Telephone, and E-mail Address of Party |
|---|---|---|
| *Sean Peter McManus, Defendant* | Electronic Mail and U.S. Mail | Sean Peter McManus<br>320 Via Villagio<br>Hypoluxo, FL 33462<br>Telephone: (561) 706-2990<br>Email: smcmanus@patriotsettlement.com<br>PRO SE |

Pursuant to the Honorable Joanna Seybert's Individual Motion Practices, a courtesy copy of the above-referenced documents, comprised of printed copies of the documents actually filed on ECF and featuring the ECF filing information at the top of every page, is being provided to the Court on this date by Federal Express.

By: **: s/ Carl F. Schoeppl, Esq. (CS7917)**
Carl F. Schoeppl, Esq.
*One of the Attorneys for Defendant Erik Deitsch*