UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------X
SECURITIES AND EXCHANGE COMMISSION,

                 Plaintiff,

                                   <u>MEMORANDUM & ORDER</u>
       -against-                    18-CV-5459(JS)(GRB)

NUTRA PHARMA CORPORATION, ERIK
DEITSCH a/k/a RIK DEITSCH, and
SEAN PETER MCMANUS,

                 Defendants.
----------------------------------X
APPEARANCES
For Plaintiff:       Marc P. Berger, Esq.
                    Preethi Krishnamurthy, Esq.
                    Lara Shalov Mehraban, Esq.
                    Lee Attix Greenwood, Esq.
                    Lindsay Senechal Moilanen, Esq.
                    Sheldon Leo Pollock, III, Esq.
                    Securities and Exchange Commission
                    Brookfield Place
                    200 Vesey Street, Suite 400
                    New York, New York 10281

For Defendants:
Nutra Pharma       Daniel Desouza, Esq.
                    DeSouza Law, PA
                    101 NE Third Avenue, Suite 1500
                    Fort Lauderdale, Florida 33301

Erik Deitsch       Carl F. Schoeppl, Esq.
                    Kyle Gustin DeValerio, Esq.
                    Schoeppl & Burke, P.A.
                    4651 North Federal Highway
                    Boca Raton, Forida 33431-5133

Sean P. McManus   <u>Pro</u> <u>Se</u>

SEYBERT, District Judge:

       In this securities fraud action, defendants Nutra Pharma

Corporation ("Nutra Pharma") and Erik Deitsch ("Deitsch")

partially move to dismiss (see Deitsch Mot., D.E. 31; Nutra Pharma

Mot., D.E. 33) the Amended Complaint of Plaintiff the Securities

and Exchange Commission (the "SEC") (Am. Compl., D.E. 28).  For

the following reasons, the motions are GRANTED in part and DENIED

in part.

BACKGROUND

The Court takes the following facts from the Amended

Complaint as true and construes them in the light most favorable

to the SEC.[1]

I.  Facts

Nutra Pharma was incorporated in 2000.  (Am. Compl.

¶ 23.)  During the relevant period, from approximately July 2013

through June 2018, Nutra Pharma purported to sell two pain

relievers made with cobra venom.  (Am. Compl. ¶¶ 1, 26.)  Deitsch

has run Nutra Pharma since approximately 2002, and during the

relevant period, acted as its CEO, president, CFO, and chairman.

(Am. Compl. ¶ 20.)  Defendant Sean McManus ("McManus") worked as

a consultant for Nutra Pharma from approximately 2013 to 2017.

---

[1] The original Complaint was filed on September 28, 2018.
(Compl., D.E. 1.)  After Defendants filed motions to dismiss
(D.E. 21, 23, 24), the SEC filed an Amended Complaint on
May 29, 2019, in light of the recent Supreme Court decision
Lorenzo v. SEC, 139 S. Ct. 1094, 203 L. Ed. 2d 484 (2019) (see
SEC Letter, D.E. 25).  The Court's discussion is limited to the
operative Amended Complaint and pending motions.  The Clerk of
the Court is directed to TERMINATE the motions to dismiss the
original Complaint found at D.E. 21, 23, and 24.

(Am. Compl. ¶ 21.)   The SEC alleges that Nutra Pharma has never turned a profit, and in December 2016, reported annual losses of $3.5 million.   (Am. Compl. ¶¶ 27-28.)

A.   The Alleged Misleading Press Releases and Q-10 Reports

1. The Promoter Releases

In July 2013, Nutra Pharma entered into a consulting agreement with Wall Street Buy.   (Am. Compl. ¶ 57.)   Christopher Castaldo ("Castaldo") ran Wall Street Buy from at least 2013 through 2017.   (Am. Compl. ¶ 22.)   Deitsch looked into Castaldo and learned Castaldo had been found liable for violating securities laws as a broker in a 2008 SEC civil enforcement action.   (Am. Compl. ¶¶ 49, 44.)   In 2012, aware of Castaldo's background, Deitsch and Nutra Pharma hired him to promote Nutra Pharma's stock to potential investors.   (Am. Compl. ¶ 50.)   The 2013 consulting agreement, signed by Deitsch on Nutra Pharma's behalf, required Nutra Pharma to pay Wall Street Buy $10,000 in cash plus five million shares of Nutra Pharma stock for each month of the three-month term and to issue a $30,000 note convertible to Nutra Pharma shares to Wall Street Buy.   (Am. Compl. ¶¶ 59-60.)

