**MARC P. BERGER**
**REGIONAL DIRECTOR**
Lara S. Mehraban
Sheldon L. Pollock
Preethi Krishnamurthy
Lee A. Greenwood
Lindsay S. Moilanen
**Attorneys for Plaintiff**
**SECURITIES AND EXCHANGE COMMISSION**
New York Regional Office
Brookfield Place
200 Vesey Street, Suite 400
New York, New York 10281-1022
(212) 336-0116 (Krishnamurthy)

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, <br><br>       Plaintiff, <br><br>   -against- <br><br> NUTRA PHARMA CORPORATION, ERIK DEITSCH a/k/a RIK DEITSCH, and SEAN PETER McMANUS, <br><br>      Defendants. | **SECOND AMENDED COMPLAINT** <br><br> 18-cv-05459 (JS) (ST) <br><br> **JURY TRIAL DEMANDED** |

Plaintiff Securities and Exchange Commission (the "Commission"), for its Second Amended Complaint against Defendants Nutra Pharma Corporation ("Nutra Pharma"), Erik Deitsch a/k/a Rik Deitsch ("Deitsch"), and Sean Peter McManus ("McManus") (collectively, "Defendants"), alleges as follows:

**SUMMARY**

1. From approximately August 2013 through June 2018 (the "Relevant Period"), Defendants—Nutra Pharma, a microcap penny stock issuer that purported to make pain relief drugs using venom from cobra snakes; Deitsch, Nutra Pharma's chief executive officer, chief financial

officer, president, and chairman; and McManus, a former registered stock broker who had effectively been barred from the profession for misconduct and whom Nutra Pharma nevertheless hired to promote its stock to investors—defrauded investors by making materially false and misleading statements about Nutra Pharma and violated anti-fraud and other federal securities laws.

2.     In 2013 and 2015, Nutra Pharma raised over $920,000 by issuing millions of shares of its stock to over thirty investors in at least two private placement offerings, for which Nutra Pharma failed to file required registration statements with the Commission.

3.     Before and during Nutra Pharma's 2013 and 2015 private placements, Defendants sought to inflate Nutra Pharma's share price in the market, at least partly to make the private placements' lower stock price appear more attractive to investors.

4.     Before and during the private placements, Nutra Pharma and Deitsch knowingly issued a series of materially false or misleading press releases touting Nutra Pharma's products and its purported investment and business accomplishments—including a press release touting Nutra Pharma's completed expansion and upgrade of a cobra farm, when in fact Nutra Pharma never had a cobra farm, never had cobras, and indeed had never produced cobra venom.

5.     Nutra Pharma repeated this and other such false statements in a quarterly filing Nutra Pharma made with the Commission on Form 10-Q, which Deitsch signed and certified.

6.     During at least the second private placement, McManus, while unlawfully acting as a broker without Commission registration, further defrauded at least one investor by knowingly or recklessly making materially false statements about Nutra Pharma, including that Nutra Pharma had 1300 cobras on a farm in Florida and that the company "milked" the cobras for venom monthly.

7.     During at least the second private placement, Deitsch also engaged in manipulative trades of Nutra Pharma stock by submitting orders to buy shares at prices at or above the sellers' ask prices in order to support or "walk up" the stock price—in other words, on some occasions,

Deitsch offered to pay more for the shares than the amount the seller was willing to take. After one brokerage firm told Deitsch his trades looked "uneconomical" and were "upticking the price of the stock," the firm closed his brokerage account. Shortly afterwards, Deitsch opened a new account with a different brokerage firm and continued to make the same type of manipulative trades.

8.     Deitsch also repeatedly failed to make required public filings with the Commission about his beneficial ownership of significant percentages of outstanding Nutra Pharma stock and about his purchases of Nutra Pharma stock.

9.     Finally, Nutra Pharma, through Deitsch, failed to make required public filings with the Commission to disclose Nutra Pharma's issuance of millions of shares of stock and therefore Nutra Pharma's dilution of previously-existing shareholders' equity in the company.

## VIOLATIONS

10.     By virtue of the foregoing conduct and as alleged further herein, Nutra Pharma violated Sections 5(a) and (c) and 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §§ 77e(a), 77e(c), and 77q(a)], Sections 10(b) and 13(a) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §§ 78j(b) and 78m(a)], and Rules 10b-5, 13a-11 and 13a-13 thereunder [17 C.F.R. §§ 240.10b-5, 240.13a-11, and 240.13a-13].

11.     By virtue of the foregoing conduct and as alleged further herein, Deitsch violated Securities Act Sections 5(a) and (c) and 17(a) [15 U.S.C. §§ 77e(a), 77e(c), and 77q(a)], Exchange Act Sections 9(a)(2), 10(b), 13(a), 13(d), and 16(a) [15 U.S.C. §§ 78i(a)(2), 78j(b), 78m(a), 78m(d), and 78p(a)], and Rules 10b-5, 13a-14, 13d-2, and 16a-3 thereunder [17 C.F.R. §§ 240.10b-5, 240.13a-14, 240.13d-2, and 240.16a-3]. Deitsch further aided and abetted Nutra Pharma's violations of Securities Act Section 17(a) [15 U.S.C. § 77q(a)], Exchange Act Sections 10(b) and 13(a) [15 U.S.C. §§ 78j(b) and 78m(a)] and Rules 10b-5, 13a-11 and 13a-13 thereunder [17 C.F.R. §§ 240.10b-5, 240.13a-11, and 240.13a-13].

12.     By virtue of the foregoing conduct and as alleged further herein, McManus violated Securities Act Section 17(a) [15 U.S.C. § 77q(a)], Exchange Act Sections 10(b) and 15(a) [15 U.S.C. §§ 78j(b) and 78o(a)], and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

13.     Unless Defendants are restrained and enjoined, they will engage in the acts, practices, transactions, and courses of business set forth in this Complaint or in acts, practices, transactions, and courses of business of similar type and object.

## NATURE OF THE PROCEEDINGS AND RELIEF SOUGHT

14.     The Commission brings this action pursuant to the authority conferred upon it by Securities Act Section 20(b) [15 U.S.C. § 77t(b)] and Exchange Act Section 21(d) [15 U.S.C. § 78u(d)].

15.     The Commission seeks a final judgment: (a) permanently enjoining each defendant from engaging in the acts, practices, and courses of business alleged here against it or him and from committing future violations of the provisions of the federal securities laws it or he is alleged to have violated; (b) ordering Defendants to disgorge the ill-gotten gains they received as a result of the violations alleged here and to pay prejudgment interest thereon; (c) ordering Defendants to pay civil money penalties pursuant to Securities Act Section 20(d) [15 U.S.C. § 77t(d)] and Exchange Act Section 21(d)(3) [15 U.S.C. § 78u(d)(3)]; (d) permanently prohibiting Deitsch from serving as an officer or director of any company that has a class of securities registered under Exchange Act Section 12 [15 U.S.C. § 78l] or that is required to file reports under Exchange Act Section 15(d) [15 U.S.C. § 78o(d)], pursuant to Exchange Act Section 21(d)(2) [15 U.S.C. § 78u(d)(2)]; (e) permanently prohibiting Deitsch and McManus from participating in any offering of a penny stock, pursuant to Securities Act Section 20(g) [15 U.S.C. § 77t(g)] and Exchange Act Section 21(d)(6) [15 U.S.C. § 78u(d)(6)]; and (f) ordering any other and further relief the Court may deem just and proper.

## JURISDICTION AND VENUE

16.     This Court has jurisdiction over this action pursuant to Securities Act Section 22(a) [15 U.S.C. § 77v(a)] and Exchange Act Section 27 [15 U.S.C. § 78aa].

17.     Defendants, directly and indirectly, have made use of the means or instrumentalities of interstate commerce or of the mails in connection with the transactions, acts, practices, and courses of business alleged herein.

18.     Venue lies in this District under Securities Act Section 22(a) [15 U.S.C. § 77v(a)] and Exchange Act Section 27 [15 U.S.C. § 78aa] because certain transactions, acts, practices, and courses of business constituting the violations alleged herein occurred within the Eastern District of New York. Among other things, Deitsch and McManus—while physically on Long Island, including in Glenwood Landing, New York—solicited investors; McManus made material misrepresentations to an investor located in Old Westbury, New York; and Nutra Pharma sold unregistered securities through a private placement to at least three investors who lived in East Northport, Wantagh, and Mineola, New York, respectively.

