**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

---

**SECURITIES AND EXCHANGE COMMISSION,**

                              **Plaintiff,**

         **-against-**

**NUTRA PHARMA CORPORATION, ERIK DEITSCH a/k/a RIK DEITSCH, and SEAN PETER McMANUS,**

                              **Defendants.**

---

**18 Civ. 05459 (JS) (ST)**

**PLAINTIFF SECURITIES AND EXCHANGE COMMMISSION'S
MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION
FOR PARTIAL SUMMARY JUDGMENT**

Lee A. Greenwood
Preethi Krishnamurthy
Lindsay S. Moilanen
Securities and Exchange Commission
New York Regional Office
200 Vesey Street, Suite 400
New York, NY 10281
(212) 336-1060 (Greenwood)

*Attorneys for Plaintiff Securities and
Exchange Commission*

April 9, 2021

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ...................................................................................................1

STATEMENT OF UNDISPUTED FACTS ................................................................................3

    I.      Background on Nutra Pharma and Deitsch......................................................................3

    II.     From 2013 through 2016, Nutra Pharma Retained Christopher Castaldo's "Investor Relations" Firm as a Consultant to Promote Its Stock.................................................3

    III.    In 2015, with Castaldo's and McManus's Help, Nutra Pharma Sold Its Stock to Individual Investors to Raise Capital. ..............................................................................4

           A.  Castaldo and McManus Called Potential Investors. .................................................5

           B.  Deitsch Sent Potential Investors Subscription Documents That Did Not Include Financial Information About Nutra Pharma. ...........................................................5

           C.  Through a Cold Call from Castaldo's Firm, at Least One Investor Who Had No Prior Relationship with Nutra Pharma Invested in the 2015 Offering....................6

           D.  Deitsch Signed Subscription Agreements for Two Unaccredited Investors............8

    IV.    Nutra Pharma Issued Shares of Its Common Stock Without a Registration Statement. ....................................................................................................9

    V.    Deitsch's Personal Holdings of Nutra Pharma Common Stock Changed Significantly Over Time, But He Failed to File the Required Forms to Disclose Those Changes. ...............................................................................................10

STANDARD OF REVIEW ....................................................................................................12

ARGUMENT ...........................................................................................................................13

    I.      Based on the Undisputed Facts, the Nutra Defendants Violated Securities Act Section 5 Through an Unregistered Offering of Securities. .........................................13

           A.  The Undisputed Facts Establish the SEC's *Prima Facie* Case.............................14

           B.  The Nutra Defendants Cannot Meet Their Burden of Showing that an Exemption from Registration Applies.....................................................................................15

1. The Undisputed Facts Show that the 2015 Offering Did Not Satisfy the Safe Harbor Provision under Rule 506 of Regulation D. .........................................15

2. The Undisputed Facts Show that the 2015 Offering Did Not Satisfy the Section 4(a)(2) Exemption. .............................................................................19

II. Nutra Pharma Violated Exchange Act Section 13(a) and Rule 13a-11, and Deitsch Aided and Abetted the Violation. .................................................................23

A. Nutra Pharma's Primary Violation (Claim 10)....................................................23

B. Deitsch Aided and Abetted Nutra Pharma's Violation (Claim 14). .....................25

III. Deitsch Violated Stock Ownership and Purchase Disclosure Requirements. ............27

A. Deitsch Violated Exchange Act Section 13(d) and Rule 13d-2(a) (Claim 8)........27

B. Deitsch Violated Exchange Act Section 16(a) and Rule 16a-3 (Claim 9)............29

CONCLUSION.........................................................................................................30

# TABLE OF AUTHORITIES

**Cases**

*Armstrong v. McAlpin*, 699 F.2d 79 (2d Cir. 1983) ....................................................27

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986)................................................12

*Gallo v. Prudential Residential Services, L.P.*, 22 F.3d 1219 (2d Cir. 1994)..............12

*Gilligan, Will & Co. v. SEC*, 267 F.2d 461 (2d Cir. 1959)..........................................20

*Kamerman v. Steinberg*, 891 F.2d 424 (2d Cir. 1989)................................................28

*Laborde v. City of New York*, No. 93 Civ. 6923 (JGK), 1999 WL 38253, at *1
   (S.D.N.Y. Jan. 27, 1999)..........................................................................................14

*Saks v. Franklin Covey Co.*, 316 F.3d 337 (2d Cir. 2003)..........................................14

*SEC v. Alternate Energy Holdings, Inc.*, No. 10 Civ. 621, 2014 WL 2515710, at *1
   (D. Idaho May 13, 2014) ..........................................................................................23

*SEC v. Apuzzo*, 689 F.3d 204 (2d Cir. 2012) .................................................25, 26–27

*SEC v. Bronson*, 14 F. Supp. 3d 402 (S.D.N.Y. 2014), *aff'd*, 756 F. App'x 38
   (2d Cir. Nov. 19, 2018) ............................................................................................13

*SEC v. Castaldo*, No. 08 Civ. 8397 (JSR), 2009 WL 2591376, at *1
   (S.D.N.Y. Aug. 19, 2009)...........................................................................................4

*SEC v. Cavanagh*, 155 F.3d 129 (2d Cir. 1998) ........................................................21

*SEC v. Cavanagh*, 445 F.3d 105 (2d Cir. 2006) ...................................................13, 14

*SEC v. CKB168 Holdings, Ltd.*, 210 F. Supp. 3d 421 (E.D.N.Y. 2016)....................12, 13, 14–15

*SEC v. Cole*, No. 12 Civ. 8167 (RJS), 2015 WL 5737275, at *1 (S.D.N.Y. Sept. 19, 2015) .......21

*SEC v. Credit First Fund, LP*, No. 05 Civ. 8741, 2006 WL 4729240, at *1
   (C.D. Cal. Feb. 13, 2006)....................................................................................22, 23

*SEC v. Drexel Burnham Lambert Inc.*, 837 F. Supp. 587 (S.D.N.Y. 1993) ............14–15

*SEC v. e-Smart Technologies, Inc.*, 82 F. Supp. 3d 97 (S.D.N.Y. 2015)...........................26, 27, 30

*SEC v. Empire Development Group*, No. 07 Civ 3896 (PKC), 2008 WL 2276629, at *1
   (S.D.N.Y. May 30, 2008)..................................................................16–17, 20, 22, 23

*SEC v. Espuelas*, 579 F. Supp. 2d 461 (S.D.N.Y. 2008) ..............................................27

*SEC v. Falstaff Brewing Corp.*, 629 F.2d 62 (D.C. Cir. 1980).....................................26

*SEC v. Frohling*, 851 F.3d 132 (2d Cir. 2016) .....................................................13, 14

*SEC v. Genovese*, No. 17 Civ. 5821 (LGS), 2021 WL 1164654, at *1
   (S.D.N.Y. Mar. 26, 2021) ...............................................................................21

*SEC v. Ishopnomarkup.com, Inc.*, No. 04 Civ. 4057, 2007 WL 2782748, at *1
   (E.D.N.Y. Sept. 24, 2007).............................................................................19

*SEC v. Life Partners, Inc.*, 912 F. Supp. 4 (D.D.C. 1996)............................................20

*SEC v. Mattera*, No. 11 Civ. 8323 (PKC), 2013 WL 6485949, at *1 (S.D.N.Y. Dec. 9, 2013)....18

*SEC v. McNulty*, 137 F.3d 732 (2d Cir. 1998)..............................................................24

*SEC v. Murphy*, 626 F.2d 633 (9th Cir. 1980).............................................20, 21–22, 23

*SEC v. Paulsen*, No. 18 Civ. 6718 (PGG), 2020 WL 6263180, at *1
   (S.D.N.Y. Oct. 23, 2020) ...............................................................................25

*SEC v. Ralston Purina Co.*, 346 U.S. 119 (1953)...................................................13, 20

*SEC v. Rabinovich & Associates, LP*, No. 07 Civ. 10547 (GEL), 2008 WL 4937360, at *1
   (S.D.N.Y. Nov. 18, 2008) ...............................................................................17

*SEC v. Research Automation Corp.*, 585 F.2d 31 (2d Cir. 1978)...........................12–13

*SEC v. Sands*, 902 F. Supp. 1149 (C.D. Cal. 1995).....................................................30

*SEC v. Softpoint, Inc.*, 958 F. Supp. 846 (S.D.N.Y. 1997) .........................................15

*SEC v. StratoComm Corp.*, 2 F. Supp. 3d 240 (N.D.N.Y. 2014) ................................20

*SEC v. Tecumseh Holdings Corp.*, No. 03 Civ. 5490 (SAS), 2009 WL 4975263, at *1
   (S.D.N.Y. Dec. 22, 2009) ...............................................................................17

*SEC v. Verdiramo*, 890 F. Supp. 2d 257 (S.D.N.Y. 2011) .........................15, 27–28, 29

*United States v. Continental Illinois Nat'l Bank and Trust Co. of Chicago*, 889 F.2d 1248 (2d Cir. 1989)..................................................................................................14

*United States v. Naftalin*, 441 U.S. 768 (1979) ........................................................21

*Western Fed. Corp. v. Erickson*, 739 F.2d 1439 (9th Cir. 1984) ................................20

*Zuneska v. County of Suffolk*, 338 F. Supp. 3d 102 (E.D.N.Y. 2018) ..........................12

