UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------X
SECURITIES AND EXCHANGE COMMISSION,

                    Plaintiff,

                                        MEMORANDUM & ORDER
          -against-                     18-CV-5459(JS)(ST)

NUTRA   PHARMA   CORPORATION;   ERIK
DEITSCH a/k/a RIK DEITSCH; and SEAN
PETER McMANUS,

                    Defendants.
----------------------------------X
APPEARANCES
For Plaintiff:      Lee A. Greenwood, Esq.
                    Preethi Krishnamurthy, Esq.
                    Lindsay S. Moilanen, Esq.
                    U.S. Securities and Exchange Commission
                    New York Regional Office
                    200 Vesey Street, Suite 400
                    New York, New York  10281


For Defendant
Nutra Pharma
Corporation:        Daniel DeSouza, Esq.
                    DeSouza Law, P.A.
                    101 NE Third Avenue, Suite 1500
                    Fort Lauderdale, Florida  33301


For Defendant
Erik Deitsch:       Carl F. Schoeppl, Esq.
                    Schoeppl & Burke, P.A.
                    4651 North Federal Highway
                    Boca Raton, Florida  33431


For Defendant
Sean McManus:       Pro se

SEYBERT, District Judge:

On February 28, 2018, the Securities and Exchange Commission ("Plaintiff" or the "Commission") initiated this enforcement action against Nutra Pharma Corporation ("Nutra Pharma"), Erik Deitsch ("Deitsch," and together with Nutra Pharma, "Defendants"), and Sean Peter McManus ("McManus"), alleging violations of the Securities Act of 1933 (the "Securities Act") and the Securities Exchange Act of 1934 (the "Exchange Act"). Pending before the Court is the Commission's motion for partial summary judgment on its "non-fraud" claims. (Mot., ECF No. 68) For the following reasons, the motion is GRANTED IN PART and DENIED IN PART.

<u>BACKGROUND</u>

Unless otherwise noted, the following facts are undisputed.[1]

I.   <u>Facts</u>

A.   <u>Nutra Pharma and Deitsch</u>

Nutra Pharma is a Florida-based company incorporated in 2000 in California under the name Exotic-bird.com.  (SEC 56.1

---

[1] Unless otherwise noted, the following facts are taken from the Commission's Local Rule 56.1 Statement ("SEC 56.1 Stmt.," ECF No. 68-2), and Defendants' Local Rule 56.1 Counterstatement ("Defs. 56.1 Counterstmt.," ECF No. 72-1).  The Commission's exhibits, which are attached to the Declarations of Lindsay S. Moilanen (ECF No. 69) and Elizabeth Baier (ECF No. 70), are identified by numbers.

Stmt. ¶ 1.)  Nutra Pharma sells, among other products, two over-the-counter homeopathic products made with cobra venom that are used to treat chronic pain: Cobroxin, which it began selling in 2009; and Nyloxin, a stronger version of Cobroxin that it began to sell in 2011.  (Id. ¶ 3; Deitsch Depo. Tr. at 32-33, Ex. 14, attached to Moilanen Decl.)  At all times between April 1, 2008 and June 30, 2018, the time period relevant to the Commission's allegations, Nutra Pharma's common stock has been registered with the SEC pursuant to Section 12(g) of the Exchange Act and qualified as a penny stock.  (SEC 56.1 Stmt. ¶ 2.)  In at least 2015, Nutra Pharma qualified as a "smaller reporting company" under SEC rules. (Id. ¶ 7.)

Deitsch, who has a background in chemistry, has served as Nutra Pharma's chief executive officer, chairman of the board, and -- except for nine months in 2011 -- chief financial officer since December 2003.  (Id. ¶ 5.)  Throughout this time, Deitsch has had responsibility for all filings Nutra Pharma made with the SEC, including annual reports on Form 10-K, quarterly reports on Form 10-Q, and current reports on Form 8-K.  (Id. ¶ 6.)

B.   Nutra Pharma Engages Wall Street Buy Sell Hold

In 2009 or 2010, Christopher Castaldo ("Castaldo"), a former stockbroker based on Long Island, approached Deitsch to offer Nutra Pharma "investor relations" services through Castaldo's firm, Wall Street Buy Sell Hold ("Wall Street Buy"),

which published a stock newsletter by the same name. (Id. ¶¶ 8, 10.) Deitsch understood that Castaldo knew McManus, another consultant retained by Nutra Pharma, and that Castaldo and McManus had previously worked together as brokers. (Id. ¶ 9.) Deitsch further understood that the Wall Street Buy newsletter had at least hundreds, and possibly thousands, of subscribers who spoke, primarily by telephone, to Castaldo's team of employees based in his Long Island office. (Id. ¶¶ 10, 11.)

From 2013 through approximately 2016, Nutra Pharma entered into a series of contracts with Wall Street Buy, pursuant to which Castaldo's team provided "investor relations" services in exchange for payments in cash and stock. (Id. ¶ 13.) Nutra Pharma engaged Wall Street Buy to "tell the Nutra Pharma story to as many people as possible," and, if prospective investors believed Nutra Pharma would "be a greater value in the future," then to purchase Nutra Pharma stock. (Id. ¶ 14; Defs. 56.1 Counterstmt. ¶ 14.)

C.    The 2015 Offering

In 2015, Nutra Pharma and Deitsch decided to raise capital for the company by selling shares of Nutra Pharma common stock directly to individual investors. (SEC 56.1 Stmt. ¶ 16.) Whether these sales were exempt from registration under the Securities Act is central to several of the SEC's non-fraud allegations and the parties' present dispute. (E.g., id. ¶ 16; Defs. 56.1 Counterstmt. ¶¶ 16, 17.) As it had done in the past,

4

Nutra Pharma sold these shares directly to investors at a 50%
discount to the then-market price of the stock. (SEC 56.1 Stmt.
¶¶ 17-18) In order to make them an attractive option to open
market purchases, the shares were restricted and could not
immediately be resold. (Defs. 56.1 Counterstmt. ¶ 17.) Nutra
Pharma engaged Wall Street Buy in three separate agreements to
perform investor relations work in connection with the 2015
Offering. (SEC 56.1 Stmt. ¶ 19.)

### 1.   Castaldo and McManus Call Prospective Investors

McManus helped identify potential investors in the 2015
Offering by speaking with subscribers on Castaldo's subscriber
list in order to get people "excited about Nutra Pharma." (Id. ¶¶
21, 23.) He spoke to between five and seven prospective investors
whose names he does not recall. (Id. ¶¶ 22-24.) According to
Deitsch, "most of the private placement participants were
subscribers to [the Wall Street Buy] newsletter, and at some point,
Mr. Castaldo was the conduit by which [Deitsch] met some of these
people." (Id. ¶ 25.) Indeed, Deitsch claims that nearly all of
the Wall Street Buy subscribers who eventually purchased shares in
the 2015 Offering were already Nutra Pharma shareholders, having
previously purchased shares of Nutra Pharma on the open market.
(Defs. 56.1 Counterstmt. ¶ 25; Deitsch Depo. Tr. at 319:10-23.)
However, as discussed below, the SEC has identified at least one

investor who had not previously purchased Nutra Pharma stock but who nevertheless participated in the 2015 Offering.  (See infra.)