In August and October 2013, Nutra Pharma issued two press releases.   They were drafted by Deitsch, who controlled their distribution and posted them on Nutra Pharma's website.   (Am. Compl. ¶¶ 54-56.)   Neither press release referenced the consulting agreement.   (Am. Compl. ¶¶ 65, 70.)   The August release read that

3

"[t]he stated goal at Wall Street Buy . . . is to identify cutting edge growth companies that offer unique products and services" and quoted Castaldo as saying "I believe we have identified an enormous opportunity [in Nutra Pharma] and take great pleasure in sharing our findings with the investing public." (Am. Compl. ¶¶ 62-63.) The October release contained similar language with a new Castaldo quote: "I continue to believe that we have identified an enormous opportunity." (Am. Compl. ¶¶ 67-69.)

In March 2013, a marketing and distribution company known as New Vitality entered into a consulting agreement with MGRD, Inc. ("MGRD"), a company controlled by Deitsch. Deitsch signed on behalf of MGRD. New Vitality engaged Deitsch as a consultant. Pursuant to the agreement, Deitsch was a "Chief Science Officer and Formulator" and had to travel to New Vitality's offices once per quarter. New Vitality agreed to pay MGRD $7,000 per month and a percentage of gross receipts of certain New Vitality products. (Am. Compl. ¶¶ 72-74.) On August 29, 2013, Nutra Pharma issued a press release announcing that New Vitality had placed its first order of Nutra Pharma's Nyloxin product. The release did not mention the agreement between Deitsch and New Vitality. (Am. Compl. ¶¶ 76, 79.)

Next, in June 2015, Deitsch and the CEO of SeeThruEquity, an equity research firm, exchanged emails about a potential analyst report of Nutra Pharma stock. The CEO emailed Deitsch about two

pricing options offering "complimentary" reports. (Am. Compl. ¶¶ 145-46.) Nutra Pharma paid SeeThruEquity $8,000 for one of the packages. (Am. Compl. ¶¶ 153-54.) Eventually, Deitsch posted SeeThruEquity's press release, which he had reviewed and commented upon. The release stated that SeeThruEquity's "research is not paid for and is unbiased" and did not mention the financial arrangement between the companies. (Am. Compl. ¶¶ 159-63.) The release also claimed that Nutra Pharma's stock had a "target price" of $0.53 a share, which was approximately double the highest price Nutra Pharma stock traded at that year. (Am. Compl. ¶¶ 155, 161.)

　　2. <u>The Distribution Releases</u>

In January 2015, Nutra Pharma entered into a confidentiality and nondisclosure agreement with Nature's Clinic, a Canadian corporation and distributor, which Deitsch signed, to "evaluate a potential business relationship." (Am. Compl. ¶¶ 108-09.) In April 2015, Deitsch and Nature's Clinic's CEO spoke on the phone and discussed a potential transaction. They did not agree on a price during the call but stated they would attempt to execute written contracts. They did not ultimately execute any written contracts. (Am. Compl. ¶¶ 110-13.)

In May 2015, Nutra Pharma issued a press release "[a]nnounc[ing] that they ha[d] engaged the Nature's Clinic to begin the process of distributing Nyloxin in Canada" and had "engaged the Nature's Clinic to begin the process of regulatory

approval of Nyloxin for marketing and distribution in Canada."
(Am. Compl. ¶¶ 114-16.)

About two months later, on July 7, 2015, Nutra Pharma received correspondence from a regulatory consultant representing Nature's Clinic, stating that it could not establish a Canadian warehouse for the products without more information. (Am. Compl ¶¶ 119-21.) The consultant asked for additional information, including a draft contract, to work out the potential transaction between the parties. (Am. Compl. ¶ 123.) However, the following month, Nutra Pharma filed a Form 10-Q quarterly report with the SEC reiterating that Nutra Pharma had "engaged the Nature's Clinic to begin the process of regulatory approval of . . . Nyloxin . . . [t]he Nature's Clinic has already begun setting up their [Canadian] warehouse." (Am. Compl. ¶¶ 124-126.)

Finally, in February 2015, Deitsch sent a trial shipment of Nyloxin to someone in India in an attempt to reach an India distribution deal. Nutra Pharma never distributed Nyloxin in India. (Am. Compl. ¶¶ 129-30.) In May 2015, Deitsch sent a letter to a Canadian company providing it with authorization to identify a Chinese company capable of obtaining government approval for Nutra Pharma products in China. (Am. Compl. ¶¶ 131-32.) Nutra Pharma never distributed its products in China. (Am. Compl. ¶ 134.)