## DEFENDANTS[1]

19.     **Nutra Pharma**, incorporated in 2000 in California under the name Exotic-bird.com, has its principal place of business in Coral Springs, Florida. At all relevant times, Nutra Pharma's common stock has been registered with the Commission pursuant to Exchange Act Section 12(g) [15 U.S.C. § 78l(g)]. From at least January 1, 2013 to at least September 17, 2018, the OTC Link, an interdealer quotation service operated by the OTC Markets Group Inc., quoted the prices of Nutra Pharma's shares of common stock. Throughout the Relevant Period, Nutra Pharma's common

---

[1]     Defendants Deitsch and Nutra Pharma have entered into agreements with the Commission that toll and suspend the statute of limitations "applicable to any action or proceeding…brought by …the Commission…including any sanctions or relief that may be imposed therein," until October 9, 2018, for conduct that occurred between July 9 and October 9, 2013.

stock met the definition of a "penny stock" under Exchange Act Section 3(a)(51) [15 U.S.C. § 78c(a)(51)] and Rule 3a51-1 thereunder [17 C.F.R. § 240. 3a51-1], because the stock traded below five dollars per share and did not satisfy any of the exceptions to the definition of "penny stock" set forth in Rule 3a51-1.

20.     **Deitsch**, age 52, has run Nutra Pharma since approximately November 2002. Throughout and since the Relevant Period, Deitsch has been the company's CEO, president, CFO, and chairman of the Board of Directors. Deitsch is also an officer and director of two other companies that have issued penny stock.

21.     **McManus**, age 49, worked as a consultant for Nutra Pharma from early 2013 until at least 2017. At times during the Relevant Period, McManus conducted business through Patriot Settlement Resources ("Patriot Resources"), a company for which he served as a principal and that purportedly engaged in the structured settlement finance business.

## OTHER RELEVANT INDIVIDUAL

22.     **Christopher Castaldo ("Castaldo")**, age 48, lived and worked on Long Island, New York, including Glenwood Landing, New York, from at least 2012 until approximately December 2017. Between approximately December 1991 and at least 1998, Castaldo was a registered representative associated with various broker-dealers registered with the Commission. From at least 2013 through 2017, Castaldo ran a company called Wall Street Buy Sell Hold Inc. ("Wall Street Buy"), which, among other things, issued a newsletter named *Wall Street Buy Sell Hold*. Castaldo recently served a 24-month prison sentence for conduct unrelated to Nutra Pharma, after he pleaded guilty on March 1, 2017, to one count of conspiracy to commit securities fraud in *United States v. Castaldo*, No. 16-cr-00234 (E.D.N.Y.).

## FACTS

I.   **BACKGROUND**

A.   **Nutra Pharma**

23.   In 2000, Nutra Pharma was incorporated under the name Exotic-bird.com.

24.   In July 2000, the company changed its name to Cyber-Vitamin.com.

25.   In October 2001, the company changed its name to Nutra Pharma.

26.   During the Relevant Period, Nutra Pharma purported to sell, among other things, two over-the-counter homeopathic products made with cobra venom: Nyloxin, a human pain reliever, and Pet Pain-Away, a pain reliever for pets.

27.   Nutra Pharma has never turned a profit.

28.   For the year ended December 31, 2016, Nutra Pharma reported annual losses totaling $3.5 million.

B.   **Deitsch**

29.   In approximately November 2002, Deitsch's friend introduced him to Nutra Pharma, and Deitsch soon began running the company.

30.   Since at least 2003, Deitsch has served as Nutra Pharma's CEO, president, and chairman of the Board of Directors and, except for a brief gap before the Relevant Period, as Nutra Pharma's CFO.

31.   As part of his compensation, Deitsch received shares of Nutra Pharma.

32.   On April 1, 2008, Deitsch filed with the Commission a Schedule 13D form reporting his ownership of 33.8% of Nutra Pharma's outstanding shares.

33.   Throughout the Relevant Period, Deitsch signed, approved, and held responsibility for all filings Nutra Pharma made with the Commission, including annual reports on Form 10-K, quarterly reports on Form 10-Q, and current reports on Form 8-K.

### C.     McManus

34.     From approximately 1996 through 1998, McManus served as a registered representative at a series of broker-dealers then registered with the Commission.

35.     In January 2001, the National Association of Securities Dealers ("NASD")—now the Financial Industry Regulatory Authority ("FINRA"), a self-regulatory organization that operates under Commission oversight—barred McManus from associating with any NASD member in any capacity. The NASD based its bar on findings that McManus purchased shares of stock in the accounts of customers without their knowledge or consent. This ongoing bar prohibits McManus from associating with any member of FINRA, whose membership generally comprises every broker-dealer registered with the Commission, with limited exceptions.

36.     FINRA's publicly available BrokerCheck website (https://brokercheck.finra.org), which allows the public to search for brokers by name, prominently displays the word "BARRED" in red next to McManus's name.

37.     Since 2001, McManus has not been licensed or registered as a broker-dealer or as an associated person of a broker-dealer and has not registered any entity he owns or controls with the Commission as a broker-dealer.

38.     Deitsch met McManus in approximately 2011 or 2012.

39.     Deitsch learned that McManus was a former broker.

40.     From at least 2013 through December 2015, Deitsch engaged McManus, at times through Patriot Resources, to serve as a "consultant" to Nutra Pharma, as described in more detail below.

41.     From at least 2013 through December 2015, McManus and Deitsch spoke regularly and sometimes more than once a day.

42.     From at least 2013 through December 2015, McManus regularly spent time at Nutra Pharma's offices in Florida.

**C.     Castaldo**

43.     Deitsch first met Castaldo in approximately 2005 and stayed in touch with him afterwards.

44.     On September 30, 2008, the Commission filed a civil enforcement action against Castaldo, captioned *SEC v. Castaldo et al.,* No. 08-cv-8397 (JSR), in the United States District Court for the Southern District of New York. The complaint alleged, among other things, that Castaldo aided and abetted a registered broker-dealer's violations of Exchange Act Section 15(b)(7) by acting as the broker-dealer's unlicensed and unregistered representative when soliciting investors to purchase stock.

45.     On July 20, 2009, a jury found Castaldo liable for that claim. One month later, the court ordered Castaldo to pay disgorgement, prejudgment interest, and civil penalties totaling more than $280,000.

46.     In approximately 2010 or 2011, Castaldo reached out to Deitsch and pitched Castaldo's services to Nutra Pharma.

47.     As Deitsch knew, Castaldo put out a newsletter about stocks, *Wall Street Buy Sell Hold*, from his office on Long Island.

48.     As Deitsch further knew, Castaldo had brokers who worked for him, Castaldo worked with other investor relations professionals, and Castaldo had "a phone room," as Deitsch called it, which Castaldo used to bring in clients for his newsletter and to promote stocks.

49.     Deitsch researched Castaldo's background, learned about the Commission's 2008 enforcement action against Castaldo, and understood that Castaldo had been found liable for violating the securities laws in connection with acting as a broker.

50. In 2013, after researching Castaldo's background, Deitsch and Nutra Pharma nevertheless hired Castaldo to promote Nutra Pharma's stock to potential investors.

51. Deitsch traveled to Long Island several times to speak to people who worked for Castaldo and answer their questions.

52. On July 10, 2013, Nutra Pharma and Wall Street Buy, Castaldo's company, entered into a three-month consulting agreement whose term lasted until October 10, 2013, but could be renewed for another ninety days.

53. Under the agreement's terms, Wall Street Buy agreed, among other things, "to provide [to Nutra Pharma] one or more plans…for using various investors and public relations services…[that] may include availability to expand [Nutra Pharma's] investor base,…[and] broker relations" and to "disburse electronically, via email, public information and news releases about [Nutra Pharma]…[and] discuss this information via use of the telephone to investors interested in investing in growth companies."

54. The consulting agreement required Nutra Pharma to pay Wall Street Buy $10,000 in cash plus five million shares of Nutra Pharma stock for each month of the agreement's three-month term and to issue a $30,000 note, convertible to Nutra Pharma shares at a price of $0.005 per share, to Wall Street Buy on January 10, 2014.

55. Deitsch signed the consulting agreement on Nutra Pharma's behalf, as its chairman and CEO, and Castaldo's brother signed the agreement on Wall Street Buy's behalf, as its secretary.

## II. NUTRA PHARMA, THROUGH DEITSCH, ISSUED AT LEAST ONE MATERIALLY MISLEADING PRESS RELEASE IN 2013

56. From January 1 through December 31, 2013, Nutra Pharma's shares of stock never traded above $0.028 per share in reported prices.