**Statutes**

Exchange Act Section 12(g), 15 U.S.C. § 78l(g) ......................................................3, 24

Exchange Act Section 13(a), 15 U.S.C. § 78m(a).......................................2, 23–24, 25, 27

Exchange Act Section 13(d), 15 U.S.C. § 78m(d).........................................2, 27–28

Exchange Act Section 16(a), 15 U.S.C. § 78p(a) ......................................................3, 29, 30

Exchange Act Section 20(e), 15 U.S.C. § 78t(e) ......................................................25

Securities Act Section 2(a)(3), 15 U.S.C. § 77b(a)(3) ................................................21

Securities Act Section 4(a)(2), 15 U.S.C. § 77d(a)(2)................................14, 15, 19–23

Securities Act Section 5, 15 U.S.C. § 77e ......................................................1, 13

Jumpstart Our Business Startups Act, Pub. L. No. 112–106, § 201, 126 Stat. 306 (2012) ..........15

**Rules**

Exchange Act Rule 13d-1, 17 C.F.R. § 240.13d-1 ....................................................27–28

Exchange Act Rule 13d-2, 17 C.F.R. § 240.13d-2 ....................................................2, 28

Exchange Act Rule 13d-3, 17 C.F.R. § 240.13d-3 ....................................................9

Exchange Act Rule 13a-11, 17 C.F.R. § 240.13a-11.......................................................2, 24, 25

Exchange Act Rule 16a-3, 17 C.F.R. § 240.16a-3.......................................................3, 29–30

Exchange Act Rule 16a-6, 17 C.F.R. § 240.16a-6................................................29–30

Fed. R. Civ. P. 56(a) ...........................................................................................12

Regulation D, Rule 501, 17 C.F.R. § 230.501 ...................................................16

Regulation D, Rule 502, 17 C.F.R. § 230.502 ...............................................16, 17

Regulation D, Rule 504, 17 C.F.R. § 230.504 ...................................................19

Regulation D, Rule 505, 17 C.F.R. § 230.505 ...................................................19

Regulation D, Rule 506, 17 C.F.R. § 230.506 ...............................................15–19

## SEC Releases, Forms, and Guidance

*Bateman Eichler, Hill Richards, Inc.*, SEC No-Action Letter, 1985 WL 55679, at *1
     (Dec. 3, 1985) ...............................................................................................17–18

*Citizen VC, Inc.*, SEC No-Action Letter, 2015 WL 4699193, at *1 (Aug. 6, 2015) ...................18

*Nonpublic Offering Exemption*, Release No. 33-4552, 1962 WL 69540, at *1
     (Nov. 6, 1962) ...............................................................................................22–23

SEC Form 8-K Guidance, § 212.01 .........................................................................24

SEC Form 8-K, Item 3.02 ........................................................................................24

Plaintiff Securities and Exchange Commission (the "SEC") respectfully submits this brief, with its Local Rule 56.1 Statement and Declarations of Lindsay S. Moilanen and Elizabeth Baier and exhibits, in support of its motion for partial summary judgment against Defendants Nutra Pharma Corporation ("Nutra Pharma") and Erik Deitsch ("Deitsch") (collectively, the "Nutra Defendants").[1]  For the reasons set forth below, the Court should grant the motion.

## PRELIMINARY STATEMENT

There are no factual disputes as to the elements of any of the SEC's non-fraud claims against Nutra Pharma, a company that issued penny stock, and Deitsch, Nutra Pharma's chief executive officer, chairman of the board, and chief financial officer.  The three relevant sets of claims arise from the Nutra Defendants' failure to file an SEC registration statement for Nutra Pharma's stock offering in 2015 and failure to file SEC forms disclosing (1) unregistered issuances of Nutra Pharma stock and (2) Deitsch's ownership and purchases of Nutra Pharma stock.  The statutes and regulations requiring these disclosures serve an important purpose: ensuring that investors and prospective investors have certain key information about a stock-issuing company and its stock.  Yet the Nutra Defendants undisputedly failed to file these registration and disclosure documents, and the facts necessary to show that the registration and disclosure documents were required to be filed are not in dispute.  Nor is there any factual dispute, with respect to the only relevant claim not involving strict liability, that Deitsch knew or recklessly disregarded that Nutra Pharma failed to file the required forms.

First, there is no genuine dispute that the Nutra Defendants each violated Section 5 of the Securities Act of 1933 ("Securities Act") by offering and selling Nutra Pharma stock in 2015

---

[1]     The SEC is not seeking summary judgment against Defendant Sean McManus ("McManus").

without a registration statement (Claim 7 of the Second Amended Complaint, Dkt. No. 49).

Nutra Pharma undisputedly offered and sold stock without a registration statement, Deitsch

undisputedly acted as a necessary participant in the offering, and the offering undisputedly

involved interstate commerce.  The Nutra Defendants may contend that their stock offering was

entitled to an exemption from registration, but they bear the burden of proof on that issue, and

the undisputed facts show they cannot meet their burden here.

Second, there is no genuine dispute that Nutra Pharma violated Section 13(a) of the

Securities Exchange Act of 1934 ("Exchange Act") and Rule 13a-11 thereunder by failing to file

SEC Form 8-Ks disclosing unregistered stock sales and issuances above a certain numerical

threshold (Claim 10) and that Deitsch aided and abetted that violation (Claim 14).  There is no

dispute that the relevant stock sales and issuances were not registered, that these sales and

issuances met the thresholds for required disclosures based on their dates and amounts and the

amount of Nutra Pharma's then-outstanding shares, and that Nutra Pharma nevertheless failed to

file the required disclosure forms.  Nor is there any genuine dispute that Deitsch aided and

abetted Nutra Pharma's violation by knowingly or recklessly providing substantial assistance.

Deitsch admits he held responsibility for all of Nutra Pharma's required SEC filings; he had filed

the same sorts of forms in prior years disclosing the same sort of information; he knew Nutra

Pharma had not filed the required forms during the relevant period, because he admits he signed

all SEC filings on Nutra Pharma's behalf; and yet he did not make the required filings.

Finally, there is no genuine dispute that Deitsch violated Exchange Act Section 13(d) and

Rule 13d-2(a) by failing to file SEC Schedule 13D forms disclosing changes in his ownership of

Nutra Pharma's outstanding shares above a certain numerical threshold (Claim 8).  Nor is there

any genuine dispute that Deitsch violated Exchange Act Section 16(a) and Rule 16a-3 by failing

to timely file SEC Forms 4 and 5 disclosing his acquisitions of Nutra Pharma stock (Claim 9).

Based on the undisputed facts, the SEC is entitled to summary judgment on these claims

as a matter of law, and granting summary judgment on these non-fraud claims will narrow the

claims to be tried to a jury.  The Court should therefore grant the SEC's motion in its entirety.

## STATEMENT OF UNDISPUTED FACTS[2]

### I.      Background on Nutra Pharma and Deitsch

Nutra Pharma is a Florida-based company that was incorporated in 2000.  (¶ 1.)[3]  Between

at least April 1, 2008 and June 30, 2018 (the "Relevant Period"), Nutra Pharma's common stock has

been registered with the SEC under Exchange Act Section 12(g) [15 U.S.C. § 78l(g)] and qualified

as a penny stock.  (¶ 2.)  During the Relevant Period, Nutra Pharma sold two over-the-counter

homeopathic products made with cobra venom, including a product called Nyloxin.  (¶ 3.)  In at

least 2015, Nutra Pharma qualified as a "smaller reporting company" under SEC rules.  (¶ 7.)

Since December 2003, Deitsch has served as Nutra Pharma's chief executive officer,

chairman of the board, and (except for nine months in 2011) chief financial officer.  (¶ 5.)

Throughout the Relevant Period, as he admits, Deitsch signed, approved, and held responsibility

for all filings Nutra Pharma made with the SEC, including annual reports on Form 10-K,

quarterly reports on Form 10-Q, and current reports on Form 8-K.  (¶ 6.)

### II.     From 2013 through 2016, Nutra Pharma Retained Christopher Castaldo's "Investor Relations" Firm as a Consultant to Promote Its Stock.

In 2009 or 2010, Christopher Castaldo ("Castaldo"), a former stock broker based on Long

Island, approached Deitsch to offer Nutra Pharma "investor relations" services through

---

[2]      This section sets forth facts undisputed for purposes of this motion.  The SEC does not necessarily concede each of these facts for all purposes in this action.

[3]      Unless otherwise specified, "(¶ __ )" means paragraphs in the SEC's Local Rule 56.1 Statement.

Castaldo's firm, Wall Street Buy Sell Hold.  (¶¶ 8, 12.)  Castaldo and Defendant McManus were friends, as Deitsch knew, and Deitsch understood Castaldo and McManus had previously worked together as brokers, as Deitsch admits.  (¶ 9.)  As Deitsch understood, Castaldo had a stock newsletter, called *Wall Street Buy Sell Hold*, which had at least hundreds and possibly thousands of subscribers—Deitsch did not know whether subscribers received the newsletter for free or how Castaldo obtained subscribers.  (¶ 10.)  Deitsch knew that Castaldo had a team of employees that spoke with these subscribers, primarily by telephone.  (¶¶ 10–11.)