### 2.   Prospective Investor Subscription Documents

Once someone expressed an interest in purchasing Nutra Pharma shares in the 2015 Offering, Deitsch sent the prospective investor a subscription agreement and purchaser questionnaire. (SEC 56.1 Stmt. ¶ 26.)   The subscription agreement included a three-page purchaser questionnaire designed to determine whether the potential investor was an "accredited investor" as defined under Rule 501 of Regulation D.   (Id. ¶ 28; Subscription Agmt., Ex. 24, attached to Moilanen Decl.)   The questionnaire asked prospective investors three numbered questions: whether the investor's net worth (with a spouse, if applicable) exceeded $1 million; whether the individual had an individual annual income exceeding $200,000 or a joint income with his or her spouse exceeding $300,000 in each of the two most recent years; and about the investor's educational background and experience investing in securities.   (SEC 56.1 Stmt. ¶ 29.)   The questionnaire further required the investor's signature, along with a representation that the information was true and correct.   (Id. ¶ 30.)   In executing the subscription agreement, the investor acknowledged:

> [T]hat the proposed investment is being offered in a manner that is intended to comply with the requirements of Section 4(2) of the Act, and Rule 506 of Regulation D promulgated thereunder . . . .

6

(Defs. 56.1 Counterstmt. ¶ 30 (quoting Subscription Agmt.).)

Generally, Deitsch sent the subscription agreement with a cover email that described, among other things, the terms of the 2015 Offering, and provided numerous links to sites that contained additional information about Nutra Pharma, its products, and its shares. (Id. ¶ 26 (citing June 29, 2015 Email from Deitsch to Harrell, Ex. 26, attached to Moilanen Decl.).) Deitsch also offered to speak with potential investors about any questions that arose. (Id. ¶ 27.) However, the subscription agreement itself did not contain any financial information about Nutra Pharma. (Id.) Moreover, it is undisputed that this cover email and accompanying information was not sent to two investors, as detailed below. (See infra.)

In the event an individual decided to invest, the investor filled out and signed the subscription agreement, including the attached questionnaire, and sent both forms to Deitsch, who would "make sure that the [agreement and questionnaire] were complete" and that the investor's payment had cleared, and then counter-sign the agreement. (SEC 56.1 Stmt. ¶ 33.) Deitsch counter-signed all such subscription agreements documenting investments in the 2015 Offering. (Id. ¶ 34.)

### 3.  Harrell Invests in the 2015 Offering

In 2015, Paul Stan Harrell ("Harrell") -- a former trucking entrepreneur who had worked as a licensed stockbroker for about two years in the 1980s -- received a call from Castaldo's brother, Jerry Castaldo, who worked at Wall Street Buy.  Jerry Castaldo had been put in touch with Harrell by a mutual friend who had purchased Nutra Pharma shares in the past.  (Id. ¶¶ 35-36.) Jerry Castaldo and Harrell spoke on the phone four or five times, discussing several companies, including Nutra Pharma.  (Id. ¶¶ 39, 41.)  According to Harrell, he understood Wall Street Buy "to be a small boutique brokerage, and some kind of research group where they bird-dogged stocks and then they tried to make recommendations to people," some of whom would buy, and some of whom would not buy.  (Defs. 56.1 Counterstmt. ¶ 37 (quoting Harrell Depo. Tr. at 23:1-6, Ex. 17, attached to Moilanen Decl.).)  For his part, Harrell had limited experience in purchasing penny stocks, and at no time during their calls did Jerry Castaldo ask Harrell any questions about his investing experience or finances; nor did he ask whether Harrell had previously invested in Nutra Pharma.  (SEC 56.1 Stmt. ¶¶ 38, 42.)

To the extent Harrell knew anything about Nutra Pharma before his conversations with Jerry Castaldo, it came from their mutual friend.  (Compare SEC 56.1 Stmt. ¶ 40; with Defs. 56.1 Counterstmt. ¶ 40.)  However, when Nutra Pharma came up during a

call, Harrell was particularly interested because the company was developing treatment for multiple sclerosis, a disease with which Harrell had a personal interest.  (SEC 56.1 Stmt. ¶ 44.)  Shortly after that call, on June 9, 2015, Harrell received an email from Wall Street Buy attaching a Nutra Pharma press release.  (Id. ¶ 45.)

In a subsequent June 29, 2015 email, Deitsch attached the subscription agreement and described the basic terms of the 2015 Offering, including that Nutra Pharma was offering to sell its stock at a 50% discount to its then-market price.  (Id. ¶ 51)  Deitsch further advised Harrell that he could call him at any time. (Defs. 56.1 Counterstmt. ¶¶ 51, 53.)  In fact, shortly after receiving the email Harrell called Deitsch and they had their first conversation, which Deitsch does not recall.  (SEC 56.1 Stmt. ¶¶ 54-56.)  During the call, Deitsch talked to Harrell about Nutra Pharma, including the company's plans to expand the cobra farm,[2] and Harrell's potential $15,000 investment in the company.  (Id. ¶¶ 57-58.)  According to Harrell, Deitsch did not ask him about his background; investing experience; finances; or whether he had previously invested in Nutra Pharma.  Nor did Harrell provide Deitsch with any such information, although it appears Harrell

---

[2] (See Second Amended Complaint ¶¶ 4-6, 126-31, ECF No. 49 (providing background on the Commission's allegations regarding Nutra Pharma's claimed cobra farm operations).)

understood that such information would be provided through the subscription agreement. (Id. ¶¶ 59-60; Defs. 56.1 Counterstmt. ¶ 59.) Although Deitsch claims he generally asked prospective investors whether they already owned Nutra Pharma stock, he did not have anyone check any records to determine whether any prospective investor in fact had a pre-existing investment in the company. (SEC 56.1 Stmt. ¶ 64.) As for Harrell, Deitsch does not recall whether he had a prior investment in Nutra Pharma. (Id. ¶ 65.) After the call, Harrell decided to invest $15,000 in Nutra Pharma. (Id. ¶ 61.) The following day he signed the subscription agreement, filled out the purchaser questionnaire, and returned them to Deitsch. (Id. ¶ 63; Harrell Subscription Agmt., Ex. 27, attached to Moilanen Decl.)

D.   Barbee and Thomas Invest in Nutra Pharma

The Commission identifies two investments by unaccredited investors arising out of the 2015 Offering: the first to Charles J. Barbee ("Barbee"), and the second to Jane E. Thomas ("Thomas").