In June 2015, Nutra Pharma announced that it had "completed upgrades and an expansion to the reptile farm that houses the Asian cobras utilized in the production of [Nyloxin]" by adding "100 snakes to the existing milking line to increase venom production for the upcoming international orders from India and China." (Am. Compl. ¶¶ 138-40.) In August 2015, Nutra Pharma filed a Q-10 with the same claims. (Am. Compl. ¶ 142.) However, at the time of this press release and Q-10, Deitsch was aware that Nutra Pharma had never produced Nyloxin or other referenced products and no one else had produced them. He also knew that Nutra Pharma had never owned cobras, cobra farms, or cobra facilities. (Am. Compl. ¶¶ 134-37.)

B.   Deitsch Sells Shares

The SEC also alleges that Deitsch manipulated the market for Nutra Pharma stock. (Am. Compl. § IV, ¶¶ 164-208.) On June 17, 2015, using his brokerage account at a broker-dealer firm registered with the SEC, Deitsch placed five orders for Nutra Pharma stock at the outstanding ask price--the lowest price at which a seller is willing to sell. (Am. Compl. ¶ 164.) Each time, he placed a 100-share limit buy order. (Am. Compl. ¶¶ 167, 170, 173, 176, 179.) Though he never spent more than $20.00 on any order, each time, he also paid a $9.99 commission. (Am. Compl. ¶ 181.) The broker-dealer's representative told Deistch the compliance department had flagged the trades as uneconomical and

that they looked manipulative.  Deitsch replied that "market-makers who are professional shorters . . . keep shorting the stock and if you don't trade it, then they keep shorting the stock.  So every time I place a trade, they stop shorting the stock."  (Am. Compl. ¶¶ 182-84.)  Approximately one month later, the broker-dealer closed Deitsch's account.  (Am. Compl. ¶ 187.)

Deitsch opened a new account with a new broker-dealer in August 2015.  Between September 1 and September 8, 2015, he purchased 3,400 Nutra Pharma shares through eleven buy orders.  (Am. Compl. ¶¶ 188-89.)  With four orders, he purchased shares at a price above the outstanding ask price.  (Am. Compl. ¶ 191.)  For example, in one order, the outstanding ask price was $.074 per share, and he paid $0.18 per share for 100 shares.  (Am. Compl. ¶¶ 192-94.)  His broker disabled access to his account and explained that the trading appeared manipulative.  (Am. Compl. ¶¶ 204-05.)  Deitsch responded that "if you do nothing else but tickle the ask with 100 shares, 200 shares, [the shorters] go away. I have market makers that do that for me, and every once in awhile I do it myself."  (Am. Compl. ¶ 206.)

C.    McManus as a Broker Dealer

McManus was barred by the Financial Industry Regulatory Authority ("FINRA") in 2001.  He has not been licensed or registered as a broker-dealer since 2001.  (Am. Compl. ¶¶ 35, 37.) In 2014, he called at least seven people and attempted to solicit

them to invest in Nutra Pharma.  (Am. Compl. ¶ 96.)  He also cold-called 10 to 15 potential investors in 2015.  (Am. Compl. ¶ 212-13.)  The Amended Complaint does not allege that McManus ever effected any trades of Nutra Pharma stock.

## II.  Procedural History

Defendant Deitsch moves to dismiss Counts 1, 2, 3, 5, 11, 12 and 13 of the Amended Complaint.  (Deitsch Mot. at 1.)  Defendant Nutra Pharma joins in Deitsch's application and also moves to dismiss Count 4.  (Nutra Pharma Mot. at 1-2.)  Pro se defendant McManus, charged in Counts 1, 2, and 6 of the Amended Complaint, filed a motion to dismiss the original Complaint.  (See McManus Mot., D.E. 24.)  In that motion, he joined in Deitsch's application as to Counts 1 and 2, and also argued that the Count alleging he acted as an unregistered broker (the Seventh Claim in the original Complaint and Sixth Claim in the Amended Complaint, both against McManus alone) should be dismissed.  Although McManus has not filed a motion to dismiss the Amended Complaint, because he is proceeding pro se, the Court will consider the arguments raised in his motion to dismiss the original Complaint.