57. In 2013, Deitsch sought to raise money for Nutra Pharma through private placements of Nutra Pharma stock to investors.

58.     In August 2013, Nutra Pharma issued a misleading press release touting Nutra Pharma's products and its purported product distribution.

59.     Deitsch drafted the press release.

60.     Deitsch controlled the distribution of the press release and its posting on Nutra Pharma's website.

61.     On March 23, 2013, NAC Marketing Company, LLC, the marketing and distribution company that did business as New Vitality, entered into a consulting agreement with MGRD, Inc. ("MGRD"), a company Deitsch controlled and through which he received royalty payments.

62.     Under the agreement's terms, New Vitality engaged Deitsch (through MGRD) as a consultant to perform the duties of "Chief Science Officer and Formulator" and required Deitsch to travel to New Vitality's offices in Farmingdale, New York at least once per quarter.

63.     In return, New Vitality agreed to pay Deitsch's company $7,000 per month, along with a royalty in the form of a percentage of gross receipts of certain products New Vitality sold, including an advance of $2,500 per month against future royalties.

64.     Deitsch signed the consulting agreement on MGRD's behalf.

65.     On August 29, 2013, Nutra Pharma issued a press release announcing that New Vitality had placed its first order of Nyloxin.

66.     The press release claimed: "New Vitality, a marketing and distribution company, has placed and received their first order of [Nutra Pharma]'s all-natural, non-addictive pain reliever, Nyloxin™. The order was pursuant to New Vitality's successful test radio campaign to gauge the market acceptance of the product."

67.     The press release quoted Deitsch: "This radio test represented the first broad exposure to our Nyloxin brand…. It's been a pleasure working with New Vitality as they create awareness for our products…. The radio advertising ran in major markets across the US over several

weeks, with a consumer response that was positive enough to warrant the first orders from New Vitality."

68.     The press release did not mention the consulting agreement or financial relationship between Deitsch and New Vitality.

69.     On August 26, 2013, Nutra Pharma sent New Vitality an invoice for $6,312.65 for shipping Nyloxin to New Vitality.

70.     Nutra Pharma never received any payment from New Vitality for this invoice.

## III.   NUTRA PHARMA SOLD SHARES IN A 2013 PRIVATE PLACEMENT

71.     On August 2, 2013, Nutra Pharma entered into a six-month consulting agreement with Patriot Resources, McManus's consulting company, by which McManus agreed to provide "sales and marketing consulting services" to Nutra Pharma.

72.     Under the agreement's terms, Nutra Pharma agreed to pay Patriot Resources 2.5 million shares of Nutra Pharma stock and to pay McManus 3.5 million shares of Nutra Pharma stock.

73.     Deitsch signed the agreement on Nutra Pharma's behalf, and McManus signed the agreement on Patriot Resource's behalf.

74.     Pursuant to this agreement and Wall Street Buy's consulting agreement with Nutra Pharma, described above in paragraphs 52 through 55, McManus and Castaldo used their resources to obtain investors for Nutra Pharma's private placement.

75.     In the fall of 2013, Castaldo and McManus arranged for a dinner—which Deitsch paid for—with potential investors at a restaurant on Long Island.

76.     Before the dinner, Castaldo told Deitsch and McManus that "15 super high net worth investors . . . WEALTHY – Powerful people [are] attending."

77.     On October 9, 2013, the dinner took place at a steakhouse in Woodbury, New York.

78.     Deitsch attended the dinner and pitched the attendees on investing in Nutra Pharma through a private placement.

79.     McManus also attended the dinner.

80.     From October through December 2013, after Nutra Pharma had disseminated the materially misleading press release described above, Nutra Pharma issued 42 million shares of its stock to at least six investors in a private placement at prices ranging from $0.001 to $0.015 per share.

81.     Nutra Pharma raised $140,000 from investors through this private placement.

82.     During the same period, from October through December 2013, Deitsch received at least $15,000 from Nutra Pharma's bank account through at least ten separate transfers to himself, purportedly for loan repayments, and additional cash withdrawals in increments ranging from $500 to $3,000.

83.     Nutra Pharma did not file any registration statement with the Commission for this stock offering.

## IV.     MCMANUS SOLICITED INVESTORS FOR NUTRA PHARMA IN 2014

84.     In approximately August 2014, McManus traveled to Castaldo's office on Long Island.

85.     While there, he called at least seven people and tried to solicit them to invest in Nutra Pharma.

86.     In approximately August or September 2014, McManus mailed a paper invitation to prospective investors for a "Complimentary Investor Luncheon" scheduled for September 12, 2014, at a steakhouse in Florida.

87.     The invitation described the event as a "highly informational presentation made by the CEO's of [another company] and Nutra Pharma" and provided the ticker symbol for each company's stock.

88.     The invitation further promoted the companies and the event (with emphasis in the original): "Get informed on these two '*Breakout*' companies! Get an update on new exciting developments! Learn about the carefully researched sales projections, market reach, and growth potential!"

89.     The invitation instructed attendees to RSVP by email to McManus by September 5, 2014, "before we fill up."

90.     On September 16, 2014, four days after the luncheon, McManus received over $1,200 from Nutra Pharma, purportedly for "investor relations."

## V.   NUTRA PHARMA, THROUGH DEITSCH, ISSUED OR PUBLICIZED AT LEAST THREE MATERIALLY FALSE AND MISLEADING PRESS RELEASES AND A FALSE AND MISLEADING FORM 10-Q IN 2015

91.     In 2015, Deitsch again sought to raise money for Nutra Pharma from private placements of stock.

92.     From January 1 through May 14, 2015, Nutra Pharma's shares of stock never traded above $0.008 per share in reported prices.

93.     Between May 14 and July 10, 2015, Nutra Pharma issued two materially false and misleading press releases touting Nutra Pharma's products and its purported product distribution and posted on its website a third materially false and misleading press release issued by a third party.

94.     Nutra Pharma later repeated some of the same false and misleading claims in its August 2015 Form 10-Q public filing with the Commission.

95.     Deitsch drafted the two false and misleading press releases Nutra Pharma issued, edited and approved the third false and misleading press release posted on Nutra Pharma's website, and approved and signed the false and misleading Form 10-Q.

96.     Deitsch controlled the distribution of these press releases and their posting on Nutra Pharma's website.

**A.     The May 14, 2015 Press Release and August 18, 2015 Form 10-Q**

97.     On January 1, 2015, Nutra Pharma entered into a Confidentiality and Nondisclosure Agreement with a Canadian corporation doing business as Nature's Clinic, a Canadian distributor, to "evaluate a potential business relationship" between them.

98.     Deitsch signed the agreement on Nutra Pharma's behalf.

99.     On approximately April 10, 2015, Deitsch and the CEO of Nature's Clinic spoke by telephone about Nature's Clinic serving as Nutra Pharma's Canadian product distributor.

100.     On the call, the two CEOs discussed a potential transaction that would allow Nutra Pharma to place its products in Nature's Clinic's Canadian warehouse, enable Nature's Clinic to act as Nutra Pharma's Canadian import and export broker, and permit Nature's Clinic to serve as Nutra Pharma's regulatory representative for all required Canadian product licenses.

101.     The two CEOs reached no agreement during the call on the amount of money Nutra Pharma would pay Nature's Clinic in return but agreed to try in approximately three weeks to execute written contracts covering the services Nature's Clinic would provide and the compensation Nutra Pharma would pay in return.

102.     By May 14, 2015, Nutra Pharma and Nature's Clinic had not executed any such contracts, as Deitsch knew because he had not signed any such contracts.

103. On May 14, 2015, Nutra Pharma nevertheless issued a press release announcing its engagement of Nature's Clinic to obtain regulatory approval and begin distribution of Nyloxin in Canada.

104. The press release claimed: "Nutra Pharma Has Announced That They Have Engaged the Nature's Clinic to Begin the Process of Distributing Nyloxin® in Canada."

105. The press release further claimed: "Nutra Pharma…announced today that they have engaged the Nature's Clinic to begin the process of regulatory approval of…Nyloxin® for marketing and distribution in Canada."

106. The press release quoted Deitsch: "I'm excited to announce that we have begun working with Canadian distributors to register Nyloxin for sale throughout Canada."

107. The press release further quoted the president of Nature's Clinic: "We believe that we can get all of these products approved for re-sale in the Canadian market this calendar year. In preparation for these sales, we've already begun setting up our Chatham, Ontario warehouse facility for distribution and fulfillment."