Before Deitsch hired Castaldo and his firm in 2013, Deitsch learned that Castaldo had received "some black marks on his record" in approximately 2009 and believed the "infraction" involved Castaldo's "acting as a broker/dealer," in Deitsch's words.[4]  (¶ 12.)  From 2013 through approximately 2016, Nutra Pharma entered into a series of contracts with Castaldo's firm: Castaldo's firm agreed to provide "investor relations" services, and Nutra Pharma paid Castaldo's firm in cash and stock.  (¶ 13.)  Nutra Pharma hired Castaldo's firm "to tell the Nutra Pharma story to as many people as possible" so that potential investors would buy Nutra Pharma stock in the public market.  (¶ 14.)  Deitsch understood that Castaldo had "a phone room" and that his employees would talk about Nutra Pharma's stock to the newsletter subscribers.  (¶ 15.)

### III.   In 2015, with Castaldo's and McManus's Help, Nutra Pharma Sold Its Stock to Individual Investors to Raise Capital.

In 2015, the Nutra Defendants decided to raise capital for the company by selling shares of Nutra Pharma common stock directly to individual investors in a so-called "private placement" (the "2015 Offering").  (¶ 16.)  When Nutra Pharma sold its shares directly to

---

[4]     In 2009, a jury found Castaldo liable in an SEC action for aiding and abetting Exchange Act Section 15(b)(7) and Rule 15b7-1, essentially by acting as an unlicensed securities broker.  *See SEC v. Castaldo*, 2009 WL 2591376, at *1 (S.D.N.Y. Aug. 19, 2009) (describing the jury verdict and determining the relief).  Judge Rakoff ordered Castaldo to pay over $280,000 in disgorgement, interest, and penalties.  *Id.* at *2.

investors this way, the company usually sold the shares at a 50% discount to the market price at which the stock then traded.  (¶ 17.)[5]   Deitsch re-hired Castaldo and his firm to perform investor relations work for Nutra Pharma during the time of the 2015 Offering.  (¶ 19.)  In fact, Deitsch shared the terms of the 2015 Offering with Castaldo by email.  (¶ 20.)

### A.    Castaldo and McManus Called Potential Investors.

McManus helped identify potential investors in the 2015 Offering by speaking with subscribers on Castaldo's subscriber list.  (¶ 21.)  McManus spoke to at least five to seven such potential investors, whose names he does not recall.  (¶ 22.)  Deitsch knew that McManus had been to Castaldo's offices to help people get "excited about Nutra Pharma" during the time of the 2015 Offering.  (¶ 23.)  As Deitsch admits, McManus personally called newsletter subscribers on Castaldo's list.  (¶ 24.)  As Deitsch further admits, "most of the private placement participants were subscribers to [Castaldo's] newsletter, and at some point, Mr. Castaldo was the conduit by which [Deitsch] met some of these people."  (¶ 25.)

### B.    Deitsch Sent Potential Investors Subscription Documents That Did Not Include Financial Information About Nutra Pharma.

Once someone expressed an interest in purchasing Nutra Pharma shares in the 2015 Offering, Deitsch sent the prospective investor a subscription agreement and purchaser questionnaire—what Deitsch termed the "subscription document."  (¶ 26.)  The subscription document contained no financial information about Nutra Pharma, nor did the Nutra Defendants otherwise send prospective investors any financial information about Nutra Pharma.  (¶ 27.)  The three-page purchaser questionnaire explained that its purpose was to determine whether the potential investor was an "accredited investor" under Rule 501 of Regulation D.  (¶ 28.)  The

---

[5]    Nutra Pharma had previously raised funds in at least three other so-called private placements.  (¶ 18.)

questionnaire then asked prospective individual investors several numbered questions, including whether the investor's net worth (with a spouse, if applicable) exceeded $1 million; whether the individual had an individual annual income exceeding $200,000 or a joint income with his or her spouse exceeding $300,000 in each of the two most recent years; and about the investor's educational background and experience investing in securities.  (¶ 29.)  The questionnaire required the investor's signature and representation that the information was true.  (¶ 30.)

After deciding to invest, the investor filled out and signed the questionnaire, signed the subscription agreement, and sent both forms to Deitsch.  (¶ 31.)  Once the Nutra Defendants "ma[d]e sure that [the subscription forms] were complete" and the investor's payment had cleared, Deitsch counter-signed the subscription agreement and had the shares issued.  (¶ 33.)  Deitsch counter-signed all such subscription agreements in the 2015 Offering.  (¶ 34.)

### C.    Through a Cold Call from Castaldo's Firm, at Least One Investor Who Had No Prior Relationship with Nutra Pharma Invested in the 2015 Offering.

In 2015, Paul Stan Harrell ("Harrell")—a former trucking entrepreneur who had worked as a licensed stock broker for about two years in the 1980s—received a call from Castaldo's brother, Jerry Castaldo, who worked with Castaldo at Wall Street Buy Sell Hold.  (¶ 35.)  Harrell understood that his friend, who had bought some stock through Wall Street Buy Sell Hold, had suggested that Castaldo's firm call Harrell.  (¶ 36.)  Harrell also understood that Castaldo's firm was a brokerage firm—a firm that, in Harrell's words, "offers stocks for sale," among other things.  (¶ 37.)  Before his first call from Wall Street Buy Sell Hold, Harrell had only bought shares of one penny stock before—in 1989, more than twenty-five years before.  (¶ 38.)

Harrell spoke to Jerry Castaldo, the only person to whom Harrell spoke at Wall Street Buy Sell Hold, four or five times in total by phone.  (¶ 39.)  Before his conversations with Jerry Castaldo, Harrell had never heard of Nutra Pharma.  (¶ 40.)  On these four or five calls, Jerry

Castaldo discussed with Harrell the stocks of several companies.  (¶ 41.)  Jerry Castaldo did not

ask Harrell any questions about his investing experience or finances or about whether Harrell had

ever invested in Nutra Pharma before.  (¶ 42.)  On the last of their four or five calls, Jerry

Castaldo talked to Harrell about Nutra Pharma.  (¶ 43.)  Harrell was interested in knowing more

about Nutra Pharma because it was apparently pursuing a cure for a disease that Harrell had a

personal interest in.  (¶ 44.)  Shortly after that call, on June 9, 2015, Harrell received an email

from Wall Street Buy Sell Hold attaching a Nutra Pharma press release.  (¶ 45.)

About three weeks later, on June 29, 2015, Harrell received an email from Deitsch.

(¶ 46.)  Deitsch wrote: "Stann [*sic*], Sean McManus requested that I send you this information."

(¶ 47.)  Deitsch understood that Harrell had learned of Nutra Pharma through Castaldo's firm and

thought that Harrell had spoken to McManus about investing in the 2015 Offering.[6]  (¶ 48.)

Deitsch's email to Harrell attached the subscription document—the subscription agreement and

purchaser questionnaire—and described the basic terms of the 2015 Offering, including that

Nutra Pharma was offering to sell its stock at a 50% discount to the price the stock was trading at

in the public market.  (¶ 51.)  Although the email generally referenced "current shareholders"

and "long-term supporters" of Nutra Pharma, Harrell was neither.  (¶ 52.)  The email contained

Deitsch's signature block with his contact information.  (¶ 53.)

Just after receiving this email, Harrell called Deitsch.  (¶ 54.)  It was the first time Harrell

had spoken to Deitsch, and the call lasted only about five minutes.  (¶ 56.)  On the call, Deitsch

talked to Harrell about Nutra Pharma, including plans to expand the cobra farm.  (¶ 57.)  Deitsch

and Harrell also discussed Harrell's potential $15,000 investment in Nutra Pharma.  (¶ 58.)

---

[6]        In fact, Harrell never spoke to McManus.  (¶ 49.)  McManus believes he asked Deitsch to send Harrell
information about the 2015 Offering—based on seeing Deitsch's June 29, 2015 email to Harrell, which copied
McManus—but McManus neither remembers Harrell nor remembers how he got Harrell's name.  (¶ 50.)

Deitsch did not ask Harrell any questions about his background, investing experience, or finances and did not ask Harrell whether he had previously invested in Nutra Pharma or had any prior connection to the company.[7]  (¶ 59.)  Nor did Harrell provide information about his background, investing experience, or finances to Deitsch on the call.  (¶ 60.)

Despite the call's brevity, Harrell made his decision to invest $15,000 in Nutra Pharma based on it.  (¶ 61.)  Harrell did not speak to anyone else at Nutra Pharma before investing. (¶ 62.)  On June 30, 2015—the day after he received Deitsch's email—Harrell signed the subscription agreement and purchaser questionnaire and sent them back to Nutra Pharma.  (¶ 63.)

Although Deitsch "for the most part" asked prospective investors if they owned Nutra Pharma stock already, Deitsch did not have anyone check any records to determine whether any prospective investor had a pre-existing investment in Nutra Pharma stock.[8]  (¶ 64.)

### D.    Deitsch Signed Subscription Agreements for Two Unaccredited Investors.

On June 19, 2015, Charles J. Barbee ("Barbee"), a then-57-year-old Michigan resident, signed a subscription agreement and a purchaser questionnaire for a $900 investment in Nutra Pharma.  (¶ 66.)  On his questionnaire, Barbee described his employment as a retail sales manager, listed his education as high school only, and made clear that he had only occasional experience investing in stocks and bonds and no experience with venture capital investments. (¶ 67.)  Barbee checked off "no" in response to the questions asking whether his and his spouse's net worth exceeded $1 million and whether he had an individual income exceeding $200,000 or a joint spousal income exceeding $300,000.  (¶ 68.)  On June 19, 2015, Deitsch signed Barbee's

---

[7]      Deitsch does not recall whether he spoke to Harrell, nor does Deitsch recall whether he asked Harrell if Harrell had invested in Nutra Pharma stock before.  (¶ 55.)