On June 19, 2015, Barbee executed the subscription agreement and attached purchaser questionnaire for a $900 investment in Nutra Pharma. (SEC 56.1 Stmt. ¶ 66.) On the purchaser questionnaire, Barbee stated that he had only occasional experience investing in stocks and bonds and no experience with venture capital investments. (Id. ¶ 67.) Moreover, Barbee advised

10

that he and his wife's net worth did not exceed $1 million, that his income did not exceed $200,000, and that their joint income did not exceed $300,000.  (Id. ¶ 68.)  That same day, Deitsch countersigned Barbee's subscription agreement, and on June 24, 2015, Nutra Pharma issued 15,000 shares of common stock to Barbee as part of the 2015 Offering.  (Id. ¶¶ 69-70.)  There is no dispute that Barbee was not an accredited investor within the meaning Rule of 501(a) of Regulation D.  (Id. ¶ 71.)

On June 30, 2015, Thomas executed the subscription agreement and attached purchaser questionnaire for a $10,000.02 investment in Nutra Pharma.  (Id. ¶ 72.)  On the purchaser questionnaire, Thomas stated that she had frequent experience investing in stocks and bonds; Thomas did not fill out the box regarding her experience with venture capital investments.  (Id. ¶ 73.)  Moreover, Thomas advised that she and her spouse's net worth did not exceed $1 million, that her income did not exceed $200,000, and that their joint income did not exceed $300,000. (Id. ¶ 74.)  On July 20, 2015, Deitsch countersigned Thomas's subscription agreement, and on August 26, 2015, Nutra Pharma issued 166,667 shares of its common stock to Thomas as part of the 2015 Offering.  (Id. ¶¶ 75-76.)  There is no dispute that Thomas was not an accredited investor within the meaning of Rule 501(a) of Regulation D.  (Id. ¶ 77.)

While Defendants concede that Barbee and Thomas were not accredited investors, they point to representations Barbee and Thomas assented to in the subscription agreement regarding their understanding of the risks involved with respect to their investment in Nutra Pharma. (Defs. 56.1 Counterstmt. ¶¶ 71, 77.) There is no record evidence that Defendants provided any financial information about Nutra Pharma to Barbee or Thomas before they invested, although Defendants point out that both individuals had relationships with Nutra Pharma investors. (SEC 56.1 Stmt. ¶ 78; Defs. 56.1 Counterstmt. ¶ 78.)

E.   Summary of the 2015 Offering

From May 1 through December 31, 2015, Nutra Pharma issued a total of 12,585,000 shares of its common stock to investors in the 2015 Offering. (SEC 56.1 Stmt. ¶ 80.) Through these stock sales, Nutra Pharma raised a total of $756,300.82 from thirty-three investors located in ten states and Canada. (Id. ¶ 81.) Nutra Pharma did not file a registration statement with the SEC in connection with any of the sales from the 2015 Offering; rather, Nutra Pharma maintains it was exempt from such a requirement. (Id. ¶ 82.)

Nutra Pharma also issued a total of 3,310,000 shares of its common stock to various individuals and entities in return for services during this same period, including 200,000 shares to Castaldo and 750,000 shares to McManus. (Id. ¶ 83.) Deitsch

counter-signed each of the agreements obligating Nutra Pharma to issue these shares for services.  (Id. ¶ 84.)  Nutra Pharma did not file a registration statement with the SEC for any of these issuances of shares for services; again, Nutra Pharma maintains it was exempt from such a requirement.  (Id. ¶ 85.)

From May 1 through December 31, 2015, twenty-five separate issuances of common stock -- either to investors or in exchange for services -- resulted in a more than 5% increase in the number of shares outstanding disclosed in Nutra Pharma's then-most-recent Form 10-Q.  (Id. ¶ 86.)  Nutra Pharma's common stock issuances to investors on July 13, 2015 resulted in a percentage increase of more than 20% to the number of outstanding shares disclosed in the prior Form 10-Q.  (Id. ¶ 87.)  However, Nutra Pharma did not file a Form 8-K with the SEC concerning any of the 2015 issuances of unregistered common stock to investors or in exchange for services.  (Id. ¶ 88.)  In comparison, Nutra Pharma filed Forms 8-K concerning at least two earlier unregistered issuances of common stock to investors in 2008 and 2009, one of which also disclosed the issuance of unregistered shares in exchange for services.  (Id. ¶ 89.)  Deitsch signed these earlier Forms 8-K.  (Id. ¶ 90.)  However, Defendants respond that the circumstances in 2008 and 2009 differed from those in 2015.  (Defs. 56.1 Counterstmt. ¶ 89.)  Specifically, in the 2008 Form 8-K, there was a specific date when the private placement closed and the Nutra

Pharma Board authorized the issuance of shares in exchange for services; and in the 2009 Form 8-K, there was a specific date when all subscriptions for unregistered shares were accepted. (Id.) On the other hand, in 2015, "there were a significant number of different dates when shares were issued." (Id.) For these reasons, Nutra Pharma disclosed the issuance of unregistered shares "on a rolling basis" in its Forms 10-Q filed on August 18, 2015 and November 23, 2015. (Id.)

### F.   Deitsch's Personal Holdings in Nutra Pharma

On April 1, 2008, Deitsch filed with the SEC a Schedule 13D reporting his beneficial ownership of 54.5 million shares of Nutra Pharma common stock, which amounted to 33.8% of the company's outstanding common stock. (SEC 56.1 Stmt. ¶ 91.) It is undisputed that this was the only Schedule 13D form that Deitsch filed with the SEC until June 2018. (Id. ¶ 92.)

In annual Forms 10-K, however, Nutra Pharma disclosed Deitsch's holdings, along with the holdings of Nutra Pharma's other officers and directors. (Id. ¶ 93.) For example, in the 2013 Form 10-K, Nutra Pharma disclosed that Deitsch beneficially owned 141,678,334 shares of common stock as of December 31, 2013, which amounted to 14.1% of the outstanding common stock. (Id. ¶¶ 94-95.) On April 10, 2014, Nutra Pharma issued 50 million shares of common stock to Deitsch, increasing his holdings to 191,68,360 shares and boosting his beneficial ownership stake to 17.3%. (Id.

14

¶ 96.)  On May 18, 2015, Nutra Pharma effected a 40-for-1 reverse split of its common stock, which reduced by a factor of 40 the number of shares that Deitsch and all other shareholders held. (Id. ¶ 97.)  According to the 2015 Form 10-K, Deitsch beneficially owned 9,219,275 shares of common stock as of April 14, 2016, which represented 8.6% of the 106,894,580 outstanding shares.  (Id. ¶ 98.)

The following year, on June 28 and July 5, 2016, Deitsch acquired 19 million shares of common stock, increasing his holding by more than 200% and his beneficial ownership of Nutra Pharma common stock to approximately 18.4% of the outstanding shares. (Id. ¶ 99.)  According to the 2016 Form 10-K, Deitsch beneficially owned 43,219,275 shares of common stock as of April 17, 2017, which represented 11.7% of the outstanding shares.  (Id. ¶ 100.)