Accordingly, variously and collectively, Defendants move to dismiss claims for violations of Securities Act Section 17(a) (Claim 1); aiding and abetting violations of Securities Act Section 17(a) (Claim 11); violations of Exchange Act Section 10(b) and Rule 10b-5 (Claim 2); aiding and abetting violations of Exchange

Act Section 10(b) and Rule 10b-5 (Claim 12); violations of Exchange Act Section 9(a)(2) (Claim 3); violations of Exchange Act Section 13(a) and Rule 13a-14 (Claim 5); aiding and abetting violations of Exchange Act Section 13(a) and Rule 13a-13 (Claim 13); and violations of Exchange Act Section 15(a) (Claim 6).

DISCUSSION

I.  <u>Motion to Dismiss</u>

To withstand a motion to dismiss, a complaint must contain factual allegations that "'state a claim to relief that is plausible on its face.'" <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678, 129 S. Ct. 1937, 1949, 173 L. Ed. 2d 868 (2009) (quoting <u>Bell Atlantic Corp. v. Twombly</u>, 550 U.S. 544, 570, 127 S. Ct. 1955, 1974, 167 L. Ed. 2d 929 (2007)). This plausibility standard is not a "probability requirement" and requires "more than a sheer possibility that a defendant has acted unlawfully." <u>Id.</u> (internal quotation marks and citation omitted). In a securities fraud action, the complaint must contain "particular allegations giving rise to a strong inference of scienter." <u>In re PXRE Grp., Ltd., Sec. Litig.</u>, 600 F. Supp. 2d 510, 525 (S.D.N.Y. 2009), <u>aff'd</u> <u>sub nom.</u> <u>Condra v. PXRE Grp. Ltd.</u>, 357 F. App'x 393 (2d Cir. 2009).

II.  <u>Material Misrepresentations Under Securities Act Section</u>
     <u>17(a) (Count 1) and Exchange Act Section 10(b) and Rule</u>
     <u>10b-5 (Count 2)</u>

          As to Count 1, under Section 17(a) of the Securities Act

of 1933, 15 U.S.C. § 77q(a), (the "Securities Act"), in connection

with "the offer or sale of any securities[,]" it is unlawful

> (1)  to employ any device, scheme, or artifice
>       to defraud, or
> (2)  to obtain money or property by means of
>       any untrue statement of a material fact
>       or any omission to state a material fact
>       necessary in order to make the statements
>       made, in light of the circumstances under
>       which they were made, not misleading; or
> (3)  to engage in any transaction, practice,
>       or course of business which operates or
>       would operate as a fraud or deceit upon
>       the purchaser.

15 U.S.C. 77q(a).

          As to Count 2, SEC Rule 10b-5 makes it unlawful:

> (a) To employ any device, scheme, or artifice
> to defraud,
> (b) To make any untrue statement of a material
> fact or to omit to state a material fact
> necessary in order to make the statements
> made, in the light of the circumstances under
> which they were made, not misleading, or
> (c) To engage in any act, practice, or course
> of business which operates or would operate as
> a fraud or deceit upon any person,
> in connection with the purchase or sale of any
> security.

17 C.F.R. § 240.10b-5 (2018).  "Section 10(b) of the Exchange Act

and Rule 10b-5, which prohibit fraud in the purchase or sale of a

security, are violated if a person has (1) made a material

misrepresentation or a material omission as to which he had a duty

to speak, or used a fraudulent device; (2) with scienter; (3) in connection with the purchase or sale of securities." SEC v. Frohling, 851 F.3d 132, 136 (2d Cir. 2016) (internal quotation marks and citations omitted).

"The touchstone of the [materiality] inquiry is not whether isolated statements . . . were true, but whether [the] defendants' representations or omissions, considered together and in context, would affect the total mix of information and thereby mislead a reasonable investor regarding the nature of the securities offered." Halperin v. eBanker USA.com, Inc., 295 F.3d 352, 357 (2d Cir. 2002) (citation omitted). "Materiality depends on all relevant circumstances, and a complaint normally should not be dismissed based on materiality unless the statements or omissions are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." SEC v. Fiore, 416 F. Supp. 3d 306, 322 (S.D.N.Y. 2019) (internal quotation marks and citations omitted). "'When the government (as opposed to a private plaintiff) brings a civil or criminal action under Section 10(b) and Rule 10b-5, it need only prove, in addition to scienter, materiality, meaning a substantial likelihood that a reasonable investor would find the omission or misrepresentation important in making an investment decision, and not actual reliance.'" U.S. v. Shkreli, No. 15-CR-

0637, 2017 WL 3623626, at *9 (E.D.N.Y. June 24, 2017) (quoting U.S. v. Vilar, 729 F.3d 62, 89 (2d Cir. 2013)).