108. Almost two months later, on July 7, 2015, Deitsch received a letter from a licensed lobbyist and regulatory consultant representing Nature's Clinic.

109. The regulatory consultant wrote: "As you are aware Health Canada has now effectively closed the border to US exports of your corporation's types of products into Canada for resale that do not have approved pharmaceutical site licenses and related product licenses."

110. Making clear that Nature's Clinic could not establish a Canadian warehouse for Nutra Pharma's products without more information, the regulatory consultant continued: "I understand that you want my client to establish an Ontario based warehouse and reshipping center for [Nyloxin, Pet Pain-Away and another product]. In order to develop a costing analysis we will

require some estimate of the monthly average volumes in 2015 and the year by year trend lines over the last two years."

111.     The regulatory consultant also made clear that Nutra Pharma and Nature's Clinic had still not decided how much Nutra Pharma would pay Nature's Clinic for the latter's services. Rather, the regulatory consultant reiterated the parties' "tentative[ ]" agreement that Nature's Clinic "would receive an administrative fee in an amount to be worked out for each shipment received, stored and/or shipped via his distribution warehouse" and that Nature's Clinic "would receive funds from Nutra Pharma Corporation as to be worked out in order to cover all out of pocket investments made for your corporation's interests," among other things.

112.     The regulatory consultant explained that he needed additional information, including a draft contract, in order to begin working on the financial aspect of the potential transaction: "As soon as we get more answers and a draft contract I can provide budget details for the two of you to work out each of your shares."

113.     The next month, on August 18, 2015, Nutra Pharma filed a Form 10-Q quarterly report with the Commission for the fiscal quarter that ended on June 30, 2015 (the "August 2015 10-Q").

114.     Deitsch signed and certified the August 2015 10-Q as Nutra Pharma's CEO and CFO.

115.     The August 2015 10-Q reiterated the May 14, 2015 press release: "On May 14, 2015 we announced that we had engaged the Nature's Clinic to begin the process of regulatory approval of our Company's Over-the-Counter pain drug, Nyloxin® for marketing and distribution in Canada. The Nature's Clinic has already begun setting up their Chatham, Ontario warehouse and expect to complete the approval process to begin distributing Nyloxin® by the end of the year."

116.     By May 2017, Nutra Pharma had still not distributed any of its products in Canada.

**B.      The June 23, 2015 Press Release and August 2015 10-Q**

117.     Nutra Pharma purportedly had a third party produce Nyloxin before 2014 and Pet Pain-Away before 2015.

118.     In approximately February 2015, Deitsch purportedly sent a trial shipment of Nyloxin on Nutra Pharma's behalf to a "middleman" in India in an effort to reach a Nyloxin distribution deal in India.

119.     Despite the purported trial shipment, Nutra Pharma never actually distributed Nyloxin in India, as Deitsch knew.

120.     On May 1, 2015, Deitsch sent a letter on Nutra Pharma's behalf to a Canadian company to provide Nutra Pharma's "official authorization for [the] company to represent Nutra Pharma and Nutra Pharma's products in The People's Republic of China as Nutra Pharma's *Designated Representative*" (emphasis in original).

121.     Deitsch's letter provided the company with authorization to "identify[ ] a Chinese company (or companies) with the capabilities needed to obtain government regulatory approval for our products and eventual distribution of our Nyloxin product line in The People's Republic of China."

122.     The letter further stated: "You are free to show this Authorization Letter to any governmental agency or company as you work to identify a short list of the companies that you recommend for consideration."

123.     Despite the letter, Nutra Pharma never actually distributed Nyloxin in China, as Deitsch knew.

124.     As Deitsch also knew, Nutra Pharma has never produced Nyloxin itself and since 2014 has not had anyone else produce Nyloxin.

125.     As Deitsch similarly knew, Nutra Pharma has never produced Pet Pain-Away itself and since 2015 has not had anyone else produce Pet Pain-Away.

126.     As Deitsch further knew, neither Nutra Pharma nor Deitsch has ever owned cobras, a cobra farm, or any similar facility for obtaining cobra venom directly from cobras.

127.     On June 23, 2015, Nutra Pharma nevertheless issued a press release announcing its purported "Expansion and Upgrades for Nyloxin Production."

128.     The press release claimed that Nutra Pharma had "completed upgrades and an expansion to the reptile farm that houses the Asian cobras utilized in the production of [Nutra Pharma]'s OTC pain drug, Nyloxin®."

129.     The press release further claimed that Nutra Pharma "announced the addition of 100 snakes to the existing milking line to increase venom production for the upcoming international orders from India and China."

130.     The press release quoted Deitsch:

> Now we need to focus on increasing sales for our OTC products, Nyloxin and Pet Pain-Away. This also requires us to scale up our raw material supplies and production facilities. The growth-liming material for Nutra Pharma is cobra venom, the active ingredient in our OTC products. We need to make sure that we have an adequate supply of validated material to meet our future production needs. With the recently announced expansion into India and China, we realize that we will need to grow exponentially to meet these expected product orders in the coming months. The expansion of the reptile facilities ensures that we can grow apace with the increasing orders.

131.     In its August 2015 10-Q, Nutra Pharma reiterated this press release: "On June 23, 2015 we announced that we had completed a series of projects to update and expand the facilities that house the Asian cobras utilized for the production of Nyloxin®. We also announced the addition of 100 snakes to the existing milking line to increase venom production for the upcoming international orders from India and China."

132.    By May 2017, Nutra Pharma had still not distributed any of its products in India or China.

**C.     The July 10, 2015 Press Release**

133.    From January 1, 2015 through July 10, 2015, Nutra Pharma's stock price never traded above $0.27 per share in reported prices.

134.    In June 2015, Deitsch and the CEO of SeeThruEquity, an equity research firm that wrote research reports for small cap and microcap companies, exchanged emails about SeeThruEquity's potential publication of an analyst report initiating coverage of Nutra Pharma's stock.

135.    SeeThruEquity's CEO emailed Deitsch two pricing options for the packages SeeThruEquity was offering to Nutra Pharma, both of which purported to offer a "complimentary" report initiating coverage of Nutra Pharma stock along with other related services.

136.    SeeThruEquity's first option, its "Premier Service" for $11,000, offered "2 conferences [for Nutra Pharma] to present at, readership reports (meaning who from the buyside is downloading the research…), complimentary 15-20 page initiation report, and FIVE complimentary 2-3 page update reports."

137.    SeeThruEquity's second option, priced at $6,500, offered "1 conference [for Nutra Pharma] to present at" and a "complimentary 15-20 page initiation report."

138.    In addition, SeeThruEquity offered Deitsch a service that could be added on to either of these options: additional press releases prepared and distributed by SeeThruEquity for an additional price.

139.    On June 26, 2015, Deitsch emailed SeeThruEquity's CEO and asked him to get started on the premier service option. Deitsch further explained: "I see some value in a press release on initiating coverage, but…I write all of the PR for Nutra Pharma."

20

140.     SeeThruEquity's CEO wrote back: "[K]eep in mind – WE are the source of the initiation release as we do not have the same limitations that you do."

141.     Deitsch replied: "OK – sounds good…. We'd like to keep the momentum going and get the story out ASAP. I'd also like the eyes on the stock as we get the next few weeks of PR ready."

142.     On June 29, 2015, SeeThruEquity sent Nutra Pharma an invoice for $8,000, addressed to Deitsch, with instructions for wiring the funds. The invoice described the services SeeThruEquity would provide in return as "STE Conf PC Fee" and "Press release and distribution service – initiation report."

143.     That day, Nutra Pharma paid SeeThruEquity $8,000 through a wire transfer.

144.     On July 6, 2015, SeeThruEquity's CEO emailed Deitsch a draft of SeeThruEquity's report initiating its coverage of Nutra Pharma stock with a "target price" of $0.53—almost double the highest price at which Nutra Pharma shares had traded so far that year. The CEO wrote: "Please fact check and comment directly onto the PDF or via email. If necessary, we can have a call."

145.     Later that day, Deitsch emailed SeeThruEquity's CEO with corrections and comments and attached Deitsch's handwritten comments on SeeThruEquity's draft report.

146.     On July 9, 2015, SeeThruEquity's CEO emailed his draft press release concerning SeeThruEquity's initiation of coverage of Nutra Pharma stock to Deitsch with the subject line: "PR – please review and approve."