[8]      Although the only prospective Nutra Pharma investors Deitsch recalls speaking to were those who had previously purchased Nutra Pharma stock in the public market, Deitsch does not recall specifically whether Harrell had a prior investment in Nutra Pharma.  (¶ 65.)

subscription agreement, to which his questionnaire was attached.  (¶ 69.)

On June 24, 2015, Nutra Pharma issued 15,000 shares of common stock to Barbee in the 2015 Offering.  (¶ 70.)  As the Nutra Defendants admit, Barbee was not an "accredited investor" within the meaning of Rule 501(a), and the Nutra Defendants had no reason to believe that Barbee was an accredited investor when Nutra Pharma issued him stock.  (¶ 71.)

On June 30, 2015, Jane E. Thomas ("Thomas"), a then-65-year-old Virginia resident, signed a subscription agreement and a purchaser questionnaire for a $10,000.02 investment in Nutra Pharma.  (¶ 72.)  On her questionnaire, Thomas described herself as a retired real estate appraiser, listed her education as high school only, and noted her frequent experience investing in stocks and bonds while leaving blank the section on venture capital investments.  (¶ 73.) Thomas checked off "no" in response to the questions asking whether her and her spouse's net worth exceeded $1 million and whether she had an individual annual income exceeding $200,000 or a joint spousal income exceeding $300,000.  (¶ 74.)  On July 20, 2015, Deitsch signed Thomas's subscription agreement, to which her questionnaire was attached.  (¶ 75.)

On August 26, 2015, Nutra Pharma issued 166,667 shares of common stock to Thomas in the 2015 Offering.  (¶ 76.)  As the Nutra Defendants admit, Thomas was not an "accredited investor" within the meaning of Rule 501(a), and the Nutra Defendants had no reason to believe that Thomas was an accredited investor when Nutra Pharma issued her stock.  (¶ 77.)

The Nutra Defendants have never produced any documents showing that they provided any financial information about Nutra Pharma to Barbee or Thomas before they invested.  (¶ 78.)

## IV.    Nutra Pharma Issued Shares of Common Stock Without a Registration Statement.

From May 1 through December 31, 2015, Nutra Pharma issued a total of 12,585,000 shares of its common stock to investors in the 2015 Offering.  (¶ 80.)  Through these stock sales, Nutra Pharma raised a total of $756,300.82 from 33 investors located in ten states and Canada.

9

(¶ 81.)  Nutra Pharma also issued a total of 3,310,000 shares of its common stock to individuals and entities (including Castaldo and McManus) in return for services during this period.  (¶ 83.) Like the subscription agreements, Deitsch counter-signed each agreement obligating Nutra Pharma to issue these shares.  (¶ 84.)  Nutra Pharma did not file a registration statement with the SEC for any of these stock sales or issuances.  (¶¶ 82, 85.)

Based on these 2015 share issuances, the total number of shares of outstanding Nutra Pharma common stock increased significantly from the number that Nutra Pharma had previously disclosed in an SEC filing.  Between May 1 and December 31, 2015, 25 separate issuances of common stock—either to investors or in exchange for services—resulted in a more than 5% increase in Nutra Pharma's number of shares outstanding disclosed in its then-most-recent Form 10-Q.  (¶ 86.)  For example, the company's common stock issuances to investors on July 13, 2015, resulted in a percentage increase of more than 20% to the number of shares outstanding disclosed in the prior Form 10-Q filed on May 19, 2015.  (¶ 87.)

Nutra Pharma did not file a Form 8-K with the SEC concerning any of the 2015 unregistered issuances of common stock.  (¶ 88.)  Nutra Pharma did, however, file Forms 8-K concerning at least two earlier unregistered issuances of common stock to investors in 2008 and 2009, one of which also disclosed the issuance of unregistered shares in exchange for services. (¶ 89.)  Deitsch signed these earlier Forms 8-K.  (¶ 90.)

## V.   Deitsch's Personal Holdings of Nutra Pharma Common Stock Changed Significantly Over Time, But He Failed to File the Required Forms To Disclose Those Changes.

On April 1, 2008, Deitsch filed with the SEC a Schedule 13D form—a form on which a person who acquires 5% of more of a company's securities discloses various types of information about their acquisition—reporting his beneficial ownership of 54.5 million shares of Nutra Pharma common stock, which amounted to 33.8% of the company's common stock

outstanding.[9]  (¶ 91.)  Deitsch did not file any further Schedule 13D forms, or amendments to his prior Schedule 13D form, for more than ten years—that is, until June 2018.  (¶ 92.)  Nevertheless, in the intervening ten years, Deitsch's beneficial ownership of Nutra Pharma common stock changed significantly.  The table below reflects the largest changes:

| Date | Shares Beneficially Owned | Ownership Percentage | Citation |
|---|---|---|---|
| 12/31/2013 | 141,678,334 | 14.1% | ¶¶ 94–95 |
| 4/10/2014 | 191,678,360 | 17.3% | ¶ 96 |
| 4/14/2016 | 9,219,275[10] | 8.6% | ¶ 98 |
| 7/5/2016 | 28,298,859 | 18.4% | ¶ 99 |
| 4/17/2017 | 43,219,275 | 11.7% | ¶ 100 |
| 10/30/2017 | 3,043,298,859 | 62.7% | ¶¶ 101–103 |

Deitsch also purchased shares of Nutra Pharma stock through his personal brokerage accounts during the Relevant Period.  In total, between November 8, 2012 and April 5, 2016, Deitsch executed 273 separate purchases of Nutra Pharma shares in his personal brokerage accounts, at a total price of $12,802.94 before commissions and fees.[11]  (¶ 104.)  Deitsch has never reported any of these purchases on SEC Form 4 or Form 5.  (¶¶ 105–106.)  In the Form 4 that Deitsch filed on June 26, 2018, Deitsch disclosed his separate receipt (not through share purchases) of nearly 40 million split-adjusted shares in 2014 through 2016.  (¶ 107.)

---

[9]     "[A] beneficial owner of a security includes any person who . . .  has or shares:  (1) Voting power which includes the power to vote, or to direct the voting of, such security; and/or, (2) Investment power which includes the power to dispose, or to direct the disposition of, such security."  17 C.F.R. § 240.13d-3(a).

[10]    The number of shares decreased between April 2014 and April 2016 primarily because Nutra Pharma effected a 40-for-1 reverse split on May 18, 2015—meaning that, for every 40 shares of Nutra Pharma common stock a shareholder had held before, the shareholder would thereafter own one share.  (¶ 97.)

[11]    Though not the subject of this motion, certain of these purchases serve as the basis for the SEC's market manipulation claims against Deitsch (*see* Second Amended Complaint, Dkt. No. 49, ¶¶ 153–197).

Each Form 10-K that Nutra Pharma filed during the Relevant Period contains a section entitled "Section 16(a) Compliance of Officers and Directors," which, since April 1, 2011, has stated that "based on our review of Forms 3, 4, 5, and Schedule 13D furnished to us during the last fiscal year, all of our officers and directors filed the required reports." (¶¶ 108–109.) Deitsch signed each of these Forms 10-K. (¶ 110.)

## STANDARD OF REVIEW

Summary judgment is appropriate when a party shows "that there is no genuine dispute as to any material fact and that [it] is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

"The movant bears the burden of establishing that there are no genuine issues of material fact." *Zuneska v. County of Suffolk*, 338 F. Supp. 3d 102, 112 (E.D.N.Y. 2018) (citing *Gallo v. Prudential Residential Servs., L.P.*, 22 F.3d 1219, 1223 (2d Cir. 1994)). "Once the movant makes such a showing, the non-movant must proffer specific facts demonstrating a genuine issue for trial. . . . Conclusory allegations or denials will not defeat summary judgment." *Zuneska*, 338 F. Supp. 3d at 112 (quotation marks and citation omitted). "Where the nonmoving party bears the burden of proof at trial, summary judgment is warranted if the nonmovant fails to make a showing sufficient to establish the existence of an element essential to its case." *SEC v. CKB168 Holdings, Ltd.*, 210 F. Supp. 3d 421, 440 (E.D.N.Y. 2016) (quotation marks and citation omitted) (granting summary judgment to the SEC on Section 5 and other claims). "[E]ven in suits for injunctive relief, the district courts should not hesitate to grant a plaintiff's request for summary

judgment when the defendant has failed to meet the requirements prescribed by Rule 56(e)."

*SEC v. Research Automation Corp.*, 585 F.2d 31, 33–34 (2d Cir. 1978).