On October 30, 2017, Nutra Pharma discharged $400,000 in loans owed to Deitsch in exchange for three million shares of the company's Series A Preferred Stock, with each share entitling Deitsch to 1,000 votes per share, or 3 billion additional votes in total.  (Id. ¶¶ 101-02.)  As a result, Deitsch beneficially owned 3,043,298,859 shares, or 62.7% of Nutra Pharma's voting common stock.

Between November 8, 2012 and April 5, 2016, Deitsch executed a total of 273 separate transactions to purchase Nutra Pharma shares in his personal brokerage accounts, spending a total

of $12,802.94 before commissions and fees.  (Id. ¶ 104.)  Deitsch did not report any of these purchases on a Form 4 or a Form 5. (Id. ¶ 105.)  Indeed, Deitsch did not file any Forms 4 at all between March 22, 2014, and June 25, 2018, and he has not filed a Form 5 since January 1, 2005.  (Id. ¶ 106.)  Defendants respond that Deitsch was not required to report any of the 273 de minimis purchases on Form 4.  (Defs. 56.1 Counterstmt. ¶ 105.)  Nor was Deitsch required to disclose these purchases on a Form 5, because they were reported elsewhere.  (Id. ¶ 105.)  However, in a Form 4 filed on June 26, 2018, Deitsch disclosed his receipt of nearly 40 million split-adjusted shares in 2014, 2015, and 2016.  (SEC 56.1 Stmt. ¶ 107.)  Moreover, each of the Forms 10-K that Nutra Pharma filed since the fiscal year ending in 2010 state that "based on our review of Forms 3, 4, 5 and Schedule 13D furnished to us during the last fiscal year, all of our officers and directors filed the required reports."  (Id. ¶ 109.)  Deitsch signed each of these Forms 10-K as Nutra Pharma's chief executive officer.  (Id. ¶ 110.)

II.  Procedure

     The Commission initiated this action on September 28, 2018 against Nutra Pharma, Deitsch, and McManus.  (Compl., ECF No. 1.)  After the SEC filed an Amended Complaint on May 29, 2019 that mooted the pending motions to dismiss, Defendants and McManus renewed their respective motions to dismiss, which the Court granted in part and denied in part in a Memorandum and Order dated

16

March 31, 2020.  In the subsequently filed, operative Second Amended Complaint, the SEC asserts several "non-fraud" claims that are the subject of the present motion for partial summary judgment.[3]

With leave of Court, on April 4, 2021, the Commission filed the instant motion seeking summary judgment on its non-fraud claims.  (Mot., ECF No. 68; Support Memo, ECF No. 68-1.) Specifically, the Commission seeks summary judgment on its claim that the Defendants violated Section 5 of the Securities Act by offering and selling Nutra Pharma stock in 2015 without a registration statement (Claim 7); Nutra Pharma violated Section 13(a) of the Exchange Act and Rule 13a-11 thereunder by failing to file Forms 8-K disclosing unregistered stock sales and issuances above a certain numerical threshold (Claim 10), and that Deitsch aided and abetted that violation (Claim 14); and Deitsch violated Exchange Act Section 13(d) and Rule 13d-2(a) by failing to file Schedule 13D forms disclosing changes in his ownership of Nutra Pharma's outstanding shares above a certain numerical threshold (Claim 8), as well as Exchange Act Section 16(a) and Rule 16a-3 by failing to timely file Forms 4 and 5 disclosing his acquisitions

---

[3] The Commission also asserts several fraud-based claims that are not subject to the present motion, including violations Securities Act Section 17(a) and violations of Exchange Act Section 10(b) and Rule 10b-5.

of Nutra Pharma stock (Claim 9).[4]   Defendants oppose the motion.
(Opp'n, ECF No. 72; Reply, ECF No. 74.)

DISCUSSION

I.   Legal Standard

          Summary judgment is appropriate where there is "no
genuine dispute as to any material fact and the movant is entitled
to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Material
facts are those which might affect the outcome of the suit under
the governing law, and a dispute is genuine if the evidence is
such that a reasonable jury could return a verdict for the
nonmoving party." Wagner v. Chiari & Ilecki, LLP, 973 F.3d 154,
164 (2d Cir. 2020) (quoting Coppola v. Bear Stearns & Co., 499
F.3d 144, 148 (2d Cir. 2007)) (internal quotation marks omitted).
"The moving party bears the initial burden of showing that there
is no genuine dispute as to a material fact." CILP Assocs., L.P.
v. PriceWaterhouse Coopers LLP, 735 F.3d 114, 123 (2d Cir. 2013)
(cleaned up). "In moving for summary judgment against a party who
will bear the ultimate burden of proof at trial, the movant may
satisfy this burden by pointing to an absence of evidence to
support an essential element of the nonmoving party's claim."
Gummo v. Vill. of Depew, 75 F.3d 98, 107 (2d Cir. 1996) (citing
Celotex Corp. v. Catrett, 477 U.S. 317, 322–23 (1986)). "If, as

---

[4] The Commission is not seeking summary judgment on any of its
claims against McManus.

to the issue on which summary judgment is sought, there is any evidence in the record from which a reasonable inference could be drawn in favor of the opposing party, summary judgment is improper." Hetchkop v. Woodlawn at Grassmere, Inc., 116 F.3d 28, 33 (2d Cir. 1997). Moreover, "the court is not to make assessments of the credibility of witnesses" on a motion for summary judgment, as "[c]redibility assessments, choices between conflicting versions of events, and weighing of the evidence are matters for the jury." Id.

On a motion for summary judgment the Court considers the "pleadings, deposition testimony, answers to interrogatories and admissions on file, together with any other firsthand information including but not limited to affidavits." Nnebe v. Daus, 644 F.3d 147, 156 (2d Cir. 2011). In reviewing the record, "the court is required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." Sheet Metal Workers' Nat'l Pension Fund v. Vadaris Tech. Inc., No. 13-CV-5286, 2015 WL 6449420, at *2 (E.D.N.Y. Oct. 23, 2015) (quoting McLee v. Chrysler Corp., 109 F.3d 130, 134 (2d Cir. 1997)).

II.  Analysis

The Court begins with the Commission's claims under Section 5 of the Securities Act, including any potential exemptions

from registration, before turning to the Commission's remaining claims under the Exchange Act.

A.   Section 5: Unregistered Offering of Securities

1.   The Commission's *Prima Facie* Case

"Section 5 of the Securities Act makes it unlawful, directly or indirectly, to publicly offer or sell unregistered stock, see 15 U.S.C. § 77e, unless the offering is covered by an exemption." SEC v. Frohling, 851 F.3d 132, 135 (2d Cir. 2016). "To state a cause of action under Section 5, one must show '(1) lack of a [required] registration statement as to the subject securities; (2) the offer or sale of the securities; and (3) the use of interstate transportation or communication and the mails in connection with the offer or sale.'" Id. at 136 (quoting SEC v. Cavanagh, 445 F.3d 105, 111 n.13 (2d Cir. 2006)). Moreover, "[a] person not directly engaged in transferring title of the security can be held liable under § 5 if he or she 'engaged in steps necessary to the distribution of [unregistered] security issues.'" Id. (quoting SEC v. Chinese Consol. Benevolent Ass'n, 120 F.2d 738, 741 (2d Cir. 1941)). The registration requirements of the Securities Act "protect investors by promoting full disclosure of information thought necessary to informed investment decisions." SEC v. Ralston Purina Co., 346 U.S. 119, 124 (1953).