Under Section 10(b) and Rule 10b-5, scienter is "'a mental state embracing intent to deceive, manipulate, or defraud.'" Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 319, 127 S. Ct. 2499, 2507, 168 L. Ed. 2d 179 (2007) quoting Ernst & Ernst v Hochfelder, 425 U.S. 185, 193-94 & n.12, 96 S. Ct. 1375, 1381-82, r\47 L. Ed. 2d 668 (1976). The SEC need not present direct evidence of scienter, and circumstantial evidence may suffice. See Fiore, 416 F. Supp. 3d at 323-24. "[T]he question before a court on a motion to dismiss is: When the allegations are accepted as true and taken collectively, would a reasonable person deem the inference of scienter at least as strong as any opposing inference?" In re PXRE Grp., 600 F. Supp. 2d at 528 (internal quotation marks and citation omitted); see also Fiore, 416 F. Supp. 3d at 323 (the SEC "must allege facts such that 'a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged.'" (quoting Tellabs, 551 U.S. at 324, 127 S. Ct. at 2509)). On a motion to dismiss, the Court determines "whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter." Tellabs, 551 U.S. at 322–23, 127 S. Ct. 2499 (emphasis in original).

A. <u>Application</u>

Defendants argue that Counts 1 and 2 fail to state a claim because the press releases and SEC reports did not contain material misstatements. (Deitsch Br., at 6.) The SEC responds that "the Amended Complaint adequately alleges that the relevant press releases and Form 10-Q contain material misrepresentations--both false statements and misleading half-truths . . . ." (SEC Br., D.E. 34, at 12.)

As to the <u>promoter press releases</u>, the parties agree that Section 17(b)[2] of the Securities Act "puts the onus on the promoter to disclose compensation it receives from a stock issuer." (SEC Br. at 13 n.7; <u>see</u> <u>also</u> Deitsch Br. at 7 ("it is the stock promoter which has the duty to disclose any compensation paid to promote a security, not the issuer of a security.").) Defendants argue that that the two firms they engaged, Wall Street Buy and SeeThruEquity, thus had the responsibility to disclose to investors that Defendants had paid them. With respect to Wall Street Buy, Defendants note that the consulting agreement contained language requiring Wall Street Buy to disclose any compensation from Nutra Pharma. They further note that the Wall Street Buy press releases contained links to videotaped interviews

_____

[2] The Amended Complaint does not allege violations of Section 17(b).

of Deitsch, and that at the end of the interview, text appeared on the screen disclosing the fact and amount of compensation:

> The Company [Wall Street Buy] is compensated for profiling the featured companies on the Program. The Company may receive cash, stock, warrants or other consideration.
>
> The Company was compensated by Nutra Pharma . . . in the amount of ten thousand dollars, the Company also received a six month note for ten thousand dollars and five million restricted shares for development of corporate videos and a marketing/awareness campaign.

(Deitsch Br. at 7-9.)

The SEC counters that because Defendants "chose to make statements about these third-party endorsements . . . [they] had a duty to speak accurately and completely by disclosing that they had paid the promoters." (SEC Br. at 13 (internal quotation marks and citations omitted).) The SEC points to language (1) in the two Wall Street Buy press releases that it had "identified" Nutra Pharma as "an enormous opportunity" and (2) in the SeeThruEquity press release that it had issued a research report on Nutra Pharma that was "not paid for" and was "unbiased." (SEC Br. at 12.) The SEC contends that these "misrepresentations or half-truths" from Defendants required Defendants' further disclosure. (SEC Br. at 12.) The SEC also argues that the Court should not consider the videotaped interviews, but in any event, that the extent to which disclaimers impact whether the statements are misleading and material is an issue for a jury. (SEC Br. at 14 n.8.)