147.     The draft press release claimed that SeeThruEquity's "research is not paid for and is unbiased."

148.     Later that day, Deitsch emailed the draft back to SeeThruEquity's CEO with "some corrections" but did not alter the claim that SeeThruEquity's "research is not paid for and is unbiased."

149.    On July 10, 2015, Deitsch posted SeeThruEquity's final press release, announcing its initiation of coverage of Nutra Pharma stock, to Nutra Pharma's website.

150.    The press release announced that SeeThruEquity had initiated coverage of Nutra Pharma's stock "with a Price Target of $0.53."

151.    The press release claimed, just as the draft Deitsch reviewed had, that SeeThruEquity's "research is not paid for and is unbiased."

152.    The press release contained no mention of Nutra Pharma's financial arrangement with SeeThruEquity or Deitsch's role in SeeThruEquity's report initiating coverage of Nutra Pharma's stock.

## VI.    DEITSCH MANIPULATED THE MARKET FOR NUTRA PHARMA STOCK

### A.    Deitsch Placed Manipulative Trades in June 2015.

153.    On June 17, 2015—just days before Nutra Pharma issued its June 23 press release, described above—Deitsch placed five orders in Nutra Pharma stock at the outstanding ask price, the lowest price at which a seller is willing to sell, in his brokerage account at a broker-dealer firm ("Broker A") registered with the Commission.

154.    Deitsch generally placed his orders with Broker A over the Internet by accessing his brokerage account online.

155.    Just before 11:28 a.m. that day, the outstanding ask price for Nutra Pharma stock was $0.20 per share.[2]

156.    At 11:28 a.m. that day, Deitsch placed a 100-share limit buy order for Nutra Pharma stock at $0.20 per share.

157.    Broker A executed Deitsch's order at a price of $0.20 per share shortly thereafter.

---

[2]    The times listed for trades reflect Eastern Daylight Time.

158.    Just before 12:06 p.m. the same day, the outstanding ask price for Nutra Pharma stock was $0.189 per share.

159.    At 12:06 p.m., Deitsch placed a 100-share limit buy order for Nutra Pharma stock at $0.189 per share.

160.    Broker A executed Deitsch's order at a price of $0.189 per share shortly thereafter.

161.    Just before 12:48 p.m. that day, the outstanding ask price for Nutra Pharma stock was $0.199 per share.

162.    At 12:48 p.m., Deitsch placed a 100-share limit buy order for Nutra Pharma stock at $0.199 per share.

163.    Broker A executed Deitsch's order at a price of $0.199 per share shortly thereafter.

164.    Just before 1:15 p.m. that afternoon, the outstanding ask price for Nutra Pharma stock was $0.19 per share.

165.    At 1:15 p.m., Deitsch placed a 100-share limit buy order for Nutra Pharma stock at $0.19 per share.

166.    Broker A executed Deitsch's order at a price of $0.19 per share shortly thereafter.

167.    Just before 1:57 p.m. that afternoon, the outstanding ask price for Nutra Pharma stock was $0.199 per share.

168.    At 1:57 p.m., Deitsch placed a 100-share limit buy order for Nutra Pharma stock at $0.20 per share.

169.    Broker A executed Deitsch's order at a price of $0.199 per share shortly thereafter.

170.    Although Deitsch never paid more than $20.00 for Nutra Pharma stock in any of his five purchases that day, Deitsch paid a $9.99 commission to Broker A for each transaction.

171.    That same day, a representative of Broker A called Deitsch and told him that Broker A's compliance department had flagged Deitsch's trades as "uneconomical": "My

compliance department asked me to call out in regards to trading activity [in Nutra Pharma stock].
[We] noticed a series of small, uneconomical buys placed on this stock over the past several days."

172.    Broker A's representative explained that the trades looked manipulative: "This
trading activity of placing several buy orders throughout the day—market regulators could look at
that as an attempt to stabilize or uptick the price of the stock. It's not economical to place five
orders when you could have just placed one and avoided the other commissions."

173.    Deitsch replied: "The problem's you got…market-makers who are professional
shorters and they keep shorting the stock and if you don't trade it, then they keep shorting the stock.
So every time I place a trade, they stop shorting the stock."

174.    Broker A's representative warned Deitsch about his "upticking" orders: "You want
to avoid trading in this pattern otherwise we might have to put a restriction on the account….
[O]rders that are upticking the price of the stock or several orders like this today…that's something
they could flag and restrict an account for."

175.    Approximately one week later, on June 23, 2015, Broker A sent Deitsch an email
describing manipulative trading practices:

> We want you to know the relevant rules about trading the securities you hold
> in your account, especially a practice known as manipulative trading….
> Manipulative trading practices involve the purchase, sale, or other
> transactions in any security for the purpose of:
>
> -    Creating or inducing a false, misleading, or artificial appearance of activity
>      in the security.
>
> -    Unduly or improperly influencing the market price of the security.
>
> -    Setting a price that does not reflect the true state of the market in the
>      security….
>
> Manipulative trading practices constitute a serious violation of exchange
> trading rules.

176.     One month after that, on July 23, 2015, Broker A closed Deitsch's brokerage account and sent him a letter to inform him of that decision: "We are writing to inform you we have made the decision to terminate our business relationship with you…. [Broker A] will not change this decision. Please do not attempt to open a new [Broker A] account in the future."

**B.     Deitsch Placed Manipulative Trades Again in September 2015.**

177.     The next month, on August 27, 2015, Deitsch opened a new brokerage account at another broker-dealer firm ("Broker B") then registered with the Commission.

178.     Between September 1 and 8, 2015, Deitsch purchased a total of 3,400 shares of Nutra Pharma through eleven small buy orders he placed at Broker B.

179.     Deitsch generally placed his orders with Broker B over the Internet by accessing his brokerage account online.

180.     Just as he had done at Broker A, Deitsch placed limit orders for four of these purchases at a price above the outstanding ask price.

181.     On September 2, 2015, just before 2:25 p.m., the outstanding ask price for Nutra Pharma stock was $0.174 per share.

182.     At 2:25 p.m. that day, Deitsch placed a 100-share limit buy order for Nutra Pharma stock at $0.18 per share—more than the price at which the seller was willing to sell his shares.

183.     Broker B executed Deitsch's order at a price of $0.17 per share shortly thereafter.

184.     Just before 3:43 p.m. the same day, the outstanding ask price for Nutra Pharma stock was $0.165 per share.

185.     At 3:43 p.m. that day, Deitsch placed a 100-share limit buy order for Nutra Pharma stock at $0.18 per share—again, more than the outstanding ask price.

186.     Broker B executed Deitsch's order at a price of $0.16 per share shortly thereafter.

187.    Six days later, on September 8, 2015, just before 11:10 a.m. that day, the outstanding ask price for Nutra Pharma stock was $0.1539 per share.

188.    At 11:10 a.m. that day, Deitsch placed a 100-share limit buy order for Nutra Pharma stock at $0.16 per share—yet again, more than the outstanding ask price.

189.    Broker B executed Deitsch's order at a price of $0.15 per share shortly thereafter.

190.    That afternoon, just before 2:11 p.m., the outstanding ask price for Nutra Pharma stock was $0.15 per share.

191.    At 2:11 p.m. that day, Deitsch placed a 100-share limit buy order for Nutra Pharma stock at $0.16 per share—once again, more than the outstanding ask price.

192.    Broker B executed Deitsch's order at a price of $0.15 per share shortly thereafter.

193.    That month, Broker B disabled Deitsch's access to his account, and Deitsch called Broker B to ask why.

194.    On the call, Broker B's representative told Deitsch that his trading appeared to be manipulative:

> [The] home office…got in touch with me…. They said that the way you're trading, 100 shares of a low-priced security and paying the commission you are, it looks to the regulators like you might be manipulating or moving the price of the stock and they kind of wanted me to find out why you're making the 100-share transactions of a very low price security.

195.    Making it clear that he had traded for the purpose of moving Nutra Pharma's stock price up (purportedly to prevent short sellers from lowering the stock price), Deitsch replied:

> The market makers have a shorting algorithm and they walk a stock down…. If someone right now bought [the stock] up to 13.2, …they would raise the ask—it would push the algorithm up, ok, so they'd stop shorting the stock. If no one does, if there's weak volume, what they do is keep lowering the ask and they crush the stock…. So if you do nothing else but tickle the ask with 100 shares, 200 shares, they go away. I have market makers that do that for me, and every once in a while I do it myself.

196.     The representative told Deitsch that "the way our regulators view it, it looks like you're trying to manipulate or stabilize the price of the stock."