## ARGUMENT

**I.     Based on the Undisputed Facts, the Nutra Defendants Violated Securities Act Section 5 Through an Unregistered Offering of Securities (Claim 7).**

"Section 5 requires that securities be registered with the SEC before any person may sell or offer to sell such securities." *SEC v. Cavanagh*, 445 F.3d 105, 111 (2d Cir. 2006) (citing 15 U.S.C. § 77e).  This registration requirement "protect[s] investors by promoting full disclosure of information thought necessary to informed investment decisions." *SEC v. Ralston Purina Co.*, 346 U.S. 119, 124 (1953).  "Section 5 imposes strict liability on offerors and sellers of unregistered securities regardless of any degree of fault, negligence or intent on the seller's part." *SEC v. Bronson*, 14 F. Supp. 3d 402, 408 (S.D.N.Y. 2014) (quotation marks and citations omitted), *aff'd*, 756 F. App'x 38 (2d Cir. Nov. 19, 2018).  Section 5 liability extends to those who offer or sell such securities directly or indirectly, 15 U.S.C. §§ 77e(a), (c), and those who "engaged in steps necessary to the distribution" of such securities, *SEC v. Frohling*, 851 F.3d 132, 136 (2d Cir. 2016) (quotation marks and citation omitted).  To make out a *prima facie* violation of Section 5, the SEC must show "(1) lack of a registration statement as to the subject securities; (2) the offer or sale of the securities; and (3) the use of interstate transportation or communication and the mails in connection with the offer or sale." *Cavanagh*, 445 F.3d at 111 n.13 (quotation marks and citation omitted).

Once the SEC makes such a showing, "the burden shifts to defendants to show that the securities were exempt from registration." *CKB168 Holdings*, 210 F. Supp. 3d at 451–52 (citing *Cavanagh*, 445 F.3d at 111 n.13).  A securities issuer's offerings may be exempt from registration if they are not part of a public offering, and SEC regulations provide certain safe

harbors from registration for private placements that meet specific requirements.  15 U.S.C.

§ 77d(a)(2); 17 C.F.R. §§ 230.500 *et seq.*  Exemptions and safe harbors from registration are

structured to exempt transactions where the purpose and protections of registration have been

otherwise satisfied.  "Registration exemptions are construed strictly to promote full disclosure of

information for the protection of the investing public."  *Cavanagh*, 445 F.3d at 115.[12]

## A.    The Undisputed Facts Establish the SEC's *Prima Facie* Case.

The undisputed facts establish that the Nutra Defendants violated Section 5 through their

2015 Offering.  Between May 1 and December 31, 2015, the Nutra Defendants offered Nutra

Pharma common stock to prospective investors and sold 12,585,000 shares to 33 investors for a

total of $756,300.82, and no registration statement covered those sales.  (¶¶ 80–82.)

Next, the undisputed facts establish that Deitsch engaged in steps necessary to the

distribution of these unregistered shares under *Frohling*, 851 F.3d at 136.  Deitsch spoke with

prospective investors in the 2015 Offering, sent them subscription agreements and purchaser

questionnaires, received the signed documents once an investor decided to invest, reviewed the

documents for completeness and ensured payment had cleared, and then counter-signed the

subscription agreements.  (¶¶ 26, 31, 33–34, 54–61, 69, 75.)  These undisputed facts suffice to

show necessary participation as a matter of law.  *See CKB168 Holdings*, 210 F. Supp. 3d at 452

(granting summary judgment on Section 5 claim against CFO that "authorized, directed, and

---

[12]    The Nutra Defendants have not pled any exemptions from Section 5's registration requirements as affirmative defenses in their Answers (Dkt. Nos. 51 & 52), as required for matters on which they bear the burden of proof, and have therefore waived any exemption defenses.  *See United States v. Continental Illinois Nat'l Bank and Trust Co. of Chicago*, 889 F.2d 1248, 1253 (2d Cir. 1989); *Laborde v. City of New York*, 1999 WL 38253, at *4 (S.D.N.Y. Jan. 27, 1999).  The SEC objects to any motion the Nutra Defendants may make to amend their Answers to assert registration exemptions, including because any such amendment will unduly delay this case and because such amendment is futile for the reasons described below in Section I.B.  However, the SEC addresses the registration exemptions it understands the Nutra Defendants may seek to assert here, given that "a district court may still entertain affirmative defenses at the summary judgment stage [not pled in an answer] in the absence of undue prejudice to the plaintiff, bad faith or dilatory motive on the part of the defendant, futility, or undue delay of the proceedings."  *Saks v. Franklin Covey Co.*, 316 F.3d 337, 350 (2d Cir. 2003).

managed the issuance of [unregistered] securities to investors"); *SEC v. Verdiramo*, 890 F. Supp. 2d 257, 271 (S.D.N.Y. 2011) (granting summary judgment on Section 5 claim against Chairman, CEO, and CFO who "authorized and directed" the issuance of unregistered securities).

Finally, the Nutra Defendants undisputedly used interstate commerce for these offers and sales of securities—specifically, telephone calls and emails with potential investors located in at least ten states and Canada (¶¶ 15, 19–25, 43–48, 51–58, 81). *See SEC v. Softpoint, Inc.*, 958 F. Supp. 846, 861 (S.D.N.Y. 1997) (Sotomayor, J.) (Section 5 interstate commerce requirement is "broadly construed" and is satisfied by even "tangential mailings or intrastate telephone calls").

**B.**   **The Nutra Defendants Cannot Meet Their Burden of Showing that an Exemption from Registration Applies.**

The Nutra Defendants appear to contend that the 2015 Offering was exempt from registration pursuant to Securities Act Section 4(a)(2), 15 U.S.C. § 77d(a)(2)—a statutory exemption from registration for non-public securities offerings—and/or under Rule 506(b) or 506(c) in Regulation D—an SEC regulation providing a safe-harbor registration exemption under Section 4(a)(2) for qualifying private placements.[13]   The Nutra Defendants cannot meet their burden of showing that either these Rule 506 safe-harbor exemptions or Section 4(a)(2)'s exemption applies to avoid summary judgment against them.

**1.**   **The Undisputed Facts Show that the 2015 Offering Did Not Satisfy the Safe Harbor Provision under Rule 506 of Regulation D.**

***The Rule 506(b) Exemption.***   Rule 506(b) exempts from registration those securities offerings sold to an unlimited number of accredited investors and no more than 35 unaccredited

---

[13]   Prior to April 5, 2012, the Section 4(a)(2) exemption was the "Section 4(2)" exemption. Jumpstart Our Business Startups Act, Pub. L. No. 112–106, § 201, 126 Stat. 306, 314 (2012). In addition, Regulation D has changed in ways immaterial to this litigation since 2015, and the SEC cites here the provisions in effect in 2015.

investors *provided that* at least two conditions are satisfied.[14]   First, non-accredited investors to

whom an offering is sold must have been provided with certain types of financial information

about the issuer, as described in Rule 502(b), before they purchase the securities.   17 C.F.R. §

502(b) (Sept. 23, 2013).   For issuers like Nutra Pharma that filed periodic reports with the SEC,

this financial information includes a copy of the company's most recent annual report filed on

Form 10-K and "a brief description of the securities being offered, the use of the proceeds from

the offering, and any material changes in the issuer's affairs that are not disclosed in the

documents furnished."   17 C.F.R. §§ 230.502(b)(1), (b)(2)(ii) (Sept. 23, 2013).   Second, the

offering also cannot use "general solicitation," as described in more detail below.   17 C.F.R. §

502(c) (Sept. 23, 2013).   The Nutra Defendants will be unable to meet their burden of proving

the Rule 506(b) exemption applies, because the undisputed facts show that the 2015 Offering

met neither of these conditions (and indeed must have met both to obtain the exemption).

First, there is no genuine dispute that the Nutra Defendants did not provide either of the

two undisputedly unaccredited investors in the 2015 Offering (Barbee and Thomas) with any

financial information about Nutra Pharma before they made their investments.   (¶ 78.)   The

Nutra Defendants' failure to satisfy this condition alone prevents the Rule 506(b) exemption

from applying.   *See SEC v. Empire Dev. Grp.*, 2008 WL 2276629, at *9 (S.D.N.Y. May 30,

2008) (granting summary judgment on Section 5 claim and holding "[u]ncontradicted evidence

of defendants' offers and sales of [unregistered] [s]ecurities to unaccredited investors without

---

[14]       In 2015, Rule 506(b) required that offers and sales satisfy all terms and conditions in Rules 501 and 502.
17 C.F.R. § 230.506(b)(1) (Sept. 23, 2013).   Rule 501(a) sets forth the definition of an accredited investor.   At the
time of the 2015 Offering, a person could qualify as an accredited investor if he or she had a net worth (with his or
her spouse) of more than $1 million, or if he or she had an individual income exceeding $200,000 or a joint income
with his or her spouse exceeding $300,000.   *See* 17 C.F.R. §§ 230.501(a)(5), (6) (Sept. 23, 2013).

providing those investors with the required information render the exemption under Rule 506 unavailable").

Second, even if the Nutra Defendants had provided the requisite financial information to the unaccredited investors, there is no genuine dispute that the 2015 Offering involved general solicitation—cold-calling potential investors—and thus did not qualify for the exemption.