The Commission has stated a prima facie violation of Section 5. It is undisputed that through the 2015 Offering,

Defendants offered Nutra Pharma common stock to prospective investors and sold 12,585,000 shares to thirty-three investors for a total of $756,300.82, and that no registration statement covered those sales. Moreover, there can be no dispute that Deitsch engaged in steps necessary to the distribution of these unregistered shares. Deitsch spoke with prospective investors, emailed them subscription agreements and purchaser questionnaires, received and reviewed the signed documents in the event an offeree decided to invest, and then counter-signed the executed subscription agreements. These undisputed facts are sufficient to establish that Deitsch engaged in steps necessary to the distribution of unregistered Nutra Pharma securities. See SEC v. Tecumseh Holdings Corp., No. 03-CV-5490, 2009 WL 4975263, at *3 (S.D.N.Y. Dec. 22, 2009) (granting summary judgment on Section 5 claim against alleged corporate officer who "drafted or reviewed offering memoranda used to sell [unregistered] securities, authorized the distribution of these memoranda to prospective investors, and participated in conversations regarding 'matters pertaining to the sale of [unregistered] securities' and 'the compliance oversight of . . . sales personnel'"); SEC v. Mattera, No. 11-CV-8323, 2013 WL 6485949, at *10–11 (S.D.N.Y. Dec. 9, 2013) (granting summary judgment on Section 5 claim against broker-dealer liaison who introduced broker-dealers to the offeror, acted as a liaison between the broker-dealers and the offeror, and

assisted his friends in the creation of an LLC with the purpose of purchasing offeror funds). Nor is there any dispute that Defendants used interstate commerce for the 2015 Offering, including telephone calls and emails with potential investors located in at least ten states and Canada.

Based on the foregoing, the Court finds that the Commission has established a prima facie violation of Section 5.

### 2. The 506(b) Exemption

Because the SEC has established a prima facie violation of Section 5, Defendants must prove that the Nutra Pharma securities offered and sold through the 2015 Offering were exempted from registration to avoid liability. "The burden is on defendant to prove that a registration exemption applies." SEC v. Opulentica, LLC, 479 F. Supp. 2d 319, 328 (S.D.N.Y. 2007) (citing Ralston Purina Co., 346 U.S. at 126); see also Cavanagh, 445 F.3d at 111, n.13 ("Once a prima facie case has been made, the defendant bears the burden of proving the applicability of an exemption.").

### i. Applicable Law

Under the Rule 506 exemption for private placements, "offerings are exempt from registration if there are no more than thirty-five unaccredited purchasers for the offering and the offering conforms to the general requirements laid out by the SEC." Mattera, 2013 WL 6485949, at *11 (citing 17 C.F.R. §§ 230.502, 230.506). One of those requirements, described in Rule 502(b),

obligates the issuer to disclose certain types of financial information, including the company's most recent annual report filed on Form 10-K and "a brief description of the securities being offered, the use of the proceeds from the offering, and any material changes in the issuer's affairs that are not disclosed in the documents furnished."  17 C.F.R. § 230.502(b)(1), (b)(2)(ii) (Sept. 23, 2013).

The second relevant provision, described in Rule 502(c), "prohibits general solicitations for sales of unregistered securities." Mattera, 2013 WL 6485949, at *11 (citing 17 C.F.R. §§ 230.502(c), 230.508).   According to Rule 502(c), general solicitations include, but are not limited to, "[a]ny advertisement, article, notice or other communication published in any newspaper, magazine, or similar media or broadcast over television or radio." 17 C.F.R. § 230.502(c)(1) (Sept. 23, 2013). "[W]hen the promoters begin to bring in a diverse group of uninformed friends, neighbors and associates," such as through a cold-calling campaign, the protections of Rule 502 will not apply. See Nonpublic Offering Exemption, 1933 Act Release No. 33-4552, 27 Fed. Reg. 11316 (Nov. 6, 1962).   Cold calls to prospective investors constitute a general solicitation under Rule 502(c) where they have "the potential to reach a large number of people" throughout a large geographic area, and "target[] people with whom the issuer does not have a prior relationship and who are unlikely

to have any special knowledge about the offered security." Tecumseh Holdings Corp., 2009 WL 4975263, at *4; see also SEC v. Rabinovich & Assocs., LP, No. 07-CV-10547, 2008 WL 4937360, at *4 (S.D.N.Y. Nov. 18, 2008).  On the other hand, when the issuer or its agent makes targeted calls to investors with whom the issuer has a "substantive relationship" at the time of the offer to sell securities, the issuer will not be found to have engaged in a general solicitation.  Bateman Eichler, Hill Richards, Inc., 1985 WL 55679, at *1 (SEC No-Action Letter Dec. 3, 1985); Citizen VC, Inc., 2015 WL 4699193, at *1 (SEC No-Action Letter Aug. 6, 2015). "[A] 'substantive' relationship is one in which the issuer (or a person acting on its behalf) has sufficient information to evaluate, and does, in fact, evaluate, a prospective offeree's financial circumstances and sophistication, in determining his or her status as an accredited or sophisticated investor." Citizen VC, Inc., 2015 WL 4699193, at *1.

> ii.  Application

While fewer than thirty-five unaccredited purchasers participated in the 2015 Offering, the undisputed facts show Defendants failed to comply with the remaining requirements under Rule 506.  To begin, Defendants have failed to produce any documents showing that they provided any financial information about Nutra Pharma to Barbee or Thomas -- both undisputedly unaccredited investors -- before they purchased stock in the 2015

Offering.   "Uncontradicted evidence of defendants' offers and sales of [unregistered securities] to unaccredited investors without providing those investors with the required information render[s] the exemption under Rule 506 unavailable." SEC v. Empire Dev. Grp., LLC, No. 07-CV-3896, 2008 WL 2276629, at *9 (S.D.N.Y. May 30, 2008).   For this reason alone Defendants cannot establish the Rule 506 exemption applies, and their arguments to the contrary are unpersuasive for several reasons.   Defendants do not dispute that Deitsch did not provide Barbee or Thomas the necessary financial documents; rather, they blame the Commission for not asking Deitsch during his depositions to explain why his customary email identifying numerous sources of information about Nutra Pharma had not been provided.   (Defs. Counterstmt. ¶ 78.)   But at this stage Defendants bear the burden of showing that disputed facts preclude a finding that no registration exemption applies, and they cannot shift that burden to the Commission.   See Opulentica, LLC, 479 F. Supp. 2d at 328 (citing Ralston, 346 U.S. at 126).