The Court finds that the Amended Complaint adequately pleads that some of the press releases were misleading as they gave the distinct impression that the promoting companies were not being compensated for their opinions. They contained "half-truths" and once Defendants chose to speak on the issue rather than remain silent, they had "a duty to be both accurate and complete" even absent an independent duty to disclose. Caiola v. Citibank, N.A., 295 F. 3d 312, 331 (2d Cir. 2002) (discussing 10b-5 liability). The SeeThruEquity press release is a relatively simple application of these principles: it stated that SeeThruEquity issued a report that was "not paid for" and "unbiased" when Nutra Pharma had paid for the promotion and Deitsch had approved the report. Whether SeeThruEquity disclosed the arrangement or not, once Nutra Pharma made those statements in its press release, it had a duty to be accurate and complete. Accordingly, Defendants' motions as to the See Thru Equity release are DENIED.

The two Wall Street Buy releases present a closer question. They each stated that Wall Street Buy had apparently independently "identified" Nutra Pharma as a good investment opportunity--which was not the case. However, the releases did provide links to videos where Wall Street Buy sufficiently disclosed the arrangement and compensation between Nutra Pharma and Wall Street Buy. The Court considers these videos as integral

to the Amended Complaint, even though they are not explicitly referenced. The Amended Complaint relies heavily on the press releases themselves, and the releases contain links to the videos where the disclosures appear. See Sidik v. Royal Sovereign Int'l Inc., 348 F. Supp. 3d 206, 212 (E.D.N.Y. 2018) (citations omitted); see also SEC v. Rorech, 673 F. Supp. 2d 217, 221 (S.D.N.Y. 2009) (on a motion to dismiss, courts may consider documents the SEC relied upon or knew of when bringing the suit). While the better practice may have been for Defendants to include this information in the written press releases, the Court finds that its inclusion in the video interviews to be sufficient disclosure. Thus, allegations regarding the Wall Street Buy releases are DISMISSED.

The Court next considers the distribution press releases. First, as for the Canadian distribution, Defendants argue that the SEC has given the word "engaged" an arbitrary meaning. Defendants contend that Nutra Pharma had actually engaged Nature's Clinic to begin the process of obtaining regulatory approval in Canada, and that the press release made this clear. (Deitsch Br. at 12-14.) Defendants contend that "Nutra Pharma has never claimed to have solid contracts for the sale of its products in Canada, India, or China, [but] instead [made] clear that it was announcing plans for its future after it had taken preliminary steps toward the accomplishment of its goals." (Deitsch Br. at 16 (emphasis in original.) Defendants argue that the releases

contained forward looking statements accompanied by language that "bespeaks caution" and are thus protected. (Deitsch Br. at 14, 15, & n.8.)

The SEC responds that (1) arguments "about the literal truth of alleged misstatements should not be resolved on a motion to dismiss," (2) the statements were literally false because a reasonable investor would not interpret "engage" to mean only a preliminary discussion about doing business, and (3) regardless of the literal truth, the Amended Complaint alleges that "the statements were at least misleading half-truths." (SEC Br. at 15-16.) The SEC further responds that boilerplate disclaimers do not render the relevant statements accurate, and that even if the disclaimers limit liability for future events, they do not shield Defendants from misleading statements about past events. (SEC Br. at 16-17.) The SEC repeatedly argues that whether statements in the releases and forms are truthful is a question for a jury and cannot be decided on a motion to dismiss. (SEC Br. at 14 n. 8, 15, 18.)

Defendants essentially argue that each individual release was "literally" true. However, the Court finds that in considering the "total mix" of information provided to reasonable investors, the Amended Complaint adequately alleges that the distribution releases contain material misrepresentations. They each imply that things are happening--new orders, increased

demand, increased production--that collectively make Nutra Pharma's stock more desirable. Defendants, however, knew that these events were not actually occurring. Nutra Pharma was held up in regulatory approvals in Canada, had no real plans to distribute in China or India, and did not have cobra farms. "The law is well settled that so called 'half truths'--literally true statements that create a materially misleading impression--will support claims for securities fraud." SEC v. Syron, 934 F. Supp. 2d 609, 629 (S.D.N.Y. 2013) (internal quotation marks and citation omitted). Accordingly, Defendants' motions to dismiss allegations related to the distribution releases are DENIED.

Deitsch also argues that with respect to Count 2, the SEC fails to plead the scienter necessary for a 10(b) violation. (Deitsch Br. at 18-20.) However, again, considering the "allegations [ ] accepted as true and taken collectively [ ] a reasonable person [would] deem the inference of scienter at least as strong as any opposing inference." In re PXRE Grp., 600 F. Supp. at 528 (internal quotation marks and citation omitted). Viewed together, the promoter and distribution releases paint an inaccurate picture of Nutra Pharma. Deitsch was in control of Nutra Pharma's actions and statements and thus the Amended Complaint "establish[es] a strong inference of fraudulent intent by alleging . . . facts that constitute strong circumstantial

evidence of conscious misbehavior or recklessness." Syron, 934 F. Supp. 2d at 631 (internal quotation marks and citations omitted).