197.     The representative then told Deitsch that she would pass his explanation along to Broker B's home office and that "they could, in effect, close the account down."

## VII.   MCMANUS MADE FALSE STATEMENTS TO AT LEAST ONE INVESTOR

198.     On August 1, 2015, after Nutra Pharma and Deitsch had decided to try to raise more money by selling shares to investors through another private placement, Nutra Pharma entered into another six-month consulting agreement with McManus.

199.     Under the agreement's terms, McManus agreed to provide "sales and marketing consulting services" to Nutra Pharma in return for 750,000 shares of Nutra Pharma stock.

200.     Deitsch signed the agreement on Nutra Pharma's behalf, and McManus signed the agreement on his own behalf.

201.     On at least one occasion in approximately August 2015, McManus traveled to Castaldo's offices on Long Island and cold-called potential investors.

202.     On that occasion, McManus urged approximately ten to fifteen potential investors to invest in Nutra Pharma's private placement.

203.     In September through October 2015, McManus also recruited an acquaintance to invest in Nutra Pharma shares and tried to recruit the acquaintance into selling Nutra Pharma stock to other investors.

204.     On September 24, 2015, McManus pitched the arrangement to his acquaintance in a text message:

> It is illegal for me to give you stock to get people to buy stock. It[']s called manipulation and we go to prison for that. However I can give you a consulting agreement, along with three hundred thousand shares of restricted Rule 144 stock. That serves as your compensation. Your job title would be a paid consultant to NPHC [Nutra Pharma] your job description would be to get eyes on the stock and get people to buy the stock….. The stock would be

restricted for 6 months which means you can't sell it for 6 months under Rule 144. Just like me.

205.    On September 28, 2015, McManus sent an email to the acquaintance with "3 reasons as to why people should buy as much NPHC [Nutra Pharma] as possible TODAY!!!!"

206.    In his email, McManus claimed:

We have 1300 cobra snakes here on our farm in FL. We 'milk['] the cobras for their venom once a month and we use the venom in micro fractions in our drug called Nyloxin…. We are waiting for our first monthly order of this homeopathic, non-narcotic, non-addictive drug from the biggest Pharma company in India…. We are waiting for our first monthly order from one of the largest pharmaceutical company's [sic] in China for the same drug. They are also buying up to 12% of NPHC for $4.5 million dollars. That's being worked on now.

207.    Later that day, McManus followed up with another email to the acquaintance: "I forgot to mention that China anticipates ordering one shipping container a week for us. One container contains $900,000 worth of product. That's approximately 3.6 million a month in sales just from China from us."

208.    Later, on a voicemail he left for his acquaintance on approximately October 6, 2015, McManus further claimed:

The India deal is done, a done deal… [A company in India,] the equivalent to our Walgreens, emailed us today saying that everything is done, they've agreed on everything, and to expect their first purchase order Friday, this Friday coming. The minimum is $300,000 worth of product a month or up to a million. So we don't know what the order's going to be but they're going to send us a purchase order for Nyloxin.

209.    As McManus knew or recklessly disregarded, these statements to his acquaintance in emails and a phone call were false and had no factual basis, including for the reasons described above in paragraphs 117 through 126 and paragraph 132.

210.    When McManus made these statements, he knew that Nutra Pharma regularly issued press releases to tout positive news or purported positive news and he knew or recklessly

disregarded that none of Nutra Pharma's press releases made claims supporting McManus's representations to the investor.

211.    When McManus made these statements, he also knew that Nutra Pharma regularly made public filings on Form 10-K and Form 10-Q with the Commission and knew or recklessly disregarded that none of Nutra Pharma's public filings made claims supporting McManus's representations to the investor.

212.    From September 4 to November 9, 2015, McManus's acquaintance purchased over 90,000 Nutra Pharma shares (at prices ranging from $0.08 to $0.17 per share) on the open market.

213.    Several months later, in approximately February 2016, Castaldo and McManus exchanged text messages about Nutra Pharma.

214.    Castaldo told McManus: "[Y]ou guaranteed guys and you lied… [Y]ou guaranteed India and China was a done deal in august, it's 6 mos later and nothing….. [You] guaranteed India and China contracts were a done deal to get people to buy stock."

215.    Approximately one month later, in March 2016, Castaldo suggested to McManus in text messages that McManus come to New York and continue to pitch Nutra Pharma stock to potential investors: "[N]eed to get back to .25 cents, maybe you should come to ny soon, everytime [*sic*] you do, we rock the stock and it goes u[p] 10 or 15 cents[.] Up 10 or 15 cents in a few days when we work together."

216.    McManus replied: "I know."

## VIII.  NUTRA PHARMA, AT LEAST PARTLY THROUGH MCMANUS, SOLD SHARES TO INVESTORS IN A PRIVATE PLACEMENT

217.    From May through December 2015, Nutra Pharma, through its private placement, issued over 13 million shares of stock at a price of $0.06 per share to at least twenty-five investors located in numerous states.

218.    Nutra Pharma raised over $783,000 through these issuances.

219.    From May through December 2015, Deitsch received over $98,000 from Nutra Pharma's bank account through over twenty separate transfers to himself, purportedly for loan repayments and expenses, and over twenty additional cash withdrawals in increments ranging from $300 to $10,000.

220.    Nutra Pharma did not file any registration statement with the Commission for this stock offering.

221.    At least some of the investors who invested in Nutra Pharma through this private placement had spoken to McManus before investing in Nutra Pharma.

222.    Nutra Pharma paid McManus $16,000 over six payments during the second half of 2015, purportedly for "investor relations," often on or shortly after the days when one or more investors invested in Nutra Pharma's private placement of shares.

223.    At least two of the investors who invested in Nutra Pharma through this private placement had submitted investor questionnaires to Nutra Pharma that showed they were natural persons who did not have a net worth (alone or with a spouse) exceeding $1 million and, in the preceding two years, did not have individual income exceeding $200,000 or joint income with a spouse of $300,000—in other words, they were not accredited investors.

224.    At least three of the investors who invested in Nutra Pharma through this private placement lived on Long Island at the time.

225.    Neither Nutra Pharma nor Deitsch provided any of the private placement investors with financial information about Nutra Pharma prior to their investments.

226.    Nutra Pharma did not file Forms 8-K with the Commission to disclose that it issued shares to investors in unregistered offerings between May 19, 2015 and April 14, 2016, even though the shares it issued increased Nutra Pharma's outstanding shares—and therefore diluted existing shareholders' equity ownership of Nutra Pharma—by over 5%.

227.    For example, between August 18 and November 20, 2015, Nutra Pharma issued shares to investors through an unregistered offering that increased Nutra Pharma's outstanding shares by 9.5%.

## IX.    DEITSCH FAILED TO REPORT HIS OWNERSHIP AND PURCHASES OF NUTRA PHARMA STOCK

228.    On March 31, 2014, Deitsch owned 141,768,334 Nutra Pharma shares of the 1,004,313,019 shares then outstanding, or 14.1% of the outstanding shares.

229.    On April 13, 2015, Deitsch owned 211,954,334 Nutra Pharma shares of the 1,511,950,321 shares then outstanding, or 14% of the outstanding shares.

230.    From March 20, 2014 through October 26, 2015, Deitsch purchased 168,345 Nutra Pharma shares in the market in 166 separate transactions.

231.    From March 14 to April 5, 2016, Deitsch purchased at least 19,500 Nutra Pharma shares in the market in nine transactions.

232.    On April 14, 2016, Deitsch owned 9,219,275 Nutra Pharma shares of the 106,894,580 shares then outstanding, or 9% of the outstanding shares.

233.    On April 17, 2017, Deitsch owned 43,219,275 Nutra Pharma shares of the 369,240,811 shares then outstanding, or 12% of the outstanding shares.

234.    In the ten years between May 2008 and May 2018, Deitsch did not file a single Schedule 13D with the Commission to disclose his beneficial ownership of more than 5% of Nutra Pharma shares, even though his ownership of Nutra Pharma shares increased from approximately 33% to approximately 57% of Nutra Pharma's outstanding shares during that period.

235.    Between March 21, 2014 and June 2018, Deitsch did not file a single Form 4 with the Commission to disclose his purchases of Nutra Pharma stock.

236.    During that time, Deitsch similarly never filed a single Form 5 with the Commission to disclose changes in his beneficial ownership of Nutra Pharma stock.