General solicitation includes, but is not limited to, advertisements published in newspapers and magazines, public websites, and communications broadcasted over television and radio. *See* 17 C.F.R. § 230.502(c) (Sept. 23, 2013). Cold calls to potential investors—as opposed to targeted calls to investors with whom the issuer has a prior relationship—constitute a form of general solicitation under Rule 502(c) where they have the "potential to reach a large number of people," they have the "potential to reach people throughout a large geographic area," and "perhaps most importantly . . . [they] generally target[ ] people with whom the issuer does not have a prior relationship and who are unlikely to have any special knowledge about the offered security." *SEC v. Tecumseh Holdings Corp.*, 2009 WL 4975263, at *4 (S.D.N.Y. Dec. 22, 2009) (granting summary judgment on Section 5 claim where offering involved "nationwide cold-calling campaign"); *see SEC v. Rabinovich & Associates, LP*, 2008 WL 4937360, at *4 (S.D.N.Y. Nov. 18, 2008) (granting summary judgment on Section 5 claim where offering involved "cold calls to prospective investors and a website available to the general public").

In situations where cold calls are used to identify potential investors but an offer to invest is made at a later date, public SEC No-Action letters have consistently stated that the general solicitation question turns on whether the offeror has established a "substantive relationship" with the potential investor by the time of the *offer* to sell securities (not the sale of the securities). *See*, *e.g.*, *Bateman Eichler, Hill Richards, Inc.*, SEC No-Action Letter, 1985 WL 55679, at *1

(Dec. 3, 1985); *Citizen VC, Inc.*, SEC No-Action Letter, 2015 WL 4699193, at *1 (Aug. 6, 2015).  "[A] 'substantive' relationship is one in which the issuer (or a person acting on its behalf) has sufficient information to evaluate, and does, in fact, evaluate, a prospective offeree's financial circumstances and sophistication, in determining his or her status as an accredited or sophisticated investor."  *Citizen VC, Inc.*, 2015 WL 4699193, at *1.

Here, there can be no genuine dispute that the 2015 Offering included a cold-calling campaign.  The Nutra Defendants hired Castaldo's firm and McManus to generate demand for Nutra Pharma stock while the Nutra Defendants were seeking to raise money from investors in the 2015 Offering.  (¶¶ 19–24.)  Castaldo's firm and McManus made telephone calls to potential investors who were not current Nutra Pharma shareholders; rather, they made calls to lists of Castaldo's newsletter subscribers, whom Deitsch understood numbered in the hundreds or thousands (¶¶ 10, 21–25, 40–64).  That type of broad phone campaign disqualifies the offering from the registration exemption.  *See SEC v. Mattera*, 2013 WL 6485949, at *12 (S.D.N.Y. Dec. 9, 2013) (granting summary judgment on Section 5 claim where defendant told interns to "feel free" to bring fund to the attention of friends and family, whom defendant had no reason to believe would qualify as accredited investors).

Next, there is no dispute that, with respect to at least one investor (Harrell) who had no prior relationship with Nutra Pharma before investing in the 2015 Offering, the Nutra Defendants did not establish any relationship, much less a "substantive relationship," with him before they offered him stock.  Harrell first learned about Nutra Pharma from Jerry Castaldo, who never asked any questions about Harrell's financial background or whether he had previously invested in Nutra Pharma.  (¶¶ 40, 42.)  Then, never having spoken to anyone at Nutra Pharma, Harrell

received Deitsch's email solicitation to invest in the 2015 Offering.  (¶¶ 46–47, 51–52, 62.)  As a result, before making an offer to Harrell, Nutra Pharma established no relationship with him.

Finally, there is no dispute that the 2015 Offering was not limited to accredited investors. As the Nutra Defendants admit, two investors in the offering were not accredited investors, their subscriber questionnaires showed they were not accredited, and the Nutra Defendants had no reason to believe that either was an accredited investor when they purchased the stock.  (¶¶ 68, 71, 74, 77.)  Accordingly, the Nutra Defendants cannot sustain their burden of showing that the 2015 Offering did not involve a general solicitation of investors and therefore qualified for the Rule 506(b) safe harbor.  *Cf. SEC v. Ishopnomarkup.com, Inc.*, 2007 WL 2782748, at *9 (E.D.N.Y. Sept. 24, 2007) (denying SEC summary judgment where defendants proffered evidence of good faith compliance with Rule 506, including affidavits stating "only relatives and friends who met the accreditation requirements were contacted to become investors" and "each purchaser signed a subscription agreement affirming his or her accreditation").

**The Rule 506(c) Exemption.**  To the extent the Nutra Defendants claim an exemption under Rule 506(c), there can be no genuine dispute that the 2015 Offering did not qualify.  That exemption requires that all purchasers in an offering be accredited investors and that the issuer take reasonable steps to verify the purchasers' accredited investor status, 17 C.F.R. § 230.506(c) (Sept. 23, 2013).  For the reasons described above, this exemption is unavailable.[15]

### 2.    The Undisputed Facts Show that the 2015 Offering Did Not Satisfy the Section 4(a)(2) Exemption.

Securities Act Section 4(a)(2) provides an exemption from registration for "transactions

---

[15]    Nor can the Nutra Defendants rely on the other Regulation D exemptions available at the time, Rules 504 and 505.  Rule 504 was not available to Exchange Act reporting companies like Nutra Pharma.  17 C.F.R. § 230.504(a)(1) (Apr. 7, 1999).  And Rule 505 would not have applied for the same reasons Rule 506(b) did not apply.  17 C.F.R. § 230.505(b)(1) (Aug. 13, 1992).

by an issuer not involving any public offering." 15 U.S.C. § 77d(a)(2).  Although Regulation D

provides a safe harbor for qualified non-public offerings, an issuer may prove an exemption

under Section 4(a)(2) even if it does not meet the requirements for a Regulation D exemption.  In

determining whether an offering is public under Section 4(a)(2), "the governing fact is whether

the persons to whom the offering is made are in such a position with respect to the issuer that

they either actually have such information as a registration would have disclosed, or have access

to such information." *Gilligan, Will & Co. v. SEC*, 267 F.2d 461, 466 (2d Cir. 1959) (citing

*Ralston Purina Co.*, 346 U.S. at 124–25).  In assessing whether the exemption applies, courts

consider (1) the number of offerees; (2) the sophistication of the offerees; (3) the size and

manner of the offering; and (4) the relationship of the offerees to the issuer.  *Empire Dev. Grp.*,

2008 WL 2276629, at *9 (citation omitted).

A party claiming the Section 4(a)(2) exemption "must show that it is met not only with

respect to each purchaser, but also with respect to each offeree."  *SEC v. Life Partners, Inc.*, 912

F. Supp. 4, 10 (D.D.C. 1996) (citing *Western Fed. Corp.*, 739 F.2d at 1442) (quotation marks

omitted); *see SEC v. Murphy*, 626 F.2d 633, 645 (9th Cir. 1980) (same).  A defendant's failure to

produce evidence of the number and identity of *all of the offerees* in an offering—not just those

who ended up purchasing the securities—is therefore fatal to the Section 4(a)(2) exemption.  *See*

*SEC v. StratoComm Corp.*, 2 F. Supp. 3d 240, 264 (N.D.N.Y. 2014) (granting summary

judgment on Section 5 claim where defendant "failed to produce evidence of the required exact

number and identity of all offerees"); *Life Partners*, 912 F. Supp. at 10 (granting summary

judgment on Section 5 claim partly "[b]ecause the defendants have the burden of identifying all

offerees, . . . and because the court finds that defendants cannot provide this information,

defendants' offerings do not qualify for exemption under [S]ection 4[(a)](2)").

Under the Securities Act, an "offer" to sell a security "include[s] every attempt or offer to dispose of, or solicitation of an offer to buy, a security or interest in a security, for value." 15 U.S.C. § 77b(a)(3). "This definition extends beyond the common law contract concept of an offer," *SEC v. Cavanagh*, 155 F.3d 129, 135 (2d Cir. 1998), because "Congress expressly intended to define . . . broadly" the terms "offer" and "sale," which are "expansive enough to encompass the entire selling process." *SEC v. Cole*, No. 12 Civ. 8167 (RJS), 2015 WL 5737275, at *7 (S.D.N.Y. Sept. 19, 2015) (quoting *United States v. Naftalin*, 441 U.S. 768, 773 (1979)); *see also SEC v. Genovese*, No. 17 Civ. 5821 (LGS), 2021 WL 1164654, at *6 (S.D.N.Y. Mar. 26, 2021) ("Regardless of whether any solicitations were made, the undisputed evidence discussed above shows that [the broker-dealer] was preparing to sell the stock, and so was 'offering' the stock under the statutory definition.").

The Nutra Defendants cannot meet their burden of identifying each offeree in the 2015 Offering and therefore showing that the Section 4(a)(2) exemption applies. Beyond the 33 people who actually invested (¶ 81), the number and identities of the other offerees remain unknown. Indeed, Castaldo's firm and McManus undisputedly called potential investors using lists of then-subscribers to Castaldo's stock newsletter—which Deitsch understood contained at least hundreds and possibly thousands of names—and McManus could not recall the names of the prospective investors he spoke to. (¶¶ 10–15, 19–25, 43, 50.) For similar reasons, the Nutra Defendants cannot meet their burden of proving the four factors described above.

*First*, with respect to the number of offerees, although 33 people invested in the 2015 Offering, the number of offerees is unknown and there is no evidence that the Nutra Defendants sought to monitor or limit the number of offerees at all. *See Murphy*, 626 F.2d at 645 (Section 4(a)(2) exemption not available where defendant "introduced no evidence below to suggest that

the number of offerees was small or that there was even any attempt to monitor the number of offerees at all").