Defendants also point out that Barbee and Thomas (1) executed subscription agreements in which they represented each had "been furnished any and all materials relating to the Company and its activities" that each had requested; and (2) their friends or family were Nutra Pharma shareholders.   (Defs. Counterstmt. ¶ 78.)   However, because Barbee and Thomas were not

provided the financial information required by Rule 506, these facts are immaterial, and Defendants cite no authority suggesting otherwise.

In any event, even if Defendants had provided the necessary financial information to the unaccredited investors, the Court finds the undisputed facts show Defendants engaged in a cold-calling campaign that constituted a general solicitation.[5] Tecumseh Holdings Corp., 2009 WL 4975263, at *4; see also SEC v. Bio Def. Corp., No. 12-CV-11669, 2019 WL 7578525, at *16 (D. Mass. Sept. 6, 2019), aff'd sub nom. SEC v. Morrone, 997 F.3d 52 (1st Cir. 2021).  In sum, Defendants retained a promoter, Wall Street Buy, to generate demand for the 2015 Offering of Nutra Pharma stock by making telephone calls to Wall Street Buy subscribers, who Deitsch understood to number in the hundreds and, potentially, thousands.  Yet there was no effort to monitor and confirm whether these subscribers were current Nutra Pharma shareholders.  See Tecumseh Holdings Corp., 2009 WL 4975263, at *4 (finding a cold

---

[5]  Defendants halfheartedly argue that the terms "general solicitation" and "public offering" "appear to raise significant due process issues," apparently on vagueness grounds.  (Opp'n at 20-21.)  In support of their argument, raised at the end of a single paragraph, Defendants cite to FCC v. Fox Television Stations, Inc., a Supreme Court case outside of the securities law context involving the void-for-vagueness doctrine.  Because this argument is not sufficiently developed, the Court declines to address it.  See In re Gen. Motors LLC Ignition Switch Litig., No. 14-MD-2543, 2021 WL 1415121, at *3 (S.D.N.Y. Apr. 14, 2021) (finding the plaintiffs forfeited a constitutional argument raised in passing).

calling campaign constitutes a form of general solicitation where it "targets people with whom the issuer does not have a prior relationship and who are unlikely to have any special knowledge about the offered security"); see also Mattera, 2013 WL 6485949, at *12 (finding the defendant engaged in a general solicitation where its interns were told they could "feel free" to bring the offering to the attention of friends and family who the issuer "had no reason to believe" would be sophisticated investors).

In fact, it cannot be reasonably disputed that Harrell did not have a substantive relationship with Defendants before Deitsch offered him stock.  Defendants' contention that Harrell knew about Nutra Pharma before he spoke with Jerry Castaldo falls short of establishing that he and Nutra Pharma had a substantive relationship, because there is no evidence Defendants had "sufficient information to evaluate," and did in fact evaluate, Harrell's "financial circumstances and sophistication" in order to determine his status as an accredited or sophisticated investor. See Citizen VC, Inc., 2015 WL 469919, at *1.  Jerry Castaldo did not ask Harrell any questions about the latter's financial background or pre-existing relationship with Nutra Pharma.  Nor did Deitsch inquire about these matters in his follow-up email. While Harrell testified he "sort of" expected a call from Wall Street Buy because a friend had transacted with Nutra Pharma in

the past, this only demonstrates that Harrell's relationship with Nutra Pharma was tenuous at best.

Accordingly, on the undisputed facts, the Court finds that the Rule 506(b) exemption is unavailable.[6]

### 3.   The Section 4(a)(2) Exemption

"When an issuer tries to comply with Rule 506 but fails, the issuer may still rely on the statutory exemption of section 4(2)." SEC v. Life Partners, Inc., 912 F. Supp. 4, 10 (D.D.C. 1996).[7]  The Court now considers whether Defendants have raised any material dispute of fact regarding the application of the Section 4(a)(2) exemption.

### i.   Applicable Law

The test for whether an offering is an exempt "private offering" under Section 4(a)(2) asks whether the offerees could "fend" for themselves, and whether the offerees had access to the same information that registration would provide. SEC v. StratoComm Corp., 2 F. Supp. 3d 240, 264 (N.D.N.Y. 2014) (citing Ralston Purina Co., 346 U.S. at 125–27), aff'd, 652 F. App'x 35

---

[6] Nor does the Section 506(c) exemption, which requires evidence that all investors in an offering were accredited investors, apply here, because Defendants concede Thomas and Barbee, both of whom participated in the 2015 Offering, were not accredited investors. Moreover, as the Commission correctly argues, Rule 508 is not available in the present case, because it is an SEC enforcement action, not a private investor action.

[7] Section 4(2) was re-designated Section 4(a)(2).

(2d Cir. 2016); see also Gilligan, Will & Co. v. SEC, 267 F.2d 461, 466 (2d Cir. 1959).  "The factors to be considered in determining whether the exemption applies include: the number of potential investors; their relationship to the issuer and to one another; the manner of the offering, information disclosure or access; and the sophistication of the potential investors." Empire Dev. Grp., LLC, 2008 WL 2276629, at *9 (citing W. Fed. Corp. v. Erickson, 739 F.2d 1439, 1442 (9th Cir. 1984)).  "The party claiming the exemption must show that it is met not only with respect to each purchaser, but also with respect to each offeree." StratoComm Corp., 2 F. Supp. 3d at 264 (citing Life Partners, 912 F. Supp. at 10).

### ii.   Application

Defendants raise no genuine dispute of material fact regarding the application of the Section 4(a)(2) exemption.  Once the Commission established that "there was no control placed on the number of offerees, it was incumbent upon [Defendants], in opposing summary judgment, to rebut that evidence." SEC v. Murphy, 626 F.2d 633, 645 (9th Cir. 1980).  But the precise number of offerees -- as opposed to purchasers -- remains unknown, making it impossible for the Court to assess their respective sophistication and relationship to Nutra Pharma.  As discussed below, Defendants' failure to adduce any evidence regarding the number of offerees is fatal to their claim that the 2015 Offering was a private placement

under Section 4(a)(2).  See SEC v. Alt. Energy Holdings, Inc., No.
10-CV-0621, 2014 WL 2515710, at *9 (D. Idaho May 13, 2014) (quoting
Doran v. Petroleum Mgmt. Corp., 545 F.2d 893, 902 (5th Cir. 1977)).