Further, the Amended Complaint alleges that Defendants raised approximately $929,000 from investors in response to the alleged misstatements and that Deitsch personally received approximately $113,000 in cash and other transfers. (Am. Compl. ¶¶ 91-93, 228-30.) These allegations, if true, adequately demonstrate receipt of money or property for purposes of Section 17(a)(2), and also support a strong inference of scienter--that Defendants took these actions because they were profitable. Accordingly, as alleged, lack of scienter or receipt of money are not bases to dismiss these allegations in the Amended Complaint.

III. <u>Market Manipulation under Exchange Act Section 10(b) and Rule 10b-5 (Claim 2) and Exchange Act Section 9(a)(2) (Claim 3)</u>

"[M]arket manipulation comprises a class of conduct prohibited by Section 10(b), which typically involves practices such as wash sales, matched orders, or rigged prices, that are intended to mislead investors by artificially affecting the market activity." <u>Fiore</u>, 416 F. Supp. 3d at 319 (quoting <u>Fezzani v. Bear, Stearns & Co.</u>, 384 F. Supp. 2d 618, 641 (S.D.N.Y. 2004)). Under 10(b), the SEC need not demonstrate that Deitsch's actions actually impacted the market, as "courts have upheld market-manipulation-based enforcement actions on manipulative intent alone." <u>Id.</u> at 326 (collecting cases).

Further, Section 9(a)(2) makes it unlawful for one or more persons to "effect . . . a series of transaction in any security . . . creating actual or apparent active trading in such security, or raising or depressing the price of such security, for the purpose of inducing the purchase or sale of such security by others." 15 U.S.C. § 78i(a)(2). Manipulative trading under both sections requires scienter. See Fezzani, 716 F.3d at 22 (claims under Section 10(b)); Sharette v. Credit Suisse Int'l, 127 F. Supp. 3d 60, 78 (S.D.N.Y. 2015) (claim under Section 9(a)(2)).

A.   Application

Deitsch argues that the Amended Complaint does not demonstrate that he made the alleged manipulative trades with scienter or for the purpose of inducing Nutra Pharma stock's sale or purchase by others. He contends that he actually did the opposite, by trying to "protect" the stock from "professional shorters." (Deitsch Br. at 20.)

Deitsch's own statements about his motivations are insufficient to establish a lack of scienter. Issues going to Deitsch's mental state and reasons for making the trades are issues of fact that cannot be resolved on this motion to dismiss. At this stage, the Court finds that all of the facts alleged, collectively, give rise to a strong inference of scienter. See Tellabs, 551 U.S. at 322-23, 127 S. Ct. at 2509. Accordingly, the motion to dismiss Claims 2 and 3 is DENIED.

IV.  Deitsch's Alleged False Reports in Violation of Exchange
     Act Section 13(a) and Rule 13a-14 (Claim 5)

     The Amended Complaint alleges that Deitsch certified that Nutra Pharma's periodic SEC reports were truthful when he knew that they contained untrue statements of material fact or omissions of material fact.  (Am. Compl. ¶ 261.)  The reports contain the same statements alleged to be misleading in the press releases.  For the reasons already stated with respect to Claims 1 and 2 and the press releases, these portions of the motions to dismiss are DENIED.

V.   McManus as an Unregistered Broker Dealer in Violation of
     Exchange Act Section 15(a) (Claim 6)

     Under Section 15(a), it is unlawful for an unregistered broker or dealer to "make use of the mails or any means or instrumentality of interstate commerce to effect any transactions in, or to induce or attempt to induce the purchase or sale of, any security."  15 U.S.C. § 78o(a)(1).  McManus argues that the SEC has not adequately alleged that he engaged in activities making him a "broker" under Exchange Act Section 3(a)(4)(a).  The Exchange Act defines a broker as "any person engaged in the business of effecting transactions in securities for the account of others."  15 U.S.C. § 78c(a)(4)(A).  "In determining whether an individual is as a broker under Section 15(a), courts consider whether the alleged broker 1) is an employee of the issuer; 2) received commissions as opposed to a salary; 3) is selling, or previously