### FIRST CLAIM FOR RELIEF
### Violations of Securities Act Section 17(a)
### (All Defendants)

237.    As to Deitsch and Nutra Pharma, the Commission re-alleges and incorporates by reference here the allegations in paragraphs 1, 3–5, 17–31, 33–82, 91–152, 217–219, and 224; and as to McManus, the Commission re-alleges and incorporates by reference here the allegations in paragraphs 1, 3, 6, 17–31, 34–42, 117–132, 198–218, 221, 222, and 224.

238.    Defendants, directly or indirectly, singly or in concert, in the offer or sale of securities and by the use of the means or instruments of transportation or communication in interstate commerce or the mails, (1) knowingly or recklessly have employed a device, scheme or artifice to defraud, (2) knowingly, recklessly, or negligently have obtained money or property by means of untrue statements of a material fact or omissions of a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, or (3) knowingly or recklessly have engaged in a transaction, practice, or course of business which operated as a fraud or deceit upon the purchaser.

239.    By reason of the foregoing, Defendants, directly or indirectly, singly or in concert, have violated and, unless enjoined, will again violate Securities Act Section 17(a) [15 U.S.C. § 77q(a)].

### SECOND CLAIM FOR RELIEF
### Violations of Exchange Act Section 10(b) and Rule 10b-5 Thereunder
### (All Defendants)

240.    As to Deitsch, the Commission re-alleges and incorporates by reference here the allegations in paragraphs 1, 3–5, 7, 17–31, 33–82, 91–197, 217–219, and 224; as to and Nutra Pharma, the Commission re-alleges and incorporates by reference here the allegations in paragraphs 1, 3–5, 17–31, 33–82, 91–152, 217–219, and 224; and as to McManus, the Commission re-alleges and incorporates by reference here the allegations in paragraphs 1, 3, 6, 17–31, 34–42, 117–132, 198–218, 221, 222, and 224.

241.     Defendants, directly or indirectly, singly or in concert, in connection with the purchase or sale of securities and by the use of means or instrumentalities of interstate commerce, or the mails, or the facilities of a national securities exchange, knowingly or recklessly have (i) employed a device, scheme, or artifice to defraud, (ii) made untrue statements of a material fact or omitted to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, or (iii) engaged in an act, practice, or course of business which operated or would operate as a fraud or deceit upon other persons.

242.     By reason of the foregoing, Defendants, directly or indirectly, singly or in concert, have violated and, unless enjoined, will again violate Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

### THIRD CLAIM FOR RELIEF
### Violations of Exchange Act Section 9(a)(2)
### (Deitsch)

243.     The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1, 3, 7, 17, 19, 20, 23–31, 91, 92, 153–197, and 217–219.

244.     Deitsch, directly or indirectly, by the use of the mails or any means or instrumentality of interstate commerce, or of any facility of any national securities exchange, effected, alone or with one or more other persons, a series of transactions in a security creating actual or apparent active trading in such security, or raising or depressing the price of such security, for the purpose of inducing the purchase or sale of such security by others.

245.     By reason of the foregoing, Deitsch directly or indirectly, singly or in concert, has violated and, unless enjoined, will again violate Exchange Act Section 9(a)(2) [15 U.S.C. § 78i(a)(2)].

## FOURTH CLAIM FOR RELIEF
### Violations of Exchange Act Section 13(a) and Rule 13a-13 Thereunder
### (Nutra Pharma)

246.     The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1, 3, 5, 19, 20, 23–31, 33, 91–132, and 217–219.

247.     Nutra Pharma, as an issuer of a security registered pursuant to Exchange Act Section 12 [15 U.S.C. § 78l], filed one or more periodic reports with the Commission that were not factually accurate.

248.     By reason of the foregoing, Nutra Pharma violated and, unless enjoined, will again violate Exchange Act Section 13(a) [15 U.S.C. § 78m(a)] and Rule 13a-13 [17 C.F.R. § 240.13a-13] thereunder.

## FIFTH CLAIM FOR RELIEF
### Violations of Exchange Act Section 13(a) and Rule 13a-14 Thereunder
### (Deitsch)

249.     The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1, 3, 5, 19, 20, 23–31, 33, 91–132, and 217–219.

250.     Deitsch, as the principal executive officer and principal financial officer of an issuer with a class of securities registered pursuant to Exchange Act Section 12 [15 U.S.C. § 78l], certified to the best of his knowledge that one or more of the issuer's periodic reports filed with the Commission contained no untrue statements of material fact or omissions of material fact when Deitsch knew that the report or reports contained untrue statements of material fact or omissions of material fact.

251.     By reason of the foregoing, Deitsch violated and, unless enjoined, will again violate Exchange Act Section 13(a) [15 U.S.C. § 78m(a)] and Rule 13a-14 [17 C.F.R. § 240.13a-14] thereunder.

## SIXTH CLAIM FOR RELIEF
### Violations of Exchange Act Section 15(a)
### (McManus)

252.     The Commission re-alleges and incorporates by reference here the allegations in

paragraphs 1, 6, 17–31, 34–42, 71–90, 198–208, 212–218, 221, and 222.

253.     McManus, as a natural person not associated with a broker or dealer which is a

person other than a natural person, made use of the mails or any means or instrumentality of

interstate commerce to effect transactions in, or to induce or attempt to induce the purchase or sale

of, any security without being registered with the Commission as a broker-dealer.

254.     By reason of the foregoing, McManus violated, and, unless enjoined, will again

violate Exchange Act Section 15(a) [15 U.S.C. § 78o(a)].

## SEVENTH CLAIM FOR RELIEF
### Violations of Securities Act Sections 5(a) and (c)
### (Nutra Pharma and Deitsch)

255.     The Commission re-alleges and incorporates by reference here the allegations in

paragraphs 1, 2, 17–31, 34–55, 71–91, 198, and 217–227.

256.     Nutra Pharma and Deitsch, directly or indirectly, singly or in concert, (i) made use of

means or instruments of transportation or communication in interstate commerce or of the mails to

sell, through the use or medium of a prospectus or otherwise, securities as to which no registration

statement was in effect; (ii) for the purpose of sale or for delivery after sale, carried or caused to be

carried through the mails or in interstate commerce, by any means or instruments of transportation,

securities as to which no registration statement was in effect; or (iii) made use of means or

instruments of transportation or communication in interstate commerce or of the mails to offer to

sell or offer to buy, through the use or medium of a prospectus or otherwise, securities as to which

no registration statement had been filed.

257.     By reason of the foregoing, Nutra Pharma and Deitsch violated and, unless enjoined, will again violate, Securities Act Sections 5(a) and 5(c) [15 U.S.C. §§ 77e(a) and 77e(c)].

### EIGHTH CLAIM FOR RELIEF
**Violations of Exchange Act Section 13(d) and Rule 13d-2 Thereunder**
**(Deitsch)**

258.     The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1, 8, 19, 20, 23–32, and 228–234.

259.     Deitsch, after acquiring directly or indirectly the beneficial ownership of more than 5% of a class of equity securities registered pursuant to Exchange Act Section 12 [15 U.S.C. § 78l], failed to file with the Commission statements and/or amendments containing the information required by Schedule 13D within the time period prescribed in Exchange Act Section 13(d) [15 U.S.C. § 78m(d)] and Rule 13d-2 [17 C.F.R. § 240.13d-2] thereunder.

260.     By reason of the foregoing, Deitsch violated and, unless enjoined, will again violate Exchange Act Section 13(d) [15 U.S.C. § 78m(d)] and Rule 13d-2 [17 C.F.R. § 240.13d-2] thereunder.

### NINTH CLAIM FOR RELIEF
**Violations of Exchange Act Section 16(a) and Rule 16a-3 Thereunder**
**(Deitsch)**

261.     The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1, 8, 19, 20, 23–32, 228–233, 235, and 236.

262.     Deitsch, as the direct or indirect beneficial owner of more than ten percent of a class of equity securities (other than an exempted security) which was registered pursuant to Exchange Act Section 12 [15 U.S.C. § 78l] and/or as an officer or director of an issuer of such securities, failed to timely and accurately file Forms 4 and 5 with the Commission containing the information required therein.

263.     By reason of the foregoing, Deitsch violated and, unless enjoined, will again violate Exchange Act Section 16(a) [15 U.S.C. § 78p(a)] and Rule 16a-3 [17 C.F.R. § 240.16a-3] thereunder.