   *Second*, with respect to the offerees' sophistication, the Nutra Defendants cannot identify all offerees such that the Court can make an assessment as to their levels of sophistication.  *See SEC v. Credit First Fund, LP*, 2006 WL 4729240, at *12 (C.D. Cal. Feb. 13, 2006) (Section 4(a)(2) exemption not available where, "[w]ithout knowing the identity of the offerees, it is impossible to make individual assessments as to the offerees' levels of sophistication").  Nor have the Nutra Defendants offered any evidence that they only targeted sophisticated investors for the 2015 Offering.  In fact, it is undisputed that potential investors were not required to fill out a questionnaire with information concerning their financial background or expertise until they had expressed an interest in investing and thus had already received an offer to invest (¶ 26), investors were not asked such questions orally (¶¶ 42, 59–60), and at least two of the actual purchasers were not accredited investors (¶¶ 71, 77).  *See Empire Dev. Grp.*, 2008 WL 2276629, at *9 (Section 4(a)(2) exemption not available; despite defendants "belief that they were supplied with a list containing only accredited investors, the record reveals that some investors that were successfully solicited by defendants were not accredited," which they "would have known . . . either from obtaining their financial information by telephone during the solicitation call or after reviewing the investor questionnaires that all potential investors were required to complete").

   *Third*, with respect to the offering's size and manner, though the 2015 Offering raised less than $1 million, the 2015 Offering undisputedly involved a general solicitation of investors, including calls to Castaldo's newsletter subscribers.  (¶¶ 21–25, 43.)  Such conduct favors a finding that the 2015 Offering was public rather than private, because a "transaction tends to become public when the promoters begin to bring in a diverse group of uninformed friends,

22

neighbors and associates." *Nonpublic Offering Exemption*, Release No. 33-4552, 1962 WL 69540, at *2 (Nov. 6, 1962); *see also Credit First Fund*, 2006 WL 4729240, at *12 (Section 4(a)(2) exemption not available where SEC provided evidence defendants used "cold-calling tactics," defendants failed to allege identity of offerees, and thus the court was not able to make "individual assessments as to . . . the manner in which they were contacted"); *SEC v. Alternate Energy Holdings, Inc.*, No. 10 Civ. 621, 2014 WL 2515710, at *10 (D. Idaho May 13, 2014).

*Fourth*, with respect to the relationship of the offerees to the issuer, "[a] court may only conclude that the investors do not need the protection of the [Securities] Act if all the offerees have relationships with the issuer affording them access to or disclosure of the sort of information about the issuer that registration reveals," which includes information concerning "the use of investor funds, the amount of direct and indirect commissions, and accurate financial statements." *Murphy*, 626 F.2d at 647 (citations omitted).  The Nutra Defendants again cannot meet their burden because they cannot identify all offerees in the 2015 Offering (¶¶ 22, 79), at least one offeree (Harrell) undisputedly had no prior relationship with Nutra Pharma at all (¶¶ 40–43, 46–52), and the Nutra Defendants undisputedly failed to provide the type of financial information to offerees that registration reveals (¶¶ 27, 51, 78).  *See Empire Dev. Grp.*, 2008 WL 2276629, at *9 (Section 4(a)(2) exemption not available where "[n]othing in the record indicates defendants offered [unregistered] [s]ecurities only to those in a position to have the same information . . . that a registration statement would provide").

## II.   Nutra Pharma Violated Exchange Act Section 13(a) and Rule 13a-11, and Deitsch Aided and Abetted the Violation.

### A.   Nutra Pharma's Primary Violation (Claim 10)

Exchange Act Section 13(a) requires that issuers of a security registered under Exchange Act Section 12 file certain reports with the SEC described in the rules promulgated thereunder.

15 U.S.C. § 78m(a).  Specifically, Exchange Act Rule 13a-11 requires such issuers to file current

reports on Form 8-K disclosing certain events, including unregistered sales of equity securities

under Item 3.02.  17 C.F.R. § 240.13a-11(a) (Sept. 20, 2011); SEC Form 8-K, Item 3.02

(*available at* https://www.sec.gov/files/form8-k.pdf).  The Item 3.02 filing requirement is also

triggered when an issuer "enters into an agreement enforceable against the [issuer] to issue

unregistered equity securities to a third party in exchange for services."  Exchange Act Form 8-K

Guidance, § 212.01 (*available at* https://www.sec.gov/divisions/corpfin/guidance/8-kinterp.htm).

In particular, Item 3.02 of Form 8-K requires "smaller reporting companies" to report, within

four business days, such unregistered sales or issuances of stock if they represent 5% or more of

the issuer's last-reported number of outstanding shares.  SEC Form 8-K, Item 3.02.  The SEC

need not show scienter to prove an issuer's primary violation of Exchange Act Section 13(a).

*SEC v. McNulty*, 137 F.3d 732, 740–41 (2d Cir. 1998).

 The undisputed facts show that Nutra Pharma violated Exchange Action Section 13(a)

and Rule 13a-11 by failing to file Forms 8-K concerning certain stock sales to investors in the

2015 Offering and certain stock issuances in return for services in 2015.  First, Nutra Pharma's

common stock was undisputedly registered with the SEC pursuant to Exchange Act Section

12(g) and Nutra Pharma was thus required to file current reports on Form 8-K.  (¶ 2.)  Next,

Nutra Pharma undisputedly sold a total of 12,585,000 shares of its common stock without a

registration statement between May 1 and December 31, 2015.  (¶¶ 80–82.)  Nutra Pharma also

undisputedly issued 3,310,000 shares of its common stock without a registration statement

during this same time period in return for services.  (¶¶ 83, 85.)  Finally, 25 of these unregistered

issuances undisputedly resulted in over a 5% increase in Nutra Pharma's number of shares

outstanding disclosed in its then-most-recent Form 10-Q, including a more than 20% increase

due to the share issuances on July 13, 2015.  (¶¶ 86–87.)  As a result, as a smaller reporting

company (¶ 7), Nutra Pharma was required to file numerous Forms 8-K concerning these

unregistered issuances within four business days.  Though Nutra Pharma had filed Forms 8-K in

prior years for prior unregistered issuances (¶ 89), Nutra Pharma undisputedly failed to do so for

its stock issuances between May 1 and December 31, 2015.  (¶ 88.)

### B.      Deitsch Aided and Abetted Nutra Pharma's Violation (Claim 14)

To prove that an individual is liable as an aider and abettor, the SEC must demonstrate:

(1) a securities law violation by the primary violator; (2) knowledge or reckless disregard of this

violation by the aider and abettor; and (3) "'substantial assistance' by the aider and abettor in the

achievement of the primary violation.'"  *SEC v. Apuzzo*, 689 F.3d 204, 211 & n.6 (2d Cir. 2012)

(quotation omitted); 15 U.S.C. § 78t(e).  "[A] high degree of substantial assistance may lessen

the SEC's burden in proving scienter."  *Apuzzo*, 689 F.2d at 215.  The undisputed facts

demonstrate each of these elements as a matter of law.

*First*, as discussed above in Section II.A, there can be no genuine dispute that Nutra

Pharma violated Exchange Act Section 13(a) and Rule 13a-11 by failing to file required Forms

8-K for the company's unregistered stock issuances from May through December 2015.

*Second*, there can be no genuine dispute that Deitsch knowingly or at least recklessly

disregarded Nutra Pharma's primary violation.  In the context of aiding and abetting strict

liability provisions, like Exchange Act Section 13(a) and the rules thereunder, a defendant's

general awareness of the circumstances that constitute the primary violation satisfies the scienter

element.  *See SEC v. Paulsen*, 2020 WL 6263180, at *14 (S.D.N.Y. Oct. 23, 2020) ("A

defendant's general awareness of its overall role in the primary violator's illegal scheme is

sufficient knowledge for aiding and abetting liability." (internal quotation marks and citations

omitted)).  The SEC need not prove that a defendant knew the specific SEC rule that he or she helped violate—only that a defendant knew the underlying facts giving rise to the violation.  *See SEC v. Falstaff Brewing Corp.*, 629 F.2d 62, 77 (D.C. Cir. 1980) ("Knowledge means awareness of the underlying facts, not the labels that the law places on those facts.  Except in very rare instances, no area of the law not even the criminal law demands that a defendant have thought his actions were illegal.  A knowledge of what one is doing and the consequences of those actions suffices.").

Here, there is no dispute that Deitsch knew of the 2015 unregistered stock issuances and knew he had not signed any Forms 8-K on Nutra Pharma's behalf for these issuances, as he had done in prior years.  Deitsch signed each investor subscription agreement and each agreement to issue shares for services in 2015, among other involvement in the stock sales and issuances. (¶¶ 26, 31–34, 46–47, 54–61, 84.)  In addition, Deitsch—who admits he was responsible for signing and approving all Nutra Pharma SEC filings—had signed Forms 8-K in prior periods for prior unregistered stock issuances.  (¶¶ 6, 89–90.)  Deitsch therefore undisputedly acted knowingly or recklessly with respect to Nutra Pharma's primary violation.  *See SEC v. e-Smart Tech., Inc.*, 82 F. Supp. 3d 97, 107–108 (S.D.N.Y. 2015) (granting the SEC summary judgment on Exchange Act Section 13(a) aiding and abetting claim where defendant CEO "bore significant responsibility for the company's SEC filings" and was aware of company's duty to file annual reports partly because she "had previously filed yearly reports that she reviewed and certified").