It is well established that "[t]o claim the private
offering exemption, evidence of the exact number and identity of
all offerees must be produced." Erickson, 739 F.2d at 1442 (citing
SEC v. Continental Tobacco Co. of S.C., 463 F.2d 137, 161 (5th
Cir. 1972)); SEC v. Murphy, 626 F.2d 633, 645 (9th Cir. 1980);
Lively v. Hirschfeld, 440 F.2d 631, 633 (10th Cir. 1971);
StratoComm Corp., 2 F. Supp. 3d at 264.  This information is
critical in assessing whether an offering was private or public,
as generally "the more offerees, the more likelihood that the
offering is public." Murphy, 626 F.2d at 645–46.  However,
Defendants have not identified the number of offerees in the 2015
Offering, and the undisputed facts further undermine Defendants'
claim to a private placement exemption.  Defendants engaged Wall
Street Buy to generate interest in Nutra Pharma; Wall Street Buy
did so by calling subscribers to its stock newsletter, which
contained hundreds, if not thousands, of potential investors; and,
another Nutra Pharma consultant, McManus, could not recall the
names of the several prospective investors to whom he spoke.  The
foregoing indicates an indeterminate number of offers made during
the 2015 Offering.  Further, to the extent Defendants argue that
Wall Street Buy's efforts did not constitute an offer, as they

only provided "factual business information" on the calls, this argument is foreclosed by the broad definition Congress gave to "offer," which is "expansive enough to encompass the entire selling process." United States v. Naftalin, 441 U.S. 768, 773 (1979); see also SEC v. Genovese, No. 17-CV-5821, 2021 WL 1164654, at *6 (S.D.N.Y. Mar. 26, 2021) ("Regardless of whether any solicitations were made, the undisputed evidence discussed above shows that [the broker-dealer] was preparing to sell the stock, and so was 'offering' the stock under the statutory definition.").

Moreover, "[w]ithout knowing the identity of the offerees, it is impossible to make individual assessments as to the offerees' levels of sophistication," SEC v. Credit First Fund, LP, No. 05-CV-8741, 2006 WL 4729240, at *12 (C.D. Cal. Feb. 13, 2006), or whether they could "fend for themselves." Ralston Purina Co., 346 U.S. at 125.  The fact that investors -- as opposed to offerees -- completed purchaser questionnaires with information regarding their financial background does not indicate that Defendants were aware of each offerees' relative sophistication. See Empire Dev. Grp., LLC, 2008 WL 2276629, at *9.  In fact, at least two investors who submitted completed questionnaires, Barbee and Thomas, were not accredited investors.

With respect to Nutra Pharma's relationship to the offerees, "[t]he record does not establish that each offeree had a relationship with [Nutra Pharma] giving access to the kind of

information that registration would have disclosed." Cont'l
Tobacco Co. of S.C., 463 F.2d at 158.  There is no evidence that
Defendants limited the 2015 Offering to a "select group," id. at
159, or to individuals who "occupied a privileged position relative
to the issuer that afforded them an opportunity for effective
access to the information registration would otherwise provide,"
Erickson, 739 F.2d at 1443 (citing Doran, 545 F.2d at 906).  To
the contrary, at least one investor, Harrell, had no prior
relationship with Nutra Pharma, and there is no dispute that Nutra
Pharma failed to provide the type of financial information that
registration reveals to Barbee and Thomas.  Deitsch's assertion
that such information "was there for the asking will not defeat a
motion for summary judgment." Erickson, 739 F.2d at 1443.

       Accordingly, the Court finds on the undisputed facts
that the Section 4(a)(2) exemption is unavailable.  As a result,
the Commission is entitled to summary judgment on its Section 5
claims against Defendants.

    B.    Section 13(a) and Rule 13a-11

       Next, the Commission asserts Nutra Pharma violated
Exchange Act Section 13(a) and Rule 13a-11 (Claim 10), which
require issuers of a security registered under Exchange Act Section
12 to file certain reports with the Commission.  At issue here is
Nutra Pharma's failure to file Forms 8-K concerning unregistered
stock sales from the 2015 Offering that represented 5% or more of

the company's last-reported number of outstanding shares.   The
Commission further alleges Deitsch aided and abetted Nutra
Pharma's primary violation of Exchange Act Section 13 (Claim 14).

While the Court finds the undisputed facts make out a
primary violation of Section 13 by Nutra Pharma, triable issues
remain regarding Deitsch's knowledge of the violations.

　　1.  Primary Violation

Section 13(a) obligates issuers of a security registered
under Section 12 of the Exchange Act to file certain reports with
the Commission.  See 15 U.S.C. § 78m(a).  Exchange Act Rule 13a-
11 requires such issuers to file current reports on Form 8-K
disclosing certain events, including unregistered sales of equity
securities under Item 3.02.  See 17 C.F.R. § 240.13a-11(a) (Sept.
20, 2011); SEC Form 8-K, Item 3.02,
https://www.sec.gov/files/form8-k.pdf.  Item 3.02 requires
"smaller reporting companies" to report, within four business
days, such unregistered sales or issuances of stock if they
represent 5% or more of the issuer's last-reported number of
outstanding stock.  See SEC Form 8-K, Item 3.02.  Lack of scienter
is not a defense to claims arising under Section 13 and the
regulations thereunder.  SEC v. McNulty, 137 F.3d 732, 740-41 (2d
Cir. 1998).

The Commission is entitled to summary judgment on its
Section 13(a) claim.  There is no dispute that (1) Nutra Pharma,

whose common stock was registered pursuant to Exchange Act Section 12(g), was required to file current reports on Form 8-K; (2) Nutra Pharma sold shares of common stock without a registration statement during the 2015 Offering; and (3) twenty-five of these issuances resulted in over a 5% increase in Nutra Pharma's number of outstanding shares disclosed in its then-most-recent Form 10-Q. (See Baier Decl. ¶¶ 7-9, Ex. 2.)  As a smaller reporting company, Nutra Pharma was thus required to file Forms 8-K concerning these unregistered issuances within four business days.  The company's failure to do so violated Rule 13(a) and the regulations thereunder.

Defendants' only argument in response is unavailing. Defendants argue that Nutra Pharma included information about unregistered stock issuances in its Forms 10-Q, apparently thereby discharging its obligations under Rule 13a-11.  (See Opp'n at 27.) Defendants do not cite to any authority supporting the proposition implicit in their argument, i.e., compliance with one disclosure obligation protects the company from failing to comply with another.  This is unsurprising, because Form 10-Q and Form 8-K serve different purposes.  "The Form 10-Q includes unaudited financial statements and provides a continuing view of the company's financial position during the year."  SEC, Glossary: Form 10-Q, https://www.investor.gov/introduction-investing/investing-basics/glossary/form-10-q.  It is intended "to provide

shareholders and the investing public with a concise overview of the company's financial results, operations and management during the preceding fiscal quarter." Quarterly Report on Form 10-Q: Purpose, Corp. Compl. Series: Securities § 1:43 (2022). Form 8-K, on the other hand, "is for special event disclosures that cannot wait to be disclosed in the next Form 10-Q or Form 10-K filing"; in that way, it "completes the periodic reporting scheme by supplementing the quarterly and annual reports filed on Forms 10-Q and 10-K." Current Report on Form 8-K: Purpose, Corp. Compl. Series: Securities § 1:52 (2022). Thus, Nutra Pharma cannot satisfy its Section 13(a) obligation to file Forms 8-K reporting certain unregistered sales of equity securities by providing such information in its Forms 10-Q.