sold, the securities of other issuers; 4) is involved in negotiations between the issuer and the investor; 5) makes valuations as to the merits of the investment or gives advice; and 6) is an active rather than passive finder of investors." SEC v. CKB168 Holdings, Ltd., 210 F. Supp. 3d 421, 453 (E.D.N.Y. 2016) (internal quotation marks and citation omitted) (noting that most courts do not require the SEC to establish all factors, but a combination of factors establishing a defendant acted as a broker); see also SEC v. Rabinovich & Assocs., LP, No. 07-CV-10547, 2008 WL 4937360, at *5 (S.D.N.Y. Nov. 18, 2008) ("Among the activities indicative of being a broker are soliciting investors, participating in the securities business with some degree of regularity, and receiving transaction-based compensation.")

While McManus is correct that the Amended Complaint does not explicitly allege he effected any transactions, it does plausibly allege that he induced or attempted to induce the purchase or sale of securities by calling investors, mailing invitations to promotional events, and attending dinners and lunches and making promotional pitches. (Am. Compl. ¶¶ 82-101, 212-13.) He is alleged to have "worked as a consultant for Nutra Pharma" from 2013 to 2017 (Am. Compl. ¶ 21) and "received [compensation] from Nutra Pharma [after completing specific tasks,] purportedly for 'investor relations'" (Am. Compl. ¶ 101). He was involved in negotiations between Nutra Pharma and potential

investors, and took an active role in finding investors.  Finally,
McManus does not argue that he is lawfully registered.
Accordingly, McManus's motion to dismiss Claim 6 is DENIED.

## VI.  Aiding and Abetting (Claims 11, 12, and 13)

Defendants argue that the aiding and abetting claims
should be dismissed because the SEC has not alleged primary
violations.  (Deitsch Br. at 21.)  Because the Court finds the SEC
has adequately alleged the primary violations as discussed above,
the portion of the Defendants' motions to dismiss the aiding and
abetting claims is DENIED.

## VII. The Amended Complaint and Pleading Requirements

The Amended Complaint contains 247 paragraphs of factual
allegations, followed by fourteen claims that each "re-allege[]
and incorporate[] by reference the allegations in paragraphs 1
through 247."  Thus, the Court is left to puzzle over which of the
247 factual allegations are intended to support and underlie each
individual claim.  See, e.g., S.E.C. v. Fraser, No. 09-CV-0443,
2009 WL 2450508, at *14 (D. Ariz. Aug. 11, 2009) (SEC Complaint
violates Federal Rule of Civil Procedure 9(b) where it
"incorporates every factual paragraph into each claim section, and
it makes no attempt to lay out which conduct constitutes the
violations alleged.  Rather, the claims sections simply paraphrase
or quote the language of the statutes and rules, leaving Defendants
(and the Court) with the task of combing the Complaint and

inferring, rightly or wrongly, what specific conduct the SEC intended to assert as a violation.").

The Court has dismissed allegations with respect to the Wall Street Buy press releases. Accordingly, the SEC is DIRECTED to file a Second Amended Complaint that complies with this Memorandum and Order. Additionally, in the Second Amended Complaint, the SEC shall briefly identify which factual allegations underlie and support each claim, and not merely incorporate almost 250 paragraphs by reference. See Corrado v. N.Y. State Unified Court Sys., No. 12-CV-1748, 2014 WL 4626234, at *5 (E.D.N.Y. Sept. 15, 2014) ("While these problems may not rise to the level that would warrant dismissal of the complaint, the repetition of allegations and the organization of the [ ] pleading would unnecessarily burden the defendant[s] in attempting to respond.").

## CONCLUSION

Accordingly, Defendants' motions to dismiss (D.E. 31 and 33) are GRANTED IN PART and DENIED IN PART. The allegations regarding the Wall Street Buy press releases are DISMISSED. The SEC shall file a Second Amended Complaint in accordance with this Memorandum and Order within thirty (30) days of the date of this Order. The parties shall comply with the discovery deadlines (D.E. 43) approved by Magistrate Judge Steven Tiscione in his February 14, 2020 Electronic Order or make the appropriate

application to Judge Tiscione for any modifications in light of this Memorandum and Order.

The SEC is directed to mail a copy of this Memorandum and Order to pro se Defendant McManus and file proof of service on ECF.

SO ORDERED.

/s/ JOANNA SEYBERT
Joanna Seybert, U.S.D.J.

Dated: March ___31___, 2020
       Central Islip, New York