## TENTH CLAIM FOR RELIEF
### Violations of Exchange Act Section 13(a) and Rule 13a-11 Thereunder
### (Nutra Pharma)

264.     The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1, 9, 19, 23–31, 33, 217, 218, 220, 226, and 227.

265.     Nutra Pharma, as an issuer of a security registered pursuant to Exchange Act Section 12 [15 U.S.C. § 78l] and as a "smaller reporting company," failed to file current reports disclosing, within four days, its unregistered sales of equity securities that represented five percent or more of the number of last reported outstanding shares.

266.     By reason of the foregoing, Nutra Pharma violated and, unless enjoined, will again violate Exchange Act Section 13(a) [15 U.S.C. § 78m(a)] and Rule 13a-11 [17 C.F.R. § 240.13a-11] thereunder.

## ELEVENTH CLAIM FOR RELIEF
### Aiding and Abetting Violations of Securities Act Section 17(a)
### (Deitsch)

267.     The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1, 3–5, 17–31, 33–82, 91–152, 217–219, and 224.

268.     As alleged above in paragraphs 237–239, Nutra Pharma violated Securities Act Section 17(a) [15 U.S.C. § 77q(a)].

269.     Deitsch knowingly or recklessly provided substantial assistance to Nutra Pharma with respect to its violations of Securities Act Section 17(a) [15 U.S.C. § 77q(a)].

270.     By reason of the foregoing, Deitsch is liable pursuant to Securities Act Section 15(b) [15 U.S.C. § 77o(b)] for aiding and abetting Nutra Pharma's violations of Securities Act Section 17(a) [15 U.S.C. § 77q(a)] and, unless enjoined, Deitsch will again aid and abet these violations.

## TWELFTH CLAIM FOR RELIEF
### Aiding and Abetting Violations of Exchange Act Section 10(b) and Rule 10b-5
### (Deitsch)

271.     The Commission re-alleges and incorporates by reference here the allegations in

paragraphs 1, 3–5, 17–31, 33–82, 91–152, 217–219, and 224.

272.     As alleged above in paragraphs 240–242, Nutra Pharma violated Exchange Act

Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5] thereunder.

273.     Deitsch knowingly or recklessly provided substantial assistance to Nutra Pharma

with respect to its violations of Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5 [17

C.F.R. § 240.10b-5] thereunder.

274.     By reason of the foregoing, Deitsch is liable pursuant to Exchange Act Section 20(e)

[15 U.S.C. § 78t(e)] for aiding and abetting Nutra Pharma's violations of Exchange Act Section 10(b)

[15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5] thereunder and, unless enjoined, Deitsch

will again aid and abet these violations.

## THIRTEENTH CLAIM FOR RELIEF
### Aiding and Abetting Violations of Exchange Act Section 13(a) and Rule 13a-13
### (Deitsch)

275.     The Commission re-alleges and incorporates by reference here the allegations in

paragraphs 1, 3, 5, 19, 20, 23–31, 33, 91–132, and 217–219.

276.     As alleged above in paragraphs 246–248, Nutra Pharma violated Exchange Act

Section 13(a) [15 U.S.C. § 78m(a)] and Rule 13a-13 [17 C.F.R. § 240.13a-13] thereunder.

277.     Deitsch knowingly or recklessly provided substantial assistance to Nutra Pharma

with respect to its violations of Exchange Act Section 13(a) [15 U.S.C. § 78m(a)] and Rule 13a-13

[17 C.F.R. § 240.13a-13] thereunder.

278.     By reason of the foregoing, Deitsch is liable pursuant to Exchange Act Section 20(e)

[15 U.S.C. § 78t(e)] for aiding and abetting Nutra Pharma's violations of Exchange Act Section 13(a)

[15 U.S.C. § 78m(a)] and Rule 13a-13 [17 C.F.R. § 240.13a-13] thereunder and, unless enjoined, Deitsch will again aid and abet these violations.

## FOURTEENTH CLAIM FOR RELIEF
### Aiding and Abetting Violations of Exchange Act Section 13(a) and Rule 13a-11 (Deitsch)

279. The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1, 9, 19, 20, 23–31, 33, 217, 218, 220, 226, and 227.

280. As alleged above in paragraphs 264–266, Nutra Pharma violated Exchange Act Section 13(a) [15 U.S.C. § 78m(a)] and Rule 13a-11 [17 C.F.R. § 240.13a-11] thereunder.

281. Deitsch knowingly or recklessly provided substantial assistance to Nutra Pharma with respect to its violations of Exchange Act Section 13(a) [15 U.S.C. § 78m(a)] and Rule 13a-11 [17 C.F.R. § 240.13a-11] thereunder.

282. By reason of the foregoing, Deitsch is liable pursuant to Exchange Act Section 20(e) [15 U.S.C. § 78t(e)] for aiding and abetting Nutra Pharma's violations of Exchange Act Section 13(a) [15 U.S.C. § 78m(a)] and Rule 13a-11 [17 C.F.R. § 240.13a-11] thereunder and, unless enjoined, Deitsch will again aid and abet these violations.

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that the Court enter a Final Judgment:

## I.

Permanently enjoining Nutra Pharma and its agents, servants, employees and attorneys and all persons in active concert or participation with any of them from violating, directly or indirectly, Securities Act Sections 5(a) and (c) and 17(a) [15 U.S.C. §§ 77e(a), 77e(c), and 77q(a)], Exchange Act Sections 10(b) and 13(a) [15 U.S.C. §§ 78j(b) and 78m(a)], and Rules 10b-5, 13a-11 and 13a-13 thereunder [17 C.F.R. §§ 240.10b-5, 240.13a-11, and 240.13a-13].

**II.**

Permanently enjoining Deitsch and his agents, servants, employees and attorneys and all persons in active concert or participation with any of them from violating, directly or indirectly, Securities Act Sections 5(a) and (c) and 17(a) [15 U.S.C. §§ 77e(a), 77e(c), and 77q(a)], Exchange Act Sections 9(a)(2), 10(b), 13(a), 13(d), and 16(a) [15 U.S.C. §§ 78i(a)(2), 78j(b), 78m(a), 78m(d), and 78p(a)], and Rules 10b-5, 13a-14, 13d-2, and 16a-3 thereunder [17 C.F.R. §§ 240.10b-5, 240.13a-14, 240.13d-2, and 240.16a-3] and from aiding and abetting violations of Rules 13a-11 and 13a-13 thereunder [17 C.F.R. §§ 240.13a-11, and 240.13a-13];

**III.**

Permanently enjoining McManus and his agents, servants, employees and attorneys and all persons in active concert or participation with any of them from violating, directly or indirectly, Securities Act Section 17(a) [15 U.S.C. § 77q(a)], Exchange Act Sections 10(b) and 15(a) [15 U.S.C. §§ 78j(b) and 78o(a)], and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5];

**IV.**

Ordering Defendants to disgorge all ill-gotten gains they received directly or indirectly, with prejudgment interest thereon, as a result of the alleged violations;

**V.**

Ordering Defendants to pay civil monetary penalties under Securities Act Section 20(d) [15 U.S.C. § 77t(d)] and Exchange Act Section 21(d)(3) [15 U.S.C. § 78u(d)(3)];

**VI.**

Permanently prohibiting Deitsch from serving as an officer or director of any company that has a class of securities registered under Exchange Act Section 12 [15 U.S.C. § 78l] or that is required to file reports under Exchange Act Section 15(d) [15 U.S.C. § 78o(d)], pursuant to

Securities Act Section 20(e) [15 U.S.C. § 77t(e)] and Exchange Act Section 21(d)(2) [15 U.S.C.

§ 78u(d)(2)];

## VII.

Permanently prohibiting Deitsch and McManus from participating in any offering of a penny

stock, including engaging in activities with a broker, dealer, or issuer for purposes of issuing, trading,

or inducing or attempting to induce the purchase or sale of any penny stock, under Exchange Act

Section 21(d)(6) [15 U.S.C. § 78u(d)(6)]; and

## VIII.

Granting any other and further relief this Court may deem just and proper.


Dated:  New York, New York
        April 30, 2020

                        /s/ Marc P. Berger
                        MARC P. BERGER
                        REGIONAL DIRECTOR
                        Lara S. Mehraban
                        Sheldon L. Pollock
                        Preethi Krishnamurthy
                        Lee A. Greenwood
                        Lindsay S. Moilanen
                        Attorneys for Plaintiff
                        SECURITIES AND EXCHANGE COMMISSION
                        New York Regional Office
                        200 Vesey Street, Suite 400
                        New York, New York 10281-1022
                        (212) 336-0116 (Krishnamurthy)
                        krishnamurthyp@sec.gov