Finally, there can be no genuine dispute that Deitsch substantially assisted Nutra Pharma's violation.  A defendant substantially assists a primary violation when "he in some sort associate[s] himself with the venture, . . . [he] participate[s] in it as in something that he wishe[s] to bring about, [and] . . . he [seeks] by his action to make it succeed."  *Apuzzo*, 689 F.3d at 212

26

(quotation marks and citation omitted).  "Inaction on the part of the alleged aider and abettor" may be treated as substantial assistance when "it was in conscious or reckless violation of a duty to act." *Armstrong v. McAlpin*, 699 F.2d 79, 91 (2d Cir. 1983); *see also SEC v. Espuelas*, 579 F. Supp. 2d 461, 485 (S.D.N.Y. 2008) (it is "well-settled that where there existed a conscious or reckless violation of an independent duty to act, inaction or silence was sufficient to create aider and abetter liability"), *abrogated on other grounds by statute*.

Here, Deitsch admits that he signed, approved, and held responsibility for all filings Nutra Pharma made with the SEC during the Relevant Period, including Form 8-K reports.  (¶ 6.) Nor is there any dispute that, before 2015, Deitsch had signed Nutra Pharma Forms 8-K that disclosed, under Item 3.02, the same kinds of unregistered sales and issuances of stock that he failed to disclose in Nutra Pharma Forms 8-K in 2015.  (¶¶ 89–90.)  Deitsch's undisputed failure to file the required Forms 8-K on Nutra Pharma's behalf therefore suffices to demonstrate substantial assistance as a matter of law.  *See e-Smart Tech.*, 82 F. Supp. 3d at 107 (granting summary judgment to the SEC on aiding and abetting claim against CEO where she "bore significant responsibility" for SEC filings, thus "did not provide the resources or oversight to ensure that [the company] prepared and submitted reports on time," and thereby substantially assisted the company's Exchange Act Section 13(a) violations).[16]

## III.   Deitsch Violated Stock Ownership and Purchase Disclosure Requirements.

### A.   Deitsch Violated Exchange Act Section 13(d) and Rule 13d-2(a) (Claim 8).

"[Exchange Act] Section 13(d)(1) and Rule 13d-1(a) require a stock purchaser acquiring beneficial ownership of 5% or more of a company's securities to disclose his ownership to the

---

[16]   Although the SEC need not show that a defendant proximately caused the primary violation to satisfy the substantial assistance element, *Apuzzo*, 689 F.3d at 212–13, Deitsch in fact caused the primary violation by failing to ensure that Nutra Pharma filed the required Forms 8-K, when he admits it was his responsibility to do so.  (¶ 6.)

SEC by filing a Schedule 13D." *Verdiramo*, 890 F. Supp. 2d at 273 (citations omitted); 15 U.S.C. § 78m(d)(1); 17 C.F.R. § 240.13d-1(a). Schedule 13D filings "elicit, among other information, the filing person's purpose in acquiring the security, and are 'intended to alert investors to potential changes in corporate control so that they could properly evaluate the company in which they had invested or were investing.'" *Kamerman v. Steinberg*, 891 F.2d 424, 430 (2d Cir. 1989) (citation omitted). "Section 13(d) is not a mere 'technical' reporting provision; it is, rather, the 'pivot' of a regulatory scheme that may represent the only way that corporations, their shareholders and others can adequately evaluate . . . the possible effects of a change in substantial shareholdings." *SEC v. Drexel Burnham Lambert Inc.*, 837 F. Supp. 587, 607 (S.D.N.Y. 1993) (internal quotation marks and citation omitted).

Once stock purchasers file the required Schedule 13D forms, they have a continuing obligation under Rule 13d-2(a) to "promptly" amend a previously-filed Schedule 13D if they purchase or sell 1% or more of the company's outstanding shares of the same class of stock. 17 C.F.R. § 240.13d-2(a) (requiring an amended Schedule 13D "[i]f any material change occurs in the facts set forth in the statement"); 17 C.F.R. § 240.13d-2(a) ("An acquisition or disposition of beneficial ownership of securities in an amount equal to one percent or more of the class of securities shall be deemed 'material' for purposes of this section."). To determine the number of outstanding shares in order to calculate whether they have hit the 5% or 1% thresholds for filing a Schedule 13D or amended Schedule 13D, stock purchasers may rely on the company's most recent quarterly, annual, or current reports filed with the SEC. 17 C.F.R. § 240.13d-1(j). No showing of scienter is required for the SEC to establish a violation of Exchange Act Section 13(d) and the rules thereunder. *Verdiramo*, 890 F. Supp. 2d at 274 n.14 (citing cases).

Here, there can be no genuine dispute that Deitsch violated Section 13(d) and Rule 13d-2(a): he failed to file *any* amended Schedule 13D forms for over ten years—between April 1, 2008 and June 2018 (¶ 92)—even though his ownership of Nutra Pharma stock undisputedly increased by more than 1% on at least three occasions during that time. *First*, Deitsch's beneficial ownership increased from 14.1% on December 31, 2013, to 17.3% on April 10, 2014. (¶¶ 94–96.) *Second*, Deitsch's beneficial ownership increased from 8.6% on April 14, 2016, to 18.4% on July 5, 2016. (¶¶ 98–99.) *Third*, Deitsch's beneficial ownership increased from 11.7% on April 17, 2017, to 62.7%—a majority stake—on October 30, 2017. (¶¶ 100–103.) Nor is there any dispute that Deitsch failed to file even a single amended Scheduled 13D until June 2018 (¶ 92)—over a year after he testified in the SEC's investigation and three days after his current counsel first contacted the SEC in connection with its investigation. (¶¶ 111–112.)

## B.   Deitsch Violated Exchange Act Section 16(a) and Rule 16a-3 (Claim 9).

Exchange Act Section 16(a) and Rule 16a-3 impose important disclosure obligations on corporate officers and directors who purchase or sell stock in their corporate employers. 15 U.S.C. § 78p(a); 17 C.F.R. § 240.16a-3 (Nov. 21, 2011). "[Exchange Act] Section 16(a) and Rule 16a-3 require every person who is a director or an officer of the issuer of securities to file a Form 4 with the SEC reporting any changes in beneficial ownership, and also to file an annual statement reporting such changes on a Form 5," once the person has filed an initial statement of beneficial ownership on Form 3. *Verdiramo*, 890 F. Supp. 2d at 273 (quotation marks and citations omitted). A Form 4 must be filed within two business days after the officer's stock purchase or sale, and a Form 5 must be filed within 45 days after the company's fiscal year-end. 17 C.F.R. § 240.16a-3(g)(1) (Nov. 21, 2011); 17 C.F.R. § 240.16a-3(f)(1)(ii). A Form 5 must disclose certain "holdings and transactions not reported previously on Forms 3, 4 or 5," including

"small acquisitions" of less than $10,000 in aggregate market value within the prior six months that need not be reported on a Form 4.  17 C.F.R. § 240.16a-3(f)(1)(ii); 17 C.F.R. § 240.16a-6(a).  The officer has the choice of reporting transactions required to be reported on Form 5 on Form 4 instead, as long as the Form 4 is filed by the Form 5 deadline.  17 C.F.R. § 240.16a-3(g)(5).  No showing of scienter is required for a violation of Section 16(a) and the rules thereunder.  *e-Smart Technologies*, 82 F. Supp. 3d at 104.

There can be no genuine dispute that Deitsch violated Section 16(a) and Rule 16a-3.  First, Deitsch has undisputedly been an officer and director of Nutra Pharma since December 2003, and each Form 10-K that Deitsch signed during the Relevant Period acknowledged that he was subject to Section 16(a)'s reporting requirements.  (¶¶ 5, 109–110.)  Second, between November 8, 2012 and April 5, 2016, Deitsch undisputedly executed 273 separate purchases of Nutra Pharma common stock in his personal brokerage accounts.  (¶ 104.)  Whether these transactions should have been reported on Form 4 or Form 5—some were "small transactions" required to be reported only on Form 5—Deitsch undisputedly has never filed any Form 4 *or* Form 5 concerning these transactions.  (¶ 105.)  Finally, with respect to Deitsch's other acquisitions of Nutra Pharma common stock in 2014 through 2016, totaling nearly 40 million shares, Deitsch filed no Forms 5 at all and first filed a Form 4 on June 26, 2018, over four years after the first acquisition and over a year and a half after the last.  (¶ 107); *see SEC v. Sands*, 902 F. Supp. 1149, 1165 (C.D. Cal. 1995) (granting SEC summary judgment on Section 16(a) claim where defendant CEO filed a single Form 4 over nine months late).

## CONCLUSION

For the foregoing reasons, the Court should grant the SEC's partial motion for summary judgment against Nutra Pharma and Deitsch.

Dated:  April 9, 2021                  SECURITIES AND EXCHANGE COMMISSION
       New York, New York

By:    /s/ Lee A. Greenwood

        Lee A. Greenwood
        Preethi Krishnamurthy
        Lindsay S. Moilanen
        Securities and Exchange Commission
        New York Regional Office
        200 Vesey Street, Suite 400
        New York, NY 10281
        (212) 336-1060 (Greenwood)

        *Attorneys for Plaintiff*