### 2. Aid and Abet Liability

"To establish liability for aiding and abetting a violation of the securities laws, the SEC must show '(1) the existence of a securities law violation by the primary (as opposed to the aiding and abetting) party; (2) knowledge of this violation on the part of the aider and abettor[;] and (3) substantial assistance by the aider and abettor in the achievement of the primary violation.'" SEC v. Paulsen, No. 18-CV-6718, 2020 WL 6263180, at *12 (S.D.N.Y. Oct. 23, 2020) (quoting SEC v. DiBella, 587 F.3d 553, 566 (2d Cir. 2009)). "The[se] three requirements cannot be considered in isolation from one another. Satisfaction

of the knowledge requirement will depend on the theory of primary liability, and there may be a nexus between the degree of knowledge and the requirement that the alleged aider and abettor render substantial assistance." SEC v. Espuelas, 908 F. Supp. 2d 402, 409 (S.D.N.Y. 2012) (quoting DiBella, 587 F.3d at 566).

The Court finds Deitsch has raised a genuine dispute of material fact regarding his knowledge of the Section 13(a) violation. As to the knowledge requirement, the Commission must show "defendant's general awareness of [his] overall role in the primary violator's illegal scheme." Paulsen, 2020 WL 6263180, at *14 (citations omitted). So, to prevail here, the Commission needs to show Deitsch knew the underlying facts giving rise to the violation. Put simply, it must be undisputed that Deitsch knew that Nutra Pharma's sales of unregistered stock exceeded the 5% reporting threshold and therefore triggered the company's obligation to file a Form 8-K disclosing the sales. The only evidence in the record as to Deitsch's knowledge is Nutra Pharma's prior Form 8-K filings, which Deitsch signed and approved, made after unregistered stock issuances in 2008 and 2009. However, Defendants point out that the circumstances of those issuances differed from the 2015 Offering. In 2008 and 2009, there was a specific date on which the private placement closed or when subscriptions for unregistered shares were accepted. Conversely, the 2015 Offering involved multiple issuances over an eight-month

period.  Thus, the Court cannot say as a matter of law that Deitsch knew the 5% reporting threshold had been met solely based on his prior conduct as the officer responsible for filings made previously for facially distinguishable, unregistered stock issuances.  A jury will decide whether Deitsch had the requisite knowledge to render him liable as an aider and abettor of Nutra Pharma's 2015 Offering.

> C.   Sections 13(d) and 16(a) Claims

Next, the Commission asserts Deitsch violation Exchange Act Section 13(d) and Rule 13d-2(a) (Claim 8), and Section 16(a) and Rule 16a-3 (Claim 9).

> 1.   Applicable Law

Section 13(d)(1) and Rule 13d-1(a) obligate a stock purchaser who acquires beneficial ownership of 5% or more of a company's securities to disclose his ownership to the SEC by filing a Schedule 13D.  See SEC v. Verdiramo, 890 F. Supp. 2d 257, 273 (S.D.N.Y. 2011) (citing 15 U.S.C. § 78m(1)(D), 17 C.F.R. § 240.12d-1(a)).  Section 13(d)(2) establishes a "continuing obligation on the person filing [the Schedule 13D] to amend his statements '[i]f any material change' occurs," such as "when the person who was required to file the statement 'acquires additional securities in an amount equal to one percent or more of such securities." SEC v. Drexel Burnham Lambert, Inc., 837 F. Supp. 587, 608 (S.D.N.Y. 1993) (cleaned up).  The number of outstanding shares found in the

company's most recent quarterly, annual, or current reports filed with the SEC is used to calculate whether the 1% or 5% thresholds have been reached.  See 17 C.F.R. § 240.13d-1(j).

"Section 16(a) and Rule 16a-3 require every person who is a director or an officer of the issuer of securities to file a Form 4 with the SEC reporting any changes in beneficial ownership, and also to file an annual statement reporting such changes on a Form 5." Verdiramo, 890 F. Supp. 2d at 273 (cleaned up); see also 15 U.S.C. § 78p(a); 17 C.F.R. § 240.16a-3.  A Form 4 must be filed within two business days after the officer's stock purchase or sale, and a Form 5 must be filed within 45 days after the company's fiscal year-end.  See 17 C.F.R. §§ 240.16a-3(g)(1), (f)(1)(ii).  On Form 5, the officer must disclose certain holdings and transactions not previously reported on Forms 3, 4, or 5, including "small acquisitions" of less than $10,000 in aggregate market value within the prior six months that need not be reported on a Form 4. 17 C.F.R. § 240.16a-3(f)(1)(ii); 17 C.F.R. § 240.16a-6(a). Sections 13(d) and 16(a) do not require a showing of scienter to establish liability.  Verdiramo, 890 F. Supp. 2d at 274, n.14.

2.  Application

The undisputed facts establish Deitsch's violation of Sections 13(d) and 16(a).  To begin, Deitsch failed to file any amended Schedule 13D forms during the relevant period -- April 1, 2008 through June 2018 -- even though his ownership of Nutra Pharma

stock increased by more than 1% on at least three occasions during that time.  As a Nutra Pharma officer and director, Deitsch has acknowledged in each Form 10-K he signed that he was subject to Section 16(a)'s reporting requirements.  Yet, Deitsch failed to report acquisitions of Nutra Pharma stock made during the relevant period, including 273 separate purchases of Nutra Pharma common stock in his personal brokerage accounts.  It was not until June 2018 that Deitsch filed a Schedule 13D and Form 4.  Deitsch cites to no authority that these "curative" filings satisfy his obligations under Sections 13(d) and 16(a), and caselaw suggests the opposite.  See SEC v. Sands, 902 F. Supp. 1149, 1165 (C.D. Cal. 1995) (granting summary judgment on Sections 13(D) and 16(a) claims where the defendant-CEO failed to file an amended Schedule 13D and filed an untimely Form 4), aff'd sub nom. SEC v. First Pac. Bancorp, 142 F.3d 1186 (9th Cir. 1998).  Nor is there any support for Deitsch's contention that his disclosure of Nutra Pharma holdings in annual Forms 10-K discharged his obligations under Sections 13(d) and 16(a).  Cf. SEC v. e-Smart Techs., Inc., 82 F. Supp. 3d 97, 105 (D.D.C. 2015) (rejecting similar argument).

## CONCLUSION

Accordingly, for the stated reasons, **IT IS ORDERED** that the Commission's motion (ECF No. 68) is GRANTED as to Claims 7, 8, 9, and 10, and DENIED as to Claim 14.

**IT IS FURTHER ORDERED** that within sixty days from the date of this Memorandum & Order, the parties shall file their joint pre-trial order in accordance with the Court's Individual Rules.

**SO ORDERED.**

/s/ JOANNA SEYBERT
Joanna Seybert, U.S.D.J.

Dated: August  31 , 2022
       Central Islip